UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**BRAY & GILLESPIE**
**MANAGEMENT LLC,**
**BRAY & GILLESPIE,**
**DELAWARE I, L.P.,**
**BRAY & GILLESPIE X, LLC, et al.**
                              **Plaintiffs,**

**-vs-**                                                    **Case No.  6:07-cv-222-Orl-19KRS**

**LEXINGTON INSURANCE**
**COMPANY, BELFOR USA**
**GROUP, INC., BUILDING**
**CONSULTING ASSOCIATES,**
**INC., VERICLAIM, INC.**
                              **Defendants.**
_____

# ORDER

This case comes before the Court on the following:

1.   Motion to Dismiss by Defendant, Belfor USA Group, Inc. (Doc. No. 45, filed July 10, 2007);

2.   Defendant Lexington Insurance Company's Corrected Motion to Dismiss, or for More Definite Statement, and Motion to Strike (Doc. No. 51, filed July 12, 2007);

3.   Motion to Dismiss by Defendant Building Consulting Associates, Inc. (Doc. No. 53, filed July 12, 2007);

4.   Plaintiffs' Memorandum in Opposition to Defendant Belfor USA Group, Inc.'s Motion to Dismiss (Doc. No. 72, July 27, 2007);

5.   Defendant VeriClaim's Motion to Dismiss the Amended Complaint (Dispositive Motion) (Doc. No. 73, filed July 30, 3007);

6.       Plaintiffs' Memorandum in Opposition to Defendant Lexington Insurance
Company's Corrected Motion to Dismiss, or for More Definite Statement, and
Motion to Strike (Doc. No. 76, filed July 30, 2007);

7.       Plaintiffs' Amended Memorandum in Opposition to Motion to Dismiss by Defendant
Building Consulting Associates, Inc. (Doc. No. 77, filed July 30, 2007);

8.       Motion for Leave to File a Reply Brief by Defendant, Belfor USA Group, Inc. (Doc.
No. 79, filed Aug. 3, 2007);

9.       Defendant Lexington Insurance Company's Motion for Leave to File a Reply
Memorandum (Doc. No. 84, filed Aug. 15, 2007);

10.      Plaintiffs' Memorandum in Opposition to Defendant VeriClaim's Motion to Dismiss
the Amended Complaint (Doc. No. 85, filed Aug. 16, 2007);

11.      Plaintiffs' Memorandum in Opposition to Defendant Lexington Insurance
Company's Motion for Leave to File a Reply Memorandum (Doc. No. 87, filed Aug.
24, 2007); and

12.      Plaintiffs' Memorandum in Opposition to Defendant, Belfor USA Group, Inc.'s
Motion for Leave to File a Reply Brief (Doc. No. 88, filed Aug. 24, 2007).

## Background

Plaintiffs[1] filed their Amended Complaint on May 23, 2007.  (Doc. No. 13).  The Amended

Complaint is sixty-five pages in length, includes over 350 numbered paragraphs, and asserts

---

[1]       Plaintiffs are multiple business entities including Bray & Gillespie, LLC, the parent
company for all of the other Plaintiff, which are various Bray & Gillespie subsidiaries.  (Doc. No.
13, ¶¶ 2-8).  As Plaintiffs do not distinguish between themselves in their filings, the Court will refer
to them collectively as "Plaintiffs" or "Bray" for the purposes of this Order.

eighteen causes of action against the Defendants.[2] (*Id.*) Plaintiffs own and operate six resorts in and around Daytona Beach, Florida which were damaged by Hurricanes Charley, Frances and Jeanne during August and September of 2004. (*Id.* at ¶¶ 1-8). The Amended Complaint asserts that Defendants Lexington Insurance Company, Belfor USA Group, Inc., Building Consulting Associates, Inc. ("BCA") and VeriClaim, Inc. conspired to deny Bray the full value of their insurance coverage claims for losses resulting from the hurricanes. (*Id.* at ¶ 1). Additionally, Plaintiffs assert that Lexington breached its insurance policy and contract to repair the properties and that the other Defendants, Befor, BCA and VeriClaim, individually and collectively, interfered with Plaintiffs' contractual relationship with Lexington. (*Id.*)

## I.     The Lexington Insurance Policy

Bray purchased a Commercial Property Policy, Policy Number 7471253, from Lexington to insure their properties for the policy year of March 31, 2004 to March 31, 2005. (*Id.* at ¶ 19; *see also* Doc. No. 13-2). The Lexington Policy was an "All-Risk" policy which covered damage sustained from hurricanes and windstorms. (Doc. No. 13, ¶ 26). The limits of the Lexington Policy are as follows: (1) $25 million per occurrence, with sublimits of $25 million per occurrence for all Real & Personal Property; (2) $25 million per occurrence for all Business Interruption, which

---

[2]     The first 226 paragraphs of Plaintiffs' Amended Complaint contain the general allegations that pertain to each of the eighteen different counts. (Doc. No. 13). Many of the factual paragraphs are voluminous and contain a significant amount of detail. (*See id.*) The balance of the Amended Complaint outlines Plaintiffs' claims against Defendants. (*See id.*) Although each cause of action is separated by a subheading, many causes of action include virtually identical language. (*E.g., compare id.* at ¶¶ 294-300 *with id.* at ¶¶ 301-07). Additionally, none of the eighteen counts makes specific reference to any of general allegations of the Amended Complaint. (*See id.* at ¶¶ 227-358). Rather, each merely incorporates by reference paragraphs one through two hundred twenty-six. (*See id.*) Although this is a proper method of pleading, the voluminous nature of Plaintiffs' Amended Complaint makes it difficult to analyze the sufficiency of Plaintiffs' allegations, specifically because some of Plaintiffs' claims are subject to heightened pleading standards.

includes coverage for Ordinary Payroll; (3) $2.5 million for Interruption of Civil Authority; (4) $20 million Contingent Liability from Operation of Building Laws; and (4) $2.5 million for Newly Acquired Property. (*Id.* at ¶ 27). The Policy stipulates that all adjusted claims are due and payable within thirty days of presentation and acceptance of satisfactory proof of loss by Lexington or its appointed representative. (*Id.* at ¶ 32). The Policy provides for partial payments subject to the policy provisions provided that the insured submits a partial Proof of Loss and supporting documentation. (*Id.* at ¶ 33).

## II.    Plaintiffs' Losses

Each covered hotel sustained damage from Hurricanes Charley, Frances and Jeanne during 2004 and was forced to temporarily or permanently close.[3]  (*See id.* at ¶¶ 23, 42, 55).  In mid-August, Bray notified Lexington that its hotels had suffered damage and loss from Hurricane Charley. (*Id.* at ¶ 43). Lexington hired VeriClaim to investigate, adjust and resolve the claims for damages to the Bray properties after it was notified of the damage from Hurricane Charley. (*Id.* at ¶ 47). Representatives of all Defendants were present when Hurricane Jeanne struck in September. (*Id.* at ¶ 44). Thus, Bray was able to immediately notify Defendants of the associated damage from this storm. (*Id.*)

---

[3]     Damage from Hurricane Charley occurred during August 13 to August 15, 2004. (Doc. No. 13, ¶¶ 35-36).  Damage from Hurricane Frances occurred from September 4 until September 7, 2007. (*Id.* at ¶ 38).  Damage from Hurricane Jean occurred on or about September 25, 2004. (*Id.* at ¶ 40).

III.     **Plaintiffs' Claim of Conspiracy to Deprive them of the Full Value of Their Policy**

After Hurricane Charley, Bray alleges they immediately retained Munters Corporation to assist in the repair, remediation and clean-up of their properties.[4]  (*Id.* at ¶ 46).  However, on August 19, 2004, Lexington's Assistant Vice President/Property Claims implicitly threatened Bray that it would not provide full coverage for the losses from Hurricane Charley unless they hired Belfor to conduct the repair, remediation and clean-up of the properties.  (*Id.* at ¶ 48).  Bray was coerced into terminating Munters and retaining Belfor because they feared that they would be unable to pay their mortgages if they did not receive the full value of the loss.  (*See id.* at ¶ 50).  Bray and Lexington agreed that Lexington would pay Belfor directly.  (*Id.* at ¶ 51).

Lexington assured Bray that they would have "rights to warranty work product" and that VeriClaim would oversee and approve all of the work before Belfor received payment.  (*Id.* at ¶ 52).  VeriClaim retained BCA "to provide direction and scope assessments for dry out of water-damaged areas, demolition of irreparable areas, and repair/replacement of various buildings and to approve the work performed by Belfor."  (*Id.* at ¶ 53).  After Hurricane Charley and throughout the rest of 2004, representatives of Defendants were present to inspect the damage to Bray's properties from the three hurricanes.  (*Id.* at ¶ 45).  Following Hurricane Jeanne, Bray and Defendants created a plan for Belfor to repair all of the hotels in "a timely and efficient manner that would mitigate further business interruption losses."  (*Id.* at ¶ 56).

According to Plaintiffs, Lexington used the other Defendants to engage in a scheme to "frustrate[] the purpose of the all-risk property insurance . . . by engaging in a series of actions that

---

[4]     Although Munters began the remediation work immediately after Hurricane Charley, Hurricane Frances and Jeanne rendered its work useless.  (Doc. No. 13, ¶ 54).

[were] undertaken for the sole purpose of routinely undervaluing claims and paying policy holders less than full value for their covered losses." (*Id.* at ¶ 123). Bray also asserts a litany of allegations that Lexington acted in bad faith and intentionally failed to honor its obligations under its insurance contact with Bray. (*See id.* at ¶¶ 186-226).

Belfor and BCA failed to identify the hurricane damage, produce a comprehensive scope of repair and provide a legitimate cost estimate. (*Id.* at ¶ 128). Belfor performed unnecessary work, used unskilled and undocumented workers which often resulted in further damage to the Bray properties. (*Id.* at ¶¶ 126, 130). Belfor repeatedly overcharged for the work performed. (*See id.* at ¶¶ 134-35). BCA and VeriClaim failed to monitor Belfor's work and continuously approved work that was done improperly. (*Id.* at ¶ 143).

In the beginning of 2005, Bray informed VeriClaim that Belfor's performance was unacceptable and requested that Belfor be replaced. (*Id.* at ¶ 136). However, VeriClaim and BCA insisted that Belfor perform the work and warned Bray that their claim would "not go well" if Belfor was terminated. (*Id.* at ¶¶ 137-38). Thus, Bray felt forced to continue using Belfor. (*Id.* at ¶ 139). Despite Bray's discontent with Belfor's work, Lexington continued to pay Belfor directly. (*Id.* at ¶ 142).

Additionally, Defendants improperly classified Bray's losses as caused by one occurrence, rather than as caused by three separate occurrences. (*Id.* at ¶¶ 125, 146, 147). As a result, Lexington insisted that Bray's coverage was capped at $25 million, rather than $75 million, the amount which would have been covered in the event of three separate occurrences. (*Id.* at ¶ 149). Moreover, Lexington failed to advance to Bray the necessary money they needed to continue operating their hotels. (*Id.* at ¶¶ 150-58). Sometime between the end of April and the beginning of May 2005,

Lexington informed Bray that the remaining limit of their insurance coverage for Hurricane Charley had been paid directly to Belfor.  (*Id.* at ¶ 159).  The fact that Defendants associated all of the damage with Hurricane Charley resulted in Bray receiving less than full compensation for the damage from both Hurricane Charley and Jeanne.[5]  (*Id.* at ¶¶ 160-162).

## IV.    Results of Defendants' Improper Conduct

Lexington's failure to pay Bray caused Bray to shut down some of their operations and layoff a portion of their staff.  (*See id.* at ¶¶ 151-55).  Additionally, Bray have been unable to demolish their destroyed properties to avoid being denied coverage for failing to allow Lexington to investigate.  (*Id.* at ¶ 164).  In March of 2005, Lexington's failure to pay Bray made it impossible for Bray to continue operations.  (*Id.* at ¶¶ 165-68).  In order to avoid bankruptcy, Bray entered a settlement with their excess insurance carriers whereby Bray accepted $63 million in exchange for releasing all rights to collect on the remaining amount of their excess insurance coverage.[6]  (*Id.* at ¶¶ 169-76).

## V.    Belfor's Related Lawsuit Against Bray

On May 12, 2005, Belfor sued Bray for $6.5 million, the difference between the value of the work performed by Belfor and what Lexington paid Belfor.  (*Id.* at ¶¶ 177-78).  Bray contends that Belfor's suit violates the agreement they made with Lexington and Belfor whereby Lexington would

---

[5]      In the fall of 2006, Lexington paid Bray $25 million, the full limit of their coverage, for losses associated with Hurricane Frances.  (Doc. No. 13, ¶ 163).

[6]      Bray's excess insurance carriers were Westchester Surplus Lines Insurance Company and Axis Reinsurance Company.  (Doc. No. 13, ¶ 169).  Westchester and Axis shared a $75 million limit over and above Lexington's $25 million dollar limit for each occurrence.  (*Id.* at ¶ 170).  Thus, Bray was entitled to a total of $225 million from Westchester and Axis for damages from the three storms.  (*Id.*)  By entering settlement, Bray gave up their rights to collect $ 162 million.  (*Id.* at ¶ 174).

directly pay Belfor for all of Belfor's work. (*Id.* at ¶¶ 177, 179). In the lawsuit, Belfor asserts that it received all of the required approvals from Lexington, BCA and VeriClaim but that Lexington had already paid in full for the one occurrence. (*Id.* at ¶¶ 180-81). Bray contends that they would not have authorized further work if they had known Lexington was not going to pay. (*Id.* at ¶ 182). Moreover, Bray contends that Lexington, BCA and VeriClaim conspired with Belfor to approve work for which they knew Lexington would not pay and thus have refused to assist Bray in the Belfor litigation. (*Id.* at ¶¶ 183-85).

## VI.     Defendants' Motions to Dismiss

Each Defendant has moved to dismiss Bray's Amended Complaint. (Doc. Nos. 45, 51, 53, 73). Belfor, BCA and VeriClaim move to dismiss all counts pending against them. (Doc. No. 45, 73, 73). Lexington has moved to dismiss Counts I-IV, VI-X, and XVI-XVII.[7] (Doc. No. 51). Lexington also moves to dismiss or abate Counts XI-XII, Bray's claims for violation of the Florida insurance code. (*Id.*) Each Defendant raises substantially similar arguments with respect to the common counts. (Doc. Nos. 45, 51, 53, 73). Bray opposes each Defendant's Motion by asserting substantially similar arguments. (Doc. Nos. 72, 76, 77, 85). Therefore, the Court will analyze each Defendant's Motion as follows.

### Standard of Review

---

[7]     In the event that Bray's claims are not dismissed, Lexington filed alternative requests for relief with respect to Counts I-IV, IV-X and XVI-XVII. (Doc. No. 51). Lexington moves to dismiss or abate the noncontractual counts to Bray's Amended Complaint, Counts I-III and XVI-XVII. (*Id.*) With respect to Counts VI-X, Lexington moves: (1) for a more definite statement; and/or (2) to strike Bray's demand for attorney's fees. (Doc. No. 51). Lexington requests no relief with respect to Count V of Bray's Amended Complaint, breach of contract for Hurricane Jeanne losses. (*Id.*) Therefore, the Court will not consider the allegations contained in Count V.

For the purposes of a motion to dismiss, the Court must view the allegations of the complaint in the light most favorable to the plaintiffs, consider the allegations of the complaint as true, and accept all reasonable inferences in favor of the plaintiffs. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1532, 1534 (11th Cir. 1994); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  Furthermore, the Court must limit its consideration to the complaint and written instruments attached as exhibits.  Fed R. Civ. P. 12(b); *GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations of the complaint. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1969 (2007).

## Analysis

**I.      Counts I-III:  Plaintiffs' RICO Claims Against all Defendants**

Counts I and II of Bray's Amended Complaint assert civil claims for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, codified as 18 U.S.C. Section 1961, *et seq.*  (Doc. No. 13, ¶¶ 227-249).  Count I of Bray's Amended Complaint asserts that Defendants engaged in a pattern of racketeering activity in violation 18 U.S.C. section 1962(c) and (d), thereby causing injury to Plaintiffs' businesses.[8]  (*See, e.g.,* Doc. No. 13, ¶ 231).  Count II of Plaintiffs' Complaint incorporates the entirety of Count I by reference and asserts that the Defendants engaged

---

[8]      Title 18 U.S.C. Section 1962(c) provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Title 18 U.S.C. Section 1962(d) makes it illegal for any person to conspire to violate section 1962(c).

in a conspiracy to defraud Plaintiffs.  (Doc. No. 13, ¶¶ 240-49).  Count III of Bray's Amended

Complaint asserts a cause of action for civil RICO conspiracy under Florida law.[9]  (*Id.* at ¶¶ 250-58).

The Eleventh Circuit recently addressed the standard for pleading civil RICO claims and held

that such claims are subject to the specificity requirements of Federal Rule of Civil Procedure 9(b).

*Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007) ("Civil RICO

claims, which are essentially a certain breed of fraud claims, must be pled with an increased level

of specificity.")  In order satisfy Rule 9(b), a civil RICO claim must allege:

> (1) the precise statements, documents, or misrepresentations made; (2) the time and
> place of and person responsible for the statement; (3) the content and manner in
> which the statements misled the Plaintiffs; and (4) what the Defendants gained by the
> alleged fraud.

*Id.* at 1316-17 (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81

(11th Cir. 1997)).  When the complaint asserts claims against multiple defendants, it cannot merely

"lump[] together all of the defendants in their allegations of fraud."  *Id.* at 1317.  Rather it must

contain "specific allegations with respect to each defendant" that are sufficient to "'inform each

defendant of the nature of his alleged participation in the fraud.'"  *Id.* (quoting *Brooks*, 116 F.3d at

1381).

Plaintiffs' Amended Complaint fails to meet the requirements for pleading civil RICO claims

set forth in *Ambrosia Coal*.  Foremost, Plaintiffs' Amended Complaint does not contain specific

allegations with respect to each Defendant.  (*See* Doc. No. 13).  After Bray identifies the parties to

the action, it asserts the Defendants constitute an enterprise and lumps all of their general factual

allegations together.  (*See id.* at ¶¶ 1-226).  Moreover, Bray's RICO counts do not allege "the precise

---

[9]      Florida's Civil Remedies for Criminal Practices Act, codified as Florida Statues,
Section 772.101 *et seq.*, is the state analog to the federal RICO Act.

statements, documents, or misrepresentations made" or "the time place of and person responsible

for the statement." (*Id.* at ¶¶ 227-49).  Instead, Bray asserts a series of general allegations which

claim that Defendants engaged multiple instances of mail and wire fraud.  (*See id.*)  The pertinent

allegations of Bray's Amended Complaint are as follows:

> 232. The aforesaid acts are predicate acts constituting racketeering activity under the RICO Act in that they are indictable as multiple instances of mail fraud violations of 18 USC §§ 1341 and 1346; multiple instances of wire fraud violations of 18 USC §§ 1343 and 1346; and multiple instances of travel in interstate commerce to attempt and to actually commit mail fraud, wire fraud, in violation of 18 USC § 1952(a).

> 233. The predicate acts perpetrated against the B&G Policyholders by the enterprise include:

> 234. Violations of the Federal mail and wire fraud statutes, 18 U.S.C. 1341 and 1343, by the transmission of, at least, claim documents, insurance policies, documents relating to the repair and construction of the plaintiffs' property and correspondence mailed to plaintiffs from said enterprise, including all documents mailed or wired on or after March 31, 2004, which were transmitted in interstate commerce by the use of the United States Postal Service and included causing innumerable sounds and communications to be transmitted by means of wire communication in interstate commerce. Thus, these innumerable mailings and wire communications, as acts in pursuit of crimes as aforesaid, become and are violations of the Federal mail and wire fraud statutes.

> 235. Violations of the Federal interstate travel statute, 18 USC § 1952(a), by the travel of agents of the enterprise in interstate commerce to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the enterprises unlawful activity, including but not limited to attempting to commit mail and wire fraud and using said enterprises powers of coercion to control the market for insurance in the State of Florida.

(Doc. No. 13, ¶¶ 232-35).

In response to Defendants' Motions to Dismiss, Plaintiffs' argue that the requirements of

Rule 9(b) are relaxed in the instant case and that they are not required to plead specifics such as

"date, place or time." (*E.g.,* Doc. No. 76, pp. 7-8).  Plaintiffs also contend that they have met the

particularity requirements of Rule 9(b) and cite selected paragraphs from various sections of their

Amended Complaint.  (*Id.* at pp. 6-7).  However, the cited paragraphs are composed of conclusory allegations and do not contain the requisite specifics to plead a civil RICO claim under *Ambrosia Coal*.  Thus, Plaintiffs' federal RICO claim must be dismissed.

A claimant cannot assert a civil RICO conspiracy claim unless he pleads facts sufficient to assert a violation of one of RICO's substantive provisions.  *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 n. 2 (4th Cir. 2001); *Efron v. Embassy Suites (P.R.), Inc.,* 223 F.3d 12, 21 (1st Cir. 2000), *cert. denied,* 532 U.S. 905 (2001).  Because Bray has failed to plead a civil RICO claim, Bray's civil RICO conspiracy claim must be dismissed.

Claims under Florida's RICO act are analyzed in the same manner as claims under the federal RICO act.  *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263-64 (11th Cir. 2004).  Consequently, the pleading requirements for federal and Florida RICO claims are analogous.  *See id.*  Thus, because Bray's federal RICO claim is insufficient, Bray's Florida RICO claim is also insufficient.

Based on the foregoing, Bray's RICO claims (Counts I-III), must be dismissed.

## II.   Counts IV:  Plaintiff's Breach of Contract Claim Against Lexington for Hurricane Charley

Count IV of Bray's Amended Complaint assets a breach of contract claim against Lexington for Hurricane Charley.  (Doc. No. 13, ¶¶ 259-65).  The essential allegation of Bray's claim is that:

> Lexington's conduct, in categorizing all direct payments made to Belfor as covering repairs related to Hurricane Charley, despite being aware that some of the repairs were for losses suffered during Hurricane Jeanne, and refusing to advance to the B&G Policyholders the amounts paid to Belfor that were for Hurricane Jeanne repairs, constitutes a breach of contract for which no justification exists.

(Doc. No. 13, ¶ 262).  Lexington claims that Count IV must be dismissed because Bray "fail[ed] to allege that the $25 million per occurrence limit for all properties for Hurricane Charley has not been paid."  (Doc. No. 51, pp. 14-15).  Lexington cites Paragraph 159 of Bray's Amended Complaint, which provides that:

> In late April or early May, 2005, Lexington asserted that the remaining limit of insurance from Hurricane Charley, the first "occurrence," was paid to Belfor directly by Lexington for its remediation work at various the B&G Policyholders Properties

and argues that Bray admitted that the coverage limit for Hurricane Charley has been paid.  (Doc. No. 13, ¶ 159; Doc. No. 51, pp. 14-15).  Despite Lexington's argument, Paragraph 159 of the Amended Complaint does not admit that all of the entire coverage limit was paid for Hurricane Charley.  (Doc. No. 13, ¶ 159).  It merely states that Lexington asserted that Bray had already been paid in full.  (*See id.*)

In order to plead a claim breach of contract claim under Florida law, a plaintiff must assert the existence of a contract, a breach of such contract, and damages resulting from such breach. *Knowles v. C.I.T. Corp.,* 346 So.2d 1042, 1043 (Fla. 1977).  The allegations of the Amended Complaint are sufficient to plead the required elements for a breach of contract claim.  First, Bray asserts that "The Lexington Policy constitutes a valid and enforceable contract."  (Doc. No. 13, ¶ 260).  Next, Bray asserts that Lexington's failure to pay the full amount of coverage for damages associated with Hurricane Charley was a breach of that contract.  (*See id.* at ¶¶ 262-63).  Finally, Bray asserts that it has sustained damages from Lexington's conduct "including, but not limited to, lost business opportunities, the loss of the time value of money, the lost value of the excess insurance policies, other consequential damages, attorney's fees and expert fees, all of which are compensable."  (*Id.* at ¶ 263).  Because the allegations of Bray's Amended Complaint are sufficient

to plead a breach of contract claim against Lexington with respect to Hurricane Charley, Lexington's Motion to Dismiss Count IV of the Amended Complaint is denied.

## III.    Counts VI-X:  Plaintiffs' Breach of Contract Claims Against Lexington for Each Individual Property

Counts VI-X assert breach of contract claims against Lexington for failure to repair each one of Bray's properties.  (*See* Doc. No. 13, ¶¶ 273-307).  Each count is virtually identical, except for the name of the property at issue.[10] (*Id.*)  In essence, each of Bray's breach of contract claims alleges that: (1) Lexington entered into a new contract with Bray to repair each property because it opted to repair the property and selected Belfor to perform the repair work; (2) Lexington breached each contract because it failed to repair each property within a reasonable time; and (3) Bray sustained damages because of Lexington's breach.  (*See id.*)

Lexington moves to dismiss each breach of contract claim, alleging that Bray has failed to plead the required elements to sustain a breach of contract claim.  (Doc. No. 51, pp. 15-17). According to Lexington, Counts VI-X should be considered claims for breach of separate oral contracts because they each allege that the parties entered a "new" contract but fail to allege the existence of a written contract or to include a copy of such contract.  (*Id.* at p. 16).  In response, Bray alleges that Lexington's decision to pay for the repairs and subsequent selection of Belfor to perform the repair work created a new contract which bound Lexington to repair the properties within a reasonable time.  (Doc. No. 76, pp. 20-21).

---

[10]     Count VI, which asserts breach of contract to repair Treasure Island, contains the additional allegation that Lexington directed Bray to use Belfor for the repair work.  (Doc. No. 13, ¶ 274).  However, this difference is immaterial for the purposes of the Court's analysis.

Under Florida law, when an insurance contract provides an option to for the insurer to either pay for the loss or repair or replace the property, an insurer's decision to repair the property creates a new contract to restore the property within a reasonable time.  *Travelers Indem. Co. v. Parkman*, 300 So. 2d 284, 285 (Fla. 4th DCA 1974) (holding that "when the [automobile] insurer makes its election to repair, that election is binding upon the insured and creates a new contract under which the insurer is bound to restore the vehicle within a reasonable time."); *see also Drew v. Mobile USA Ins. Co.*, 920 So. 2d 832, 835 (Fla. 4th DCA 2006) (applying the holding of *Travelers* to homeowners insurer);  *Arch Roberts & Co. v. Auto-Owners Ins. Co.*, 305 So. 2d 882, 882-83 (1st DCA 1974).  If an insurer makes such an election and then fails to repair the property, the insured may recover damages for loss of use.  *E.g., Travelers,* 920 So. 2d at 835.  However, the insurer must elect to exercise a contractual option to repair.  *Md. Cas. Co. v. Fla. Produce Distrib.*, 498 So.2d 1383, 1384 (Fla. 5th DCA 1986) (insured could not recover damages for loss of use because insurer did not exercise contractual obligation to repair); *see also Drew*, 920 So. 2d at 835 (insurer exercised contractual option to repair);  *Arch Roberts,* 305 So. 2d at 882 (same); *Travelers Indem. Co.,* 300 So.2d at 285 (same).   Bray has not claimed that there was a contractual option to repair within the Lexington Policy or that Lexington exercised such an option.

Because Bray has failed to allege the existence of a written contract or attach a copy of a written contract, Counts VI-X of their Amended Complaint must be analyzed as claims for breach of separate oral contracts.  (*See* Doc. No. 13, ¶¶ 279-307).  Under Florida law, in order "[t]o state a cause of action for breach of an oral contract, a plaintiff is required to allege facts that, if taken as true, demonstrate that the parties mutually assented to 'a certain and definite proposition' and left no essential terms open."  *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So.

2d 297, 300 (Fla. 1st DCA 1999) (quoting *Jacksonville Port Auth., City of Jacksonville v. W.R. Johnson Enters., Inc.*, 624 So.2d 313, 315 (Fla. 1st DCA 1993)).  However in federal court, a claim for breach of contract must be plead in accordance with the notice pleading standard set forth in Federal Rule of Civil Procedure 8(a).  *E.g.,Whitaker v. Lee Mem. Health Sys.,* 177 Fed. Appx. 892, 895 (11th Cir. 2006).  Bray's allegations are sufficient to put Defendants on notice of the basis for Bray's claims and the grounds upon which they rest.  *See id.*  Therefore, Lexington's Motion to Dismiss Counts VI-X must be denied.

**IV.      Counts XI-XII: Bray's Claims Against Lexington Under the Florida Insurance Code**

Count XI of the Amended Complaint asserts a cause of action against Lexington for failure to pay Bray's Hurricane Jeanne claim.  (Doc. No. 13, ¶¶ 308-19).  Bray specifically contends that Lexington has violated the Florida Statutes, Sections 624.155 and 626.9541.  (*Id.* at ¶ 312).  Count XII incorporates the allegations of Count XI, alleges that Lexington willfully disregarded its contractual obligations, and asserts a claim for punitive damages under Florida Statutes, Section 624.155(5).  (*Id.* at ¶¶ 320-23).  Lexington moves to dismiss or abate the aforementioned counts as premature.  (Doc. No. 51, pp. 23-24).

Under Florida law, "[i]t is well established that a statutory claim of bad faith failure to settle does not accrue until the underlying action for insurance benefits is resolved in favor of the insured. . . ."  *Vanguard Fire & Cas. Co. v. Golmon*, 955 So.2d 591, 593 (Fla. 1st DCA 2006); *see also Blanchard v. State Farm Mut. Auto. Ins. Co.*, 575 So. 2d 1289 (Fla. 1981) ("an insured's underlying first-party action for insurance benefits against the insurer necessarily must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue.").  Because the existence of liability and the extent of damages are elements of a statutory bad faith

claim under Florida Statutes, Sections 624.155 and 626.9541, a statutory bad faith claim should be abated or dismissed until the extent of coverage is determined in the underlying breach of contract claims. *Vanguard Fire & Cas. Co.*, 955 So. 2d at 594.

According to the allegations of Plaintiffs' Amended Complaint, Lexington associated all of the damages to Bray's properties with Hurricane Charley and has failed to pay any of the losses associated with Hurricane Jeanne. (*E.g.,* Doc. No. 13, ¶¶ 262, 269). Thus, there been no determination of coverage or the extent of damages with respect to the damage caused by Hurricane Jeanne. Because Counts XI and XII of Plaintiffs' Amended Complaint relate solely to Bray's alleged losses from Hurricane Jeanne, they should be abated as premature. *See O'Rourke v. Provident Life and Acc. Ins. Co.*, 48 F. Supp.2d 1383, 1384-85 (S.D. Fla. 1999) (citing cases and reasoning that Florida courts have recently found that "abatement is . . . preferable over dismissal as a means of postponing the adjudication of issues that have not yet become ripe."); *Mich. Millers Mut. Ins. Co. v. Bourke,* 581 So. 2d 1368, 1370 (Fla. 2d DCA 1991) ("Because [a] bad faith claim does not exist until liability and the extent of damages are determined, we hold that the trial court departed from the essential requirements of law in lifting the abatement of the bad faith claim.")

## V.    Count XIII:  Bray's Claim for Tortious Interference with Contractual Relationship Against Belfor

Count XIII of Bray's Amended Complaint asserts that Belfor knowingly and intentionally interfered with Bray's contractual relationship with Lexington and caused Lexington to refuse to perform its obligations under the policy. (Doc. No. 13, ¶¶ 324-29). Bray specifically claims that:

> Belfor intentionally and without justification interfered with the relationship between Lexington and the B&G Policyholders by: (1) performing unnecessary and/or improper work that resulted in Belfor receiving monies that should have been paid

> to the B&G Policyholders; and (2) continually designating all damage caused by
> Hurricane Jeanne as damage caused by Hurricane Charley.

(*Id.* at ¶ 327).   According to Bray, BCA's actions caused Lexington to refuse to perform its

obligations under the policy and resulted in Bray receiving less than full coverage.   (Doc. No. 13,

¶¶ 328-29).   Belfor moves to dismiss Bray's claim and alleges that Bray's allegations are devoid of

factual support.   (Doc. No. 45, pp. 32-33).

Under Florida law, the elements of tortious interference are: (1) the existence of a business

relationship, even if not evinced in a formal written agreement; (2) that the defendant knew of the

relationship; (3) the defendant intentionally and unjustifiedly interfered with the relationship; and

(4) damage to the plaintiff as a result of the breach of the relationship.   *Ethan Allen, Inc. v.

Georgetown Manor, Inc.,* 647 So. 2d 812, 814 (Fla. 1994).   One cannot tortiously interfere with a

contract to which it is a party.   *E.g., Ethyl Corp. v. Balter*, 386 So.2d 1220, 1224 (Fla. 3d DCA

1980).   Consequently, an agent generally cannot be held liable for tortiously interfering with the

contract of its principle because the agent is privileged to act in the best interest of the principle.

*Sloan v. Sax,* 505 So. 2d 526, 528 (Fla. 3d DCA 1987).   However, the agent can be considered a

third party to the contract for the purposes of a tortious interference claim if the agent acts outside

the scope of agency or is not acting in the principle's best interests. *Id.* (holding that employee who

was not acting in his employer's best interest when he encouraged his employer to terminate a

contract satisfied the third party requirement); *see also Rudnick v. Sears, Robuck & Co.,* 358 F. Supp

2d 1201, 1206 (S.D. Fla. 2005) ("However, Florida courts have also clarified that the privilege to

interference enjoyed by a party that is integral to the business relationship is not absolute. The

privilege is divested when the defendant acts solely with ulterior purposes and the advice is not in

the principal's best interest.").

Claims for tortious interference do not have to be plead with specificity.  *See Proctor & Gamble, Co v. Haugen*, 222 F.3d 1262, 1279 (10th Cir. 2000) (tortious interference with business relationship claims must be plead in accordance with federal standard set forth in Federal Rule of Civil Procedure 8(a)).  Under the Federal Rules a plaintiff is only required to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Bray's Amended Complaint alleges that: (1) it had a business relationship with Lexington, in the form of an insurance contract; (2) Belfor knew of the relationship because it was selected by Lexington to perform the repair work; (3) Belfor intentionally interfered with Bray's relationship by performing unnecessary work and misclassifying the losses as caused by Hurricane Charley; and (4) Bray suffered damages.  (*See* Doc. No. 13, ¶¶ 324-29).   Thus, Bray has stated sufficient allegations to sustain a tortious interference with contract claim against Belfor.  Consequently, Belfor's motion to dismiss Count XIII must be denied.

## VI.     Count XIV:  Bray's Claim for Tortious Interference with Contractual Relationship Against BCA

Count XIV of Bray's Amended Complaint asserts that BCA knowingly and intentionally interfered with its contractual relationship with Lexington.  (Doc. No. 13, ¶ 330-33).   Bray specifically alleges that:

> BCA intentionally and without justification interfered with the relationship between Lexington and the B&G Policyholders by: (1) continually designating all damage caused by Hurricane Jeanne as damage caused by Hurricane Charley; (2) failing to provide accurate or proper scopes of work and damage to Lexington; and (3) approving Belfor's request to perform work at the B&G Policyholders Properties that BCA knew was unnecessary and/or improper.

(*Id.* at ¶ 333).  According to Bray, BCA's actions caused damages because Lexington refused to perform its obligations under the policy and did not provide Bray with full coverage.  (Doc. No. 13, ¶¶ 334-35).

BCA moves to dismiss Count XIV of the Amended Complaint.  (Doc. No. 53, p. 5).  BCA argues that Bray's allegations are illogical and devoid of factual support.  (*Id.* ("The Plaintiff attempts, through the use of bold-faced assertions, to show an intention by BCAI to improperly or inaccurately prepare scope and estimate.")).  BCA argues that it would be illogical for it to interfere with Plaintiffs' relationship with Lexington because it had a financial interest in finding additional damages.   (Doc. No. 53, p. 5).  BCA also contends that: (1) Bray admitted that it was paid for the losses caused by Hurricanes Charley and Frances and (2) that "the damage allegedly done by Jeanne was not disclosed by Plaintiff until such time that BCAI was not [sic] longer engaged by Lexington or VeriClaim."[11]  (*Id.*)

The Amended Complaint alleges: (1) Bray had a valid contract with Lexington; (2) BCA knew of Bray's relationship; (3) BCA intentionally interfered with Bray's relationship; and (4) Bray suffered damages.  (Doc. No. 13, ¶¶ 330-35).  BCA's argument that it would not interfere with Bray's relationship because it had a financial interest in finding more damages is irrelevant because a plaintiff does not need to establish that the interference was intended to secure a business advantage.  *Taminami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127-28 (Fla. 1985) (reasoning that a party can interfere with a contract out of malice rather than greed).  Therefore, Bray has

---

[11]    BCA's factual arguments are not relevant for the purposes of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) because such motion merely tests the sufficiency of the complaint.  *See Brown v. Crawford County, Ga.* 960 F.2d 1002, 1010 (11th Cir. 1992) (motions under Federal Rule of Civil Procedure 12(b)(6) test the legal sufficiency of the allegations and allow a court to dismiss an action based on dispositive issues of law).

alleged all of the required elements to sustain a cause of action for tortious interference and BCA's

motion to dismiss Count XIV must be denied.

## VII.    Count XV:  Bray's Claim for Tortious Interference with Contractual Relationship Against Vericlaim

Count XV of Bray's Amended Complaint asserts that VeriClaim knowingly and intentionally

interfered with Bray's  contractual relationship with Lexington and caused Lexington to refuse to

perform its obligations under the policy.  (Doc. No. 13, ¶¶ 336-41).  Bray specifically claims that:

> VeriClaim intentionally and without justification interfered with the relationship
> between Lexington and the B&G Policyholders by: (1) failing to properly adjust the
> B&G Policyholders' claims for losses suffered during the 2004 hurricanes; (2)
> continually designating all damage caused by Hurricane Jeanne as damage caused
> by Hurricane Charley; and (3) encouraging the B&G Policyholders to continue to
> retain Belfor despite VeriClaim's knowledge of Belfor's inability to properly
> perform its work.

(*Id.* at ¶ 339).  According to Bray, VeriClaim's actions caused damages because VeriClaim

prevented Bray from receiving full coverage under the Lexington policy.  (Doc. No. 13, ¶¶ 340-41).

VeriClaim contends that it had a privilege to interfere with the Lexington policy because:

(1) Lexington delegated its privilege to interfere to VeriClaim when it retained VeriClaim to

investigate Bray's coverage; and (2)  its interference was justified as a means of protecting its own

economic interests under its agreement with Lexington.  (*Id.* at p. 21).

VeriClaim's argument misconstrues the purpose of a motion to dismiss under Federal Rule

12(b)(6).  In deciding a Rule 12(b)(6), the Court is limited to the allegations of the pleadings.  Fed

R. Civ. P. 12(b); *GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  Although

VeriClaim's arguments could constitute a valid defense, VeriClaim's alleged justification is not a

proper reason to grant its motion to dismiss because this would require consideration of facts beyond

what is alleged in the Amended Complaint.  *See, e.g., Monco Enters., Inc. v. Ziebart Corp.*, 673 So.2d 491, 492 (Fla. 1st DCA 1996) ("The question of whether an action is privileged is a jury question."); *Heavener, Ogier Servs., Inc. v. R.W. Fla. Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982) (the decision as to whether a defendant's interference was justified involves "balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important."); *Wachekhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. 4th DCA 1980) ("the burden shifts to the interferer to establish that the interference was justified."); *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1224-25 (Fla. 3d DCA 1980) (determination of privilege to interfere required consideration reason for corporation's action).

Therefore, VeriClaim's motion to dismiss Count XV is denied.

## VIII. Count XVI:  Bray's Civil Conspiracy Claim for Breach of Contract to Repair for Hurricane Charley Against all Defendants

Count XVI of Plaintiffs' Amended Complaint incorporates the entirety of Count IV (breach of Contract for Hurricane Charley Losses) and alleges that Defendants "conspired to allow Lexington to unlawfully breach the Lexington Policy and deprive [Bray] of the value of its rights under the Lexington Policy."  (Doc. No. 13, ¶¶ 342-43).  In furtherance of the conspiracy, Defendants "identified all damage caused by Hurricane Frances and Jeanne as damage caused by Hurricane Charley," and "fail[ed] to adjust the loss and assisted Lexington in denying [Bray's] claim for Hurricane Jeanne losses by assisting in Lexington's endless investigation."  (*Id.* at ¶¶ 344-45).

Defendants move to dismiss Count XVI, contending that Bray's claim is barred by Florida's economic loss rule.  (*E.g.,* Doc. No. 45, pp. 31-32; Doc. No. 51, pp. 20; Doc. No. 53, p. 6; Doc. No. 73, pp. 23-25).  Florida's economic loss rule applies when" (1) "the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract;" or (2) "there is a defect in a product that causes damage to the product but causes no personal injury or damage to other property."  *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.2d 532, 536 (Fla. 2004). In order for the contractual application of the economic loss rule to apply, the parties must be in privity of contract.  *Id.* at 536-37.  Plaintiffs' Amended Complaint fails to allege the existence of a contractual relationship with Defendants Belfor, BCA and VeriClaim.  (Doc. No. 13).  Rather, Plaintiffs' civil conspiracy allegations with respect to Defendants Belfor, BCA and VeriClaim pertain solely to Plaintiffs' contract with Lexington.  (*Id.* at ¶¶ 336-41).  Therefore, the arguments of Defendants Belfor, BCA and VeriClaim are not well taken.

Under Florida law, a cause of action for civil conspiracy requires: (1) an agreement between two or more parties; (2) to perform an unlawful act; (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy.  *Fla. Fern. Growers Ass'n, Inc. v. Concerned Citizens of Putman County*, 616 So.2d 562, 565 (Fla. 2d DCA 1993).  Thus, "an actionable conspiracy requires an actionable underlying tort or wrong."  *Id.*

Each Defendant moves to dismiss Count XVI and argues that Bray failed to allege an actionable underlying tort or wrong.  (Doc. No. 45, p. 33; Doc. No. 51, pp. 18-20; Doc. No. 53, p. 6; Doc. No. Doc. No. 76, pp. 25-26).  Tortious interference with a business relationship can constitute an unlawful act for the purposes of pleading a claim for civil conspiracy.  *Am. Diversified Ins. Servs., Inc. v. Union Fid. Life Ins. Co.*, 439 So.2d 904, 907 (Fla. 2d DCA 1983) (holding that

claim for interference with business relationship can constitute unlawful act for purposes of pleading a civil conspiracy claim); *see also Furmanite Am., Inc. v. T.D. Williamson, Inc.*, — F. Supp.2d —, 2007 WL 0000254, * 12 (MD. Fla 2007) (denying summary judgment in civil conspiracy claim based tortious interference).   The Court previously held that Bray pled a cause of action for tortious interference with the Lexington Policy against Defendant other than Lexington.   (*Supra - Analysis, Part V-VII*).   Because Bray has pled all of the required elements for a claim of civil conspiracy, the Motions to Dismiss Count XVI of Defendant Belfor, BCA and VeriClaim are denied.

Plaintiffs failed to oppose Lexington's argument with respect to Count XVI.   (Doc. No. 73).   Failure to oppose a motion raises an inference that the party does not object to such motion.   *See, e.g., Freshwater v. Shiver*, Case No. 6:05-cv-756; 2005 WL 2077306, at *2 (M.D. Fla. Aug. 29, 2005).   Later filings indicate that Bray wishes to withdraw Count XVI of its Amended Complaint against Lexington.   (Doc. No. 77, p. 7 n.3).   Based on the foregoing, the Court dismisses Count XVI solely with respect to Defendant Lexington.

## IX.     Count XVII:  Bray's Claim for Civil Conspiracy to use Coercive Power Against all Defendants

Count XVII of Plaintiffs' Amended Complaint alleges that Defendants "entered into a conspiracy to utilize their coercive power and conspired to deprive [Bray] of their full rights under the Lexington Policy."   (Doc. No. 13, ¶ 348).   Plaintiff alleges that:

> Due to the Defendants' alleged expertise, both independently and cumulatively, in remediation work, Defendants were in a position to use their power of coercion to deprive the B&G Policyholders of its [sic] rights under the Lexington Policy by encouraging the B&G Policyholders to consider the losses it suffered as caused by one occurrence, rather than the three occurrences that actually occurred.

-24-

(*Id.* at ¶ 349).   In furtherance of the conspiracy, Defendants "identified all damage caused by Hurricane Frances and Jeanne as damage caused by Hurricane Charley," and "fail[ed] to adjust the loss and assisted Lexington in denying [Bray's] claim for Hurricane Jeanne losses by assisting in Lexington's endless investigation."  (*Id.* at ¶¶ 350-51).   Each Defendant moves to dismiss Count XVII and contends that Bray has failed to plead a cause of action for conspiracy by coercion. (*E.g.,* Doc. No. 45, p. 33 n. 21, Doc. No. 51, pp. 20-22; Doc. No. 73, pp. 26-27).

Florida law recognizes an independent cause of action for conspiracy by coercion, without the need to plead an actionable wrong, when "the plaintiff can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess . . . ."  *Churruca v. Miami Jai-Alai, Inc.*, 353 So.2d 547, 550 (Fla. 1977).  "The essential elements of this tort are a malicious motive and coercion through numbers or economic influence."  *Id.*  In order to have an actionable claim, the defendants' concerted action must result in different or larger damages than could have been accomplished by the individual conspirators on their own.  *Kee v. Nat'l Reserve Life Ins., Co,*, 918 F.2d 1538, 1542 (11th Cir. 1990).

The allegations of Count XVII do not allege malice on the part of Defendants.  (Doc. No. 13, ¶¶ 347-52).  Moreover, Plaintiff's allegations are insufficient to indicate that Defendants' concerted action caused greater or different damage than Lexington could have accomplished individually.  The allegations Count XVII of the Amended Complaint assert that the Defendants conspired to deprive Bray of their rights under the Lexington Policy by classifying the damage as caused by one occurrence.  (Doc. No. 13, ¶¶ 348-50).  Plaintiffs' individual causes of action against Lexington also allege that Lexington intentionally misclassified the damages to Bray's properties to deny them full coverage under the policy.  (*E.g., id.* at ¶¶ 48 ("Lexington threatened Bray that it

would hinder their ability to retain full coverage); 262 (Lexington categorized all payments as related to damage from Hurricane Charley)).   Moreover, Plaintiffs allege the same damages from Defendants' conspiracy to assert their coercive influence as their other counts against Defendants, both individually and collectively.  (*E.g., compare* Doc. No. 13, ¶ 263 *and id.* ¶ 329, *with id.* at ¶ 352). Thus, Bray has failed to plead different or greater damages caused by the conspiracy than any Defendant could have accomplished on its own.  (*See* Doc. No. 13, ¶¶ 347-52).   Therefore, Count XVII must be dismissed.

**X:      Count XVIII:  Bray's Claim for Civil Conspiracy to Tortiously Interfere with Contractual Relationship Against Belfor, BCA and VeriClaim**

Count XVIII of the Amended Complaint incorporates Counts XIII-XV (Tortious Interference Counts) and asserts that Belfor, BCA and VeriClaim conspired with each other to tortiously interfere with Bray's contractual relationship with Lexington.  (Doc. No. 13, ¶¶ 353-54).  In furtherance of the conspiracy, Defendants "identified all damage caused by Hurricane Frances and Jeanne as damage caused by Hurricane Charley," and "fail[ed] to adjust the loss and assisted Lexington in denying [Bray's] claim for Hurricane Jeanne losses by assisting in Lexington's endless investigation." (*Id.* at ¶¶ 355-56).  Similarly, to Count XVI, Defendants Belfor, BCA and VeriClaim move to dismiss Count XVIII because: (1) Bray's claim is barred by Florida's economic loss rule; and (2) Bray failed to allege an actionable underlying tort or wrong.  (Doc. No. 45, pp. 31-33; Doc. No. 53, p. 6; Doc. No. Doc. No. 76, pp. 23-26).

Under Florida law, a cause of action for civil conspiracy requires: (1) an agreement between two or more parties; (2) to perform an unlawful act; (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to plaintiff as a result of the acts done under the conspiracy.  *Fla.*

*Fern. Growers Ass'n, Inc. v. Concerned Citizens of Putman County*, 616 So.2d 562, 565 (Fla. 2d DCA 1993).  Thus, "an actionable conspiracy requires an actionable underlying tort or wrong." *Id.* Bray has plead causes of action for tortious interference with contract. (*Supra - Analysis, Parts V-VII*).  A claim for civil conspiracy can be based on a party's tortious interference with contract. (*Supra - Analysis Part IX*).  Because Bray has plead all of the requirements for civil conspiracy, the Motions to Dismiss Count XVIII of Defendants Belfor, BCA and VeriClaim are denied.

### Conclusion

The Court **GRANTS IN PART and DENIES IN PART** the Motions to Dismiss of Defendants Belfor, Lexington, BCA and VeriClaim   (Doc. Nos. 45, 51, 53, 73) as follows:

1.    The Motions to Dismiss Counts I-III, and XVII **GRANTED**, and such counts are dismissed;

2.    The Motion to Dismiss Count XVI is **GRANTED** with respect to Defendant Lexington only and **DENIED** as to Defendants Belfor, BCA, and VeriClaim; such count remains pending against Defendants Belfor, BCA and VeriClaim;

3.    Counts XI and XII are **ABATED** pending conclusion of the remaining claims in this case; and

4.    The Motions to Dismiss Counts IV, VI-X, XIII-XV and XVIII are **DENIED**.  Such counts remain pending.

The Court **DENIES AS MOOT** Belfor's Motion for Leave to File a Reply Brief (Doc. No. 79) and Lexington's Motion for Leave to File a Reply Memorandum (Doc. No. 84).

Plaintiffs shall have ten (10) days from the date of this Order to file a Second Amended Complaint which comports with this Order.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on October 5, 2007.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record