IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BRAY & GILLESPIE MANAGEMENT,
LLC, et al,

    Plaintiffs,

-vs-                                              Case No.: 6:07-cv-222-Orl-19KRS

LEXINGTON INSURANCE COMPANY, a
Delaware Corporation, BELFOR USA
GROUP, INC., a Colorado Corporation,
BUILDING CONSULTING ASSOCIATES,
INC., an Illinois Corporation, and
VERICLAIM, INC., a Delaware Corporation,

    Defendants.
_____/

## ORDER AND RECOMMENDATIONS OF SPECIAL MASTER ON PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES FROM BELFOR USA GROUP, INC.

On August 15, 2008, Plaintiffs Bray & Gillespie Management, LLC et al. ("B&G") filed its "Motion to Compel Production of Documents and Answers to Interrogatories from Belfor USA Group, Inc." ("Motion to Compel"). On August 29, 2008, Defendant Belfor USA Group, Inc. ("Belfor") responded with its ""Memorandum In Response to Plaintiff's Motion to Compel ("Response").

The Motion addresses three Interrogatories and four Requests to Produce that B&G feels have not been appropriately answered by Belfor. All were propounded by B&G on December 14, 2007 and responded to by Belfor on April 30, 2008. Each of the three Interrogatories and each of the four Requests to Produce have been the subject of follow up "modifications" by B&G which generally sought to clarify, limit or narrow the scope of the original discovery. All such "modifications" have been confirmed in written correspondence from B&G to Belfor. For purposes of this Order and Recommendation, it will be assumed that the original discovery submitted has been thus amended to fit the scope and meaning of the confirmed "modifications".

**B&G INTERROGATORY #1** (Seeking "identification"[1] of all entities and individuals who performed Work on behalf of Belfor on the B&G Properties).

---

[1] As that term is extensively defined in the "Definition" section of B&G's Interrogatories.

Belfor first objects to this Interrogatory on the grounds that it has "absolutely no relevance" to the legal issues involved in this case. Belfor then seeks to answer the interrogatory despite that objection by referring B&G to what are admittedly "extremely voluminous" documents previously produced to B&G in another lawsuit.

The scope, necessity, and value of the work done by Belfor on the B&G properties is a central issue in this lawsuit. The identification of the companies and people who performed that work is relevant and appropriate for discovery.

As a general matter, identifying corporations, entities, or individuals who were *directly* retained or employed by Belfor to perform Work on the Properties, by reference to admittedly "voluminous" documents (including such things as e-mail traffic and minutes of meetings) is not an appropriate manner of responding to this Interrogatory. Belfor should be able to answer the Interrogatory without a reference to global job files. On the other hand, responding to this Interrogatory with its imposed definition of "Identify" as including such things as giving an individual's "age", "condition of health", "present or former relationship with any of the parties to this action" is equally inappropriate and, until and unless further facts emerge in these proceedings, ventures into irrelevancy.

Based upon the foregoing, it is the ORDER and RECOMMENDATION of the Special Master that Belfor shall be compelled to respond to B&G Interrogatory #1 as follows:

a) Identify (as the term is defined for describing corporations and business entities) all corporations or business entities (subcontractors, suppliers, vendors, etc.) Belfor retained or engaged to perform Work on the B&G Properties (including any such individuals or entities who provided Belfor with laborers for Work on the B&G Properties);

b) Identify, by name, job title, and last known address, all individuals Belfor directly employed or retained to perform Work on the B&G Properties. If specific employee files exist that contain additional identifying information requested in the definition of "Identify" those documents should be specifically referenced.

c) To the extent Belfor has documentation listing the names of individuals employed or otherwise retained by *other* entities, i.e., Belfor's subcontractors, vendors, etc., who performed Work on the Properties, those documents should be specifically referenced. Otherwise, Belfor will not be compelled to "identify" individuals hired by its subcontractors, suppliers or vendors.

**B&G INTERROGATORY #3** (Seeking information concerning prior or continuing relationships between Belfor and Co-Defendants, Lexington, VeriClaim, and BCA).

This interrogatory was "modified" by B&G in subsequent correspondence to seek only (1) contractual relationships Belfor has with Lexington/AIG and its affiliates, (2) the

gross and net value of annual work done by Belfor for Lexington/AIG as well as their respective, "policy holders and . . . affiliates' policy holders", (3) the number of projects performed annually under "that contract" and (4) any other prior or ongoing relationships, contracts, or agreements that Belfor may have with Lexington, VeriClaim, or BCA. *Motion, p.3.*

Belfor objected to this Interrogatory on two grounds. First, Belfor asserts the Interrogatory, as phrased, is overly broad. Secondly, Belfor asserts the information sought is not relevant to this case.

Another centerpiece to the allegations raised in the Amended Complaint is the notion that Belfor, Lexington, VeriClaim and BCA engaged in a systematic, cooperative program to deprive B&G of the full benefits of its property damage insurance policies. It has been asserted by B&G that Belfor is a "preferred" remediation contractor historically used by Lexington to remediate policy holder property losses, and that VeriClaim was also a "preferred" adjusting consultant who worked with Belfor and Lexington. It has further been asserted that Lexington recruited Belfor, VeriClaim and BCA to participate in adjusting and remediating the property damage loss claims reported by B&G to Lexington. According to B&G, the remediation program thus initiated to deal with its property losses featured, among other things, an arrangement in which Belfor was directly paid by Lexington for work on the damaged properties defined and approved by VeriClaim and BCA – all without input from B&G or regard to their interests. The allegations of this case, if true, certainly indicate that the defendants had a "relationship" for purposes of managing and utilizing B&G's insurance proceeds to remediate B&G's Properties.

Evidence of any prior instances of this sort of arrangement among these defendants is relevant to the issues raised in this case.

The subject interrogatory (as modified) asking for information as to "prior or ongoing relationships, contracts, or agreements that Belfor may have with Lexington, VeriClaim, or BCA" is sufficiently phrased to capture such other arrangements, if they exist. The only problem is whether the language used is overly broad as phrased. The general term, "relationship" can mean almost anything, including circumstances that do not involve construction or property damage remediation programs. Further, asking for the annual dollar value of work performed, "for Lexington/AIG, its various policy holders, and its affiliates' policy holders" is also problematic. It presupposes that Belfor would know (1) who, among its list of clients would be Lexington/AIG policy holders and, (2) who, among all the insurance carriers with whom it has dealt, are AIG "affiliates" as well as, (3) who, among its list of clients, would be policy holders of those affiliates. It also presupposes that Belfor's business and financial records would be indexed or organized in a manner to allow this data to be determined – circumstances which have been denied by Belfor. *Response, Exhibit "H", p. 3.* Perhaps the better method of discovering this information would be to take a phased approach by first laying the foundation that these defendants, in one combination or another, have actually operated together under comparable circumstances and, if so, a general description of the

project(s) involved. Once that data is determined, the prospect and appropriate manner of proceeding with further discovery for more specifics can be re-evaluated.

Based upon the forgoing, it is the ORDER and RECOMMENDATION of the Special Master that Belfor shall be compelled to respond to B&G Interrogatory #3 as follows:

 a) identify all express contractual relationships directly or indirectly involving the performance of construction or property damage remediation work, if any, Belfor has had with Lexington Insurance Co, or AIG Insurance Company, from January 1, 2001 to April 30, 2008, and,

 b) state the number of known construction or property damage remediation work projects Belfor has undertaken for Lexington, AIG, or known Lexington, AIG policy holders from January 1, 2001 to April 30, 2008, and,

 c) identify all express contractual relationships directly or indirectly involving the performance of construction or property damage remediation work, if any, Belfor has had with VeriClaim or BCA from January 1, 2001 to April 30, 2008, and,

 d) state whether or not there have been instances occurring from January 1, 2001 to April 30, 2008 in which Belfor, on the one hand, and Lexington, VeriClaim and BCA (or any combination thereof), on the other hand, were involved in construction or property damage remediation work under the same general working relationship described in the Amended Complaint, i.e., Lexington making direct payments of insurance proceeds to Belfor for work directed, approved or verified by VeriClaim and/or BCA.

 1. If "Yes", please generally identify each such project by name, Belfor file or reference number, if any, dates of commencement and completion, and location. .

**B&G INTERROGATORY # 5** (Seeking a description of any actions taken by Belfor to monitor, oversee, or qualify laborers retained to perform Work on the Properties, including ensuring that they were "legally documented").

In this Interrogatory, B&G is seeking a description of actions taken by Belfor to oversee or monitor the performance of "anyone retained, contracted, or hired by Belfor" to perform Work on the Properties, as well as a description of actions taken by Belfor to ensure that "Laborers and other employees" were skilled and "legally documented". *Motion p. 5.* The inquiry was later clarified to limit its scope to only the timeframe in which Belfor actually worked on the Project.

Belfor responded to the Interrogatory by objecting to its relevancy and asserting that it would be unduly burdensome to reveal this information.

The bulk of the information sought is relevant. As noted earlier, the quality and value of the work performed is a significant theme in this case. Inquiries as to the steps taken, if any, to qualify the skills of those working on the project, and to oversee or monitor their activities on the project are relevant to the issues raised in this action. Absent further development of some additional facts, however, whether or not steps were taken to insure the laborers were "legally documented" is not relevant to anything raised in the pleadings thus far.

Describing whatever quality control measures Belfor may have had in place for qualifying, monitoring and overseeing the work done on the B&G Properties by its own employees is not unduly burdensome. To the extent those measures might have also involved confirming the skills of subcontractor, supplier or vendor employees or laborers and monitoring or overseeing the work performed by those subcontractors, suppliers or vendors, they can also be described without undue hardship.

In its Response, Belfor agrees "general" information in this respect can be provided without problem. According to Belfor, however, the interrogatory seeks to capture every specific instruction given to every individual employee who did any work on the B&G Properties and, as such, is unduly burdensome. That, however, is not what the Interrogatory asks for. "Describe what actions you took, if any, to oversee or monitor the activities" of those working on the Project and, "what actions you took to insure the Laborers and other employees were skilled" does not, on its face, require a day-by-day account of each and every instruction given to each and every person working on the Project.

Based upon the forgoing, it is the ORDER and RECOMMENDATION of the Special Master that Belfor be compelled to Respond to B&G's Interrogatory #5 as follows:

a) describe what actions were taken by Belfor, if any, to oversee or monitor activities of persons or entities retained, contracted or hired by Belfor to perform Work on the Properties, and

b) describe what actions were taken by Belfor, if any, to ensure Laborers and other employees were sufficiently qualified, trained, or otherwise skilled enough to perform the tasks assigned to them.

**B&G REQUEST FOR PRODUCTION #2** (Seeking production of, "all documents referring, relating to, or supporting or reflecting allegations set forth in the Complaint").

According to B&G, Request #2 was first "modified" in a July 14, 2008 letter to counsel for Belfor to limit its application to nothing more than "job cost journals prepared

for B&G Properties". *Motion, p. 8.*[2] This modification, however, was apparently modified once again in an oral conversation between counsel occurring on August 15, 2008 to include whatever "special purpose snap shot [financial] reports" Belfor created for the Work done on the B&G Properties, as well as any other, "special purpose [financial] reports" or "job cost journals" created by Belfor regarding hurricane related remediation work done for "other companies". *Motion, p.8-9.*

Belfor objected to the first version of this Request as being vague, overly broad, ambiguous, unduly burdensome, and not in compliance with F.R.C.P. Rule 34(b). Belfor has further objected to the "modifications" as "an attempt to belatedly propound an entirely new production request outside the cut-off previously established by the Court for the issuance of written discovery" *Response, p.20.* Belfor's objections have merit.

The original Request for Production #2 is not in compliance with F.R.C.P. 34(b) as it fails to describe the documents requested with "reasonable particularity". *See, Gupta v/ Walt Disney World Co.* 2006 WL 2724899 (M.D. Fla. 2006). Even if it was an appropriately phrased Request, the ultimate "modification" cannot be readily construed to fall within its meaning. Financial records concerning Belfor's work for B&G, and certainly Belfor financial records dealing with job costs incurred on other projects, would not necessarily be documents contemplated by the description, "all documents referring, relating to, or supporting or reflecting allegations set forth in the Complaint". The former does not "modify" the latter as much as it re-creates it. If B&G wishes to seek production of specific Belfor financial records related to the B&G Work beyond those already produced in response to other Requests, it should first seek leave of Court to extend the time allowed for written discovery and, if granted, file an appropriately phrased Request for Production.

Based upon the forgoing, it is the ORDER and RECOMMENDATION of the Special Master that B&G's Motion to Compel as to Request For Production of Documents #2 be DENIED.

**B&G REQUEST FOR PRODUCTION #5** (Seeking production of "all communications" between Belfor and Lexington, VeriClaim, and BCA).

**B&G REQUEST FOR PRODUCTION #6** (Seeking production of "all communications" between Belfor and Willard Prediger (a former BCA employee) and Construction Consulting Associates, as well as "any and all of its past, present, and/or future divisions, parents, subsidiaries, affiliates, directors, officers, employees, agents, shareholders, assigns, heirs, executors, administrators, trustees, personal representatives, attorneys, and all representatives and other persons acting on their behalf".

---

[2] The July 14, 2008 letter from B&G's attorneys to Belfor's attorneys attached to B&G's Motion as part of Exhibit "E" does not refer to this particular "modification". Both parties, however, have agreed a written modification was made on that date. *See, Response, p. 19.*

These Requests were subsequently "modified" by B&G to limit their application to requesting production of all "communications"[3] between the named parties occurring between January 2001 and December 2006 and only as to such communications received or authored by management level or salaried employees.

Both requests have been objected to by Belfor as being overly broad, chiefly because they are not limited to the transactions and events described in the Amended Complaint. Additionally, Belfor has objected to Request #6 on the grounds that the third party entities and individuals described (presumably related to Construction Consulting Associates) are inadequately identified. Belfor's objections have merit.

B&G argues these Requests for Production are appropriate in light of its interest in pursuing other "relationships" among the co-defendants that may have mirrored the relationship alleged in the instant Complaint. If and when a foundation is established that such comparable relationships existed and can be reasonably identified, a more focused Request for Production of Documents aimed at those specific transactions might be appropriate. In the meantime, these Requests are overly broad, unduly burdensome, and fail to meet the requirements of F.R.C.P. Rule 34(b).

Based upon the forgoing, it is the ORDER and RECOMMENDATION of the Special Master that B&G's Motion to Compel as to Request(s) For Production of Documents #5 and #6 be DENIED.

**B&G REQUEST FOR PRODUCTION #19** (Seeking production of all documents pertaining to "Laborers", "employment of Laborers" and "hiring, training and documentation of Laborers").

In the context of this Request, "Laborers" is defined by B&G to mean "any human beings or natural persons" who performed any "type of work on the Properties in connection with the 2004 Hurricanes". The Request has been modified by B&G to refer only to "Laborers" who worked on the Properties during the time Belfor worked on the Properties. Belfor objected to this Request as being, "ambiguous, overly broad, (and) unduly burdensome" and because it seeks irrelevant information.

Seeking production of, "All Communications and Documents . . . that *concern or relate* to the Laborers" is overly broad, ambiguous, and unduly burdensome. Joining the B&G definition for "Laborers" produces a Request for Production here that encompasses any document that concerns or relates to "any human beings or natural persons" who performed "any type of work on the Properties". Arguably, every piece of paper generated on the Project could fall within this definition.

Narrowing down the Request to "All . . . Documents . . . that concern or relate to the . . . *employment* of the Laborers" is a little more focused, assuming "employment" means the "act of employing". Similarly, narrowing the request to "All . . . Documents . .

---

[3] Since this discovery comes in the form of a Request for Production of *Documents*, we will assume the "communications" requested to be produced here would be interpreted to mean transmittals of information that have been reduced to writing or otherwise electronically or graphically memorialized .

. that concern or relate to . . . *hiring* (and) *training* the Laborers" is a bit more understandable, although there appears to be little distinction between "employment" and "hiring". As previously noted in the discussion involving Interrogatory #5 above, the quality and value of the Work performed by Belfor is a matter in issue in this proceeding, and the steps, if any, Belfor took to retain, qualify and train skilled laborers for that work is relevant for purposes of further discovery. [4] It has also been established that the burden for Belfor to respond to discovery on this matter with respect to whatever it might have been done with Laborers it directly hired, or with whatever it might have done with respect to Laborers hired by subcontractors would not be unreasonable.

In accordance with the foregoing, therefore, it is the ORDER and RECOMMENDATION of the Special Master that Belfor be compelled to produce documents in its care, custody or control, if any, that describe, define, or directly pertain to:

a) procedures and policies used by Belfor for directly employing laborers for work on the Properties,

b) procedures and policies used by Belfor to insure that the laborers it directly employed were qualified or otherwise possessed the skills required for the work on the Properties, or

c) procedures and policies used by Belfor to insure that laborers employed by its subcontractors or vendors were qualified or otherwise possessed the skills required for the work on the Properties.

It is the further ORDER and RECOMMENDATION of the Special Master that all other aspects of B&G's Motion to Compel Production of Documents and Answers to Interrogatories by Belfor that are not specifically granted herein, are DENIED.

ORDERED and RECOMMENDED this 11th day of November, 2008.

_____
Lawrence M. Watson, Jr.
Special Master

---

[4] B&G has also asked for production of "All . . . Documents . . . that concern or relate to . . . the *documentation* of the Laborers". Assuming the term, "documentation" as used in this request has to do with assuring that any foreign laborers are properly permitted by US Immigration authorities to work in the United States, it has already been ruled in connection with the Order and Recommendation of the Special Master in connection with Interrogatory # 5 that the relevance of those inquiries has not yet been established.

On November 11, 2008, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following counsel:

Michael A. Shafir, Esquire
Steven J. Brodie, Esquire
Carlton Fields, PA
4000 International Place
100 SE 2nd Street
Miami, FL 331331

Daniel Cramer Brown, Esquire
Carlton Fields, PA
215 S. Monroe Street
Suite 500
Tallahassee, FL 32301

Carl D. Motes, Esquire
Arnold, Matheny & Eagan, PA
605 E. Robinson Street
Suite 730
Orlando, FL 32802

John N. Ellison, Esquire
John B. Berringer, Esquire
Jeremy Hennickel, Esquire
Douglas Widin, Esquire
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Drew Williams, Esquire
Kinsey Vincent Pyle
150 S Palmetto Ave, Suite 300
Daytona Beach, FL 32114

Amelia W. Koch, Esquire
Kent A. Lambert, Esquire
Roy C. Cheatwood, Esquire
Steven F. Griffith, Jr., Esquire
Baker Donelson, Bearman, Caldwell & Berkowitz
201 St. Charles Avenue, Suite 3600
New Orleans. LA 70170

Marvin P. Pastel, II, Esquire
Weinstock & Scavo, PC
Suite 300
3405 Piedmont Road, NE
Atlanta, GA 30305

Eric E. Caugh, Esquire
Lindsey A. Davis, Esquire
Zelle, Hofmann, Voelbel, Nason & Gette, LLP
Suite 4000
500 Washington Ave., S
Minneapolis, MN 55415

Bruce DelValle, Esquire
DelValle Law Group
Post Office Box 265007
Daytona Beach, FL 32126-5007