IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BRAY & GILLESPIE MANAGEMENT,
LLC, et al,

    Plaintiffs,

-vs.-                                               Case No.: 6:07-cv-222-Orl-19KRS

LEXINGTON INSURANCE COMPANY, a
Delaware Corporation, BELFOR USA
GROUP, INC., a Colorado Corporation,
BUILDING CONSULTING ASSOCIATES,
INC., an Illinois Corporation, and
VERICLAIM, INC., a Delaware Corporation,
                                                 /

**SUPPLEMENTAL ORDER AND RECOMMENDATIONS OF SPECIAL
MASTER ON B&G'S MOTION FOR PROTECTIVE ORDER CONCERNING
PRIVILEGED DOCUMENTS PRODUCED IN NATIVE FORMAT**

      On December 3, 2008, an "Order and Recommendation of Special Master On B&G's Motion for Protective Order Concerning Privileged Documents Produced in Native Format" ("December 3 Order") was filed in this matter. The December 3 Order dealt with a Motion for Protective Order filed by B&G seeking to assert privilege protections on certain documents it "inadvertently" turned over to Co-Defendants Belfor USA Group, Inc. ("Belfor") and Lexington Insurance Company ("Lexington").

      One day after the December 3 Order was entered, on December 4, 2008, Co-Defendant Lexington Insurance Company filed its "Notice of Intent to Seek De Novo Review of Special Master's Order and Recommendations on B&G's Motion for Protective Order Concerning Privileged Documents Produced in Native Format". Lexington's *de novo* review of the December 3 Order was sought on the grounds that the Special Master did not appear to address arguments raised by Lexington in an October 10, 2008 Memorandum of Law it filed in opposition to B&G's Motion for Protective Order. *See, Defendant, Lexington Insurance Company's Memorandum of Law in Opposition to Plaintiff's Motion for Protective Order Concerning Privileged Documents Produced in Native Format Directed to Special Master, DE 335, October 10, 2008.* ("October 10, 2008 Memorandum")

Lexington is quite correct in questioning whether due consideration was given to the arguments it raised in its October 10, 2008 Memorandum. As it turns out, the Special Master did not receive a copy of the October 10, 2008 Memorandum and did not know it had been placed in the Court file until Lexington filed its "Notice of Intent to Seek De Novo Review" on December 4, 2008. A careful search and inquiry has revealed the Special Master's office received no hard copy of the October 10, 2008 Memorandum by US mail as suggested in its certificate of service. While a "Notice of Electronic Filing" of the October 10, 2008, Memorandum was electronically circulated to all parties, including the Special Master, the description of the document referred to in that notice did not include the phrase, "Addressed to the Special Master". Accordingly, it was not flagged as a document to be reviewed by the Special Master. Apologies are clearly due to both Lexington and the Court for this oversight. Henceforth, more attention will be given as to the actual nature of documents described in the "Notice of Electronic Filing" messages regardless of how they are described. In the future, however, it would be helpful to include the "Addressed to Special Master" phrase in the description of the documents filed contained in the circulated "Notice of Electronic Filing" forms.

Turning now to Lexington's arguments . . .

The B&G Motion for Protective Order in question sought a preemptive ruling that B&G had not waived its right to claim privilege protection for certain electronically stored documents that were inadvertently delivered to the Defendants as well as a requirement that the Defendants go through a process of searching out and returning or destroying those documents. *See, Plaintiff's Motion for Protective Order Concerning Privileged Documents Produced in Native Format, September 26, 2008,* ("B&G Motion for Protective Order") It was B&G's contention that certain electronic files containing privileged documents inadvertently fell into the Defendants' hands by either Logik Systems or both, of two events.

"Event number one" involved a B&G outside vendor identified as Logik Systems, Inc. who operates as a specialty computer processing firm. Logik Systems had been hired by B&G to trace B&G documents stored in TIFF Image format electronic files back to their original "native format" files in order to separate and segregate documents B&G deemed privileged as they were situated in the native format files. *B&G Motion for Protective Order p.5;* According to the evidence presented by B&G, Logik Systems was expressly told to hold back unprivileged e-mails if they appeared to include attachments that were privileged. *Id, Exhibit "C"* ¶ 9. Logik apparently ignored or otherwise failed to heed that instruction from B&G and delivered the Defendants non-privileged e-mails that included privileged attachments (the "Logik Systems Hard Drive"). All tolled, Logik sent the Defendants 294 electronic files containing emails with privileged attachments. The error was discovered some two months after the delivery was made. Counsel for B&G immediately notified the Defendants of the error, identified the attachments that had not been removed from the produced e-mails, and requested the Defendants to return, sequester, or destroy the specified documents pursuant to F.R.C.P. Rule 26(b)(5)(B). *Id. at p. 9*

"Event number two" is a far more convoluted tale that includes the extraordinary circumstances that led to event number one occurring in the first place. Early on in this case, it seems B&G's former outside counsel elected to convert all of B&G's electronically stored information from their original "native format" electronic files into a "TIFF Image" format as part of a program to organize and prepare B&G's electronically stored business records for use in this lawsuit. Once that task was completed, the converted body of TIFF Image format documents was used to screen out privileged documents and generate a Privilege Log to protect B&G's privileged documents. The resulting Privilege Log generated from the TIFF Image files was over 900 pages in length and identified a significant number of privileged B&G documents. According to B&G's current counsel, this undertaking involved examining close to 800,000 documents and took several months to accomplish. *Id., p.2*. Unfortunately, it appears to have been an exercise fraught with problems, if not a monumental waste of time and money.

As it turned out, B&G's subsequent tender of the body of TIFF Image documents (again, which had been used to screen out and segregate their privileged documents) to the Defendants in response to their respective Requests for Production of Documents failed to adequately respond to that portion of the Defendant's Requests seeking embedded "metadata" information contained in the original native format electronic files. When the conversion to TIFF Image format occurred, it appears portions of the embedded metadata information was left behind. *Id.* Both Belfor and Lexington filed Motions to Compel production of the native format files and their embedded metadata. On June 25, 2008, an evidentiary hearing was held on those motions.

The Court agreed with the Defendants' Motions to Compel, and B&G was given a time certain to produce the native format files with their accompanying embedded data. *Id, p. 3*. The fact that B&G had already been ordered to produce metadata with native format electronic files in connection with an earlier production request in this case did not help their position on the motions heard June 25. The fact that the Court also concluded B&G's agents had "deliberately manipulated the electronically stored information" in a manner that specifically excluded some of the requested metadata sealed their fate. At the conclusion of the June 25, 2008, hearing, the Court ordered B&G to assume the full burden of getting the case discovery program "moving forward in the right direction" and produce the native format files on or before July 11, 2008, "at whatever cost". *Id. Exhibit B. p. 196-198*. B&G now had matter of some 16 calendar days (10 working days) to produce their native format electronic files.

Since their 900 page Privilege Log was based upon the converted TIFF Image electronic filing format, B&G now found itself faced with the challenge of either (a) launching a new screening program to sort through the native format electronic files to identify and segregate all privileged documents, and create a new Privilege Log, or (b) somehow "unwinding" the TIFF Image conversion and linking the documents stored in that format back to the original native format files to reproduce a revised Privilege Log which identified the privileged documents in their native format files. The time allowed by the June 25 Order to produce the native format documents obviously negated the former option, but an expert produced by the Defendants to testify as to the importance of

3

recovering the native format metadata apparently opined that the latter "unwinding" option could be accomplished in "less than a week" *B&G Motion for Protective Order, p. 3.*

When they set about the task of tracing the TIFF Image files back to the native format files, however, B&G discovered they had new problems. It appeared that without access to the actual computer hard drives that were used to convert the original native format documents to the TIFF Image files, one could not "link" or relate all of the documents on the TIFF Image back to the documents stored in native format. Some, but not all, of the original computer hard drives used to do the conversion were apparently located. At that point, Logik Systems was awarded the contract to do the re-conversion and identify the documents stored in the native format that had been segregated as privileged in the TIFF Image format. In the process, they were to link the privileged documents segregated on the TIFF Image format Privilege Log to their counter parts in the native format files then segregate those documents as well.[1]

Ultimately, some 60% of the total body of documents converted to TIFF Image electronic files were thus successfully linked back to their native format counterparts, the privileged documents stored in native format were located and segregated[2], and the Privilege Log was presumably updated to include a listing of those documents as they were found in the native format files. Approximately 40% of the B&G documents stored in TIFF Image format, however, could not be related back to the native format files. Accordingly, any privileged documents in those native format files could not be related to the TIFF Image format Privilege Log and thus could not be located and segregated in their native format files through the "unwinding" process. Other "work around" options for electronically isolating the privileged documents in their native format files were explored without success. *Id. at p.* 6-7. If the privileged documents stored in the 40% segment of the native format files were to be located and isolated, it would require another screening process to physically review and vet each one of those files. Again, an option time would simply not allow.

Fearing sanctions from the Court if they did not meet the July 11, 2008, production deadline, feeling little hope for successfully obtaining an extension of time to make the production[3], and suffering a firm rejection of additional relief sought with a last minute appeal to the District Court *See, Plaintiff's Motion for an Appeal of the Magistrate Judge's Ruling Entered June 25, 2008 (Doc. #255) July 10, 2008 and Order Denying Motion for Appeal (Doc.#256) July 11, 2008* B&G's attorneys felt compelled to turn over the remaining native format files to the Defendants knowing that they contained privileged materials.

---

[1] As previously noted, Logik failed to follow instructions given with respect to this re-conversion and a number of privileged documents attached to certain e-mails were delivered to the Defendants when they finished their work.

[2] With the exception of the privileged documents attached to e-mails that were not caught by Logik Systems as described above.

[3] The Court's Order of June 25, 2008, specifically discouraged the notion of seeking additional time for producing the native format files. *See, B&G Motion for Protective Order, p. 3 citing* June 25, 2008, Hearing Transcript at pp 198-200.

On July 15, 2008 B&G's counsel thus sent defendants a set of hard drives containing the 40% of the total native format files which had not been vetted to segregate and isolate privileged documents.[4] (hereinafter, the "B&G Hard Drive"). Accompanying that delivery was a letter from B&G's in-house counsel stating:

> ... [a]lthough we have endeavored to protect privileged information, given the extraordinary time, effort, complexity and extreme pressures and stress entailed in getting this information to each of you within the time period contemplated by the [June 25, 2008] Order, *enclosed is produced with a full reservation of rights as regards the agreed 'claw back' processes for privileged documents.*

*B&G Motion for Protective Order p. 8, Exhibit "G",* (emphasis added). As previously noted, two months later in September of 2008, B&G discovered for the first time that Logik Systems had also delivered the Defendants privileged documents attached to certain e-mail messages in the "Logik Systems Hard Drive". On that same day, a second letter went out the Defendants again asking that those documents be returned as well.

The B&G Motion for Protective Order thus seeks to rectify the consequences of these two disclosures. B&G wants a ruling that they have not claimed privilege and some plan in place requiring the Defendants to locate and return their privileged documents.

Lexington's objections to B&G's claimed relief begins with a critical review of the efforts by of B&G's lawyers to organize and manage B&G's documents and meet the various Requests for Production issued by the Defendants. Citing a long history of their multiple failings in producing some 800,000 documents in a timely or appropriate manner, Lexington asserts that the B&G lawyers are now blaming "everyone but themselves" for their current situation while they erroneously seek to define "inadvertent" to include their own "failure to undertake even the most rudimentary document review" to avoid production of privileged documents. *October 10 Memorandum, p.2-4.*

While their methods for organizing and structuring B&G's electronically stored business records were perhaps questionable, and certainly frustrating to all concerned, the actions of B&G's lawyers have clearly established an intent to protect B&G's privileged documents. Serious problems have indeed arisen with their initial decision to convert native format documents to a TIFF Image format, the manner in which that conversion took place, and the subsequent use of the TIFF Image electronic files to respond to Requests for Production. It is clear, however, that once the conversion took place – however ill advised - a substantial expenditure of time and money occurred to physically examine each of the converted files and prepare a 900 page Privilege Log; a process that involved physically identifying and segregating thousands of purportedly privileged documents at a considerable expenditure of man hours, time and money. While there may

---

[4] The 60% segment of the native format files vetted by Logik Systems by "unwinding" the TIFF Image conversion had already been directly delivered to the Defendants by Logik on July 11, 2008.

have been fumbles and missteps in complying with subsequent document requests, it would appear there was no initial shortage of effort to protect B&G's privileged documents.

Even when the shortfalls in their document production later occurred and resulted in consequences threatening the ultimate value of the earlier work done to segregate privileged documents in the TIFF Image format, B&G's counsel made significant efforts to recapture that work during the time they had available to do so. Again, while it could be argued that B&G former lawyers were the architects of their own destiny and their efforts to recapture the work may not have been as successful as many would like, no one can argue efforts to protect the documents were not made. The errors in made in organizing and reformatting B&G's business records, and the errors committed in meeting both the Defendants' production requests and the Court's discovery orders cannot be fairly translated into a complete failure to take any steps to protect their privileged documents.

Lexington next seeks to refute B&G's argument that the June 25, 2008, Order of the Court effectively "compelled" it to disclose the privileged documents located in the B&G Hard Drive. Lexington asserts, "B&G's own actions, not the Court, led to the inadvertent production of (these) privileged electronic documents" and rejects the notion that the 10 business day deadline imposed by the June 25, 2008 Court Order had anything to do with the problem because those time limits were "self-imposed". *October 10, 2008, Memorandum, at p. 5-6.*

In its *Motion of Protective Order,* B&G cites *Transamerica Computer Co. v. IBM, 573 F.2d 646 (9th Cir. 1978)* for the proposition that inadvertently releasing privileged documents in complying with a Court Order mandating accelerated discovery does not constitute a waiver of privilege. In that action, IBM was directed to produce some 17 million pages of documents in just three months and, in the process of meeting that discovery order, inadvertently released a number of privileged documents. The Ninth Circuit later agreed with IBM's request for a determination that it had not waived its privilege by releasing those documents stating;

> [The] document inspection program imposed such incredible burdens on IBM that it would be disingenuous for us to say that IBM was not, in a very practical way, "compelled" to produce privileged (documents) which it certainly would have withheld and would not have produced had the discovery program proceeded under a less demanding schedule.

Lexington seeks to distinguish this precedent by pointing out that B&G was not faced with such a discovery schedule in this case and, in fact, had "over a year" to respond to Lexington's Request for Production, *October 10, 2008, Memorandum, at p. 5-6.* B&G, however, is not seeking protection for any privileged documents that might have been released in the one year period they took to respond to Lexington's discovery requests. The inadvertent release for which they seek protection with this Motion occurred during

6

the 10 working days from June 25, 2008, they were given to get their inadequate production right – clearly an accelerated schedule.

Lexington next notes that while the Court's Order of June 25, 2008. directs B&G to produce electronic documents, it does not directly order B&G to produce *privileged* documents. Lexington argues B&G's reliance on a series of cases in which parties were ruled not to have waived privilege protections when documents were produced pursuant to Court Orders expressly directing production of *privileged* documents is not well placed. Lexington is correct in its observation that the June 25, 2008 Court Order does not specifically direct B&G to produce privileged documents. In fact, after directing B&G to produce the subject electronic files with the missing embedded metadata, the Court specifically noted , "You (B&G) will have to determine how to do that in a way that helps protect your privileges . . ." *B&G Motion for Protective Order, Exhibit "B" at 196-198.* The specific items B&G was ordered to produce was the embedded metadata in the native format – and the Court expressly admonished B&G to take responsibility for making that production *without* losing the privilege protection. The simple fact of the matter is B&G could not accomplish the production without compromising their privilege protections in the time frame they were given – at least for 40% of its electronic files. There is no question B&G would have withheld production of those documents if it had been given the time to do so. The Court's order of June 25, 2008 was clearly a compelling factor in the release of B&G's privileged documents.

Lexington next argues that B&G has failed to meet the five part test for establishing an inadvertent disclosure of privileged documents required under Federal and Florida law. Although each party phrased the elements of that test a bit differently, Lexington and B&G basically agree the five factors reviewed in making this determination are;

1) the reasonableness of the precautions taken to prevent inadvertent disclosure,
2) the number or extent of inadvertent disclosures
3) the scope or extent of the overall discovery involved
4) the time and the measures taken in rectifying the disclosures, and
5) whether the overriding interests of justice would be served by relieving a party of its error.

*See, B&G Motion for Protective Order, p. 14; October 10, 2008 Memorandum, p. 5,* both citing *Ray v. Cutler Labs., Div. Of Miles, Inc. 746 F. Supp. 86, 88, (M.D. Fla. 1990); Universal City Development Partners, Ltd. v. Ride & Show Engineering, Inc. 230 F.R.D. 688 (M.D. Fla. 2005).*

Lexington challenges the contention that B&G took appropriate measures to protect its privileged documents coming from both the hard drive produced by Logik Systems on July 11, 2008, and the hard drive produced by B&G's corporate counsel on July 15, 2008. At the outset, this criticism overlooks the fact that B&G clearly took extensive measures to originally identify and segregate it's privileged documents from the TIFF Image records it created. Again, while the decision to do the TIFF Image

7

conversion may have been wanting, there was a clear effort to protect privileged documents after it occurred.

Once the problems with getting requested metadata from the TIFF Image records appeared, the record reflects that B&G took additional steps to continue protecting their privileged documents. They specifically instructed Logik to go so far as to hold back non-privileged e-mails if they contained privileged attachments in the process of reestablishing some 60% of the native format documents. If anything, this was an overkill with respect to the non-privileged documents. The cases cited by Lexington in its October 10, 2008 Memorandum seem to uniformly deal with instances in which the party releasing privileged documents did virtually nothing to protect their disclosure. *See, for example, Ciba-Geigy Corp. v. Sandoz LTD, 916 F. Supp. 404 (D.N.J. 1995)* (no review before production, no instructions on handling, failure to take reasonable precautions) *Federal Deposit Ins. Co. V. Marine Midland Realty Credit Corp. 138 F.R.D. 479 (D.C. Va. 1991)* (screening effort manifestly inadequate), *Appeal of General Dynamics Corp. 1983 WL 7497 (D.O.T.C.A.B. Jan. 26. 1983)* (no attempt of any sort to review documents, no inquiry with those in possession to determine if privileged documents may have been intermingled with non-privileged materials). Here, B&G was confronted with technical restraints that compelled it to rely on Logik to follow its instructions in completing the "unwinding" operation, and timing restraints that dictated Logik having to direct ship the converted hard drive directly to Counsel for Defendants when its task was done. There was no time available to do much more than that and still meet the July 11, 2008 deadline. *See, B&G Motion for Protective Order at p. 14-15.* When the mistake was discovered two months later, counsel for B&G immediately notified counsel for the Defendants and sought to rectify the error.

As it turned out, there is considerable doubt as to whether there is any technical process that can electronically link the segregated privileged documents found in the TIFF Image files with their counterparts in the remaining 40% of the native format files. B&G held back delivery of these hard drives until four days after the due date to confirm that fact, then delivered them with a letter from B&G's in-house counsel expressly preserving its privilege protections. While that protective measure may be considered weak in some respects, it represents all that could be done with those electronic files.

Under the circumstances, B&G has taken reasonable steps to protect its privileged documents. In the final analysis, their disclosure was a collateral consequence of another entirely separate problem. While that collateral problem may well have been caused by questionable actions by B&G's outside attorneys, its creation does not manifest an intentional waiver by B&G of its rights to claim privilege protections or an act of neglect with the foreseeable consequence of releasing privileged documents.

Lexington next argues that the sheer volume of B&G's inadvertent disclosures weigh in favor of a determination that they have waived their privilege. According to B&G, the Logic Hard Drive contained over 200,000 electronic files; 294 have been identified as having privileged attachments. *See, Motion for Protective Order, at p.15.* We have no information as to the actual number of privileged documents that were

8

released in the B&G Hard Drive. There is insufficient data to conclude B&G should be considered as having waived its right to claim privilege protections by virtue of the volume of the documents released.

Finally, Lexington argues B&G took an inordinate amount of time to rectify its mistake in releasing privileged documents. The evidence reflects that B&G sent notice of the inadvertent release of the Logik Hard Drive documents the same day they discovered the release had been made. The effort to rectify the release of privileged documents occurring with the delivery of the B&G Hard Drives occurred at the same time the hard drives were delivered. B&G did not delay in seeking to rectify the release of their privileged documents triggered by these two events.

In the December 3, 2008, Order it was the Recommendation and Order of the Special Master that:

a) to the extent that any documents subject to a claim of privilege were delivered to the Defendants in the "Logik Systems Hard Drive" and the "B&G Hard Drive", that delivery was an inadvertent and unintended event and,

b) B&G has not waived its right to claim privilege for such documents by virtue of those deliveries, however,

c) to the extent that it is able to do so, it is incumbent upon B&G to provide Defendants express notice specifically identifying any documents it deems privileged that were inadvertently delivered to Defendants, and to provide Defendants with the basis for claiming any privilege it wishes to claim with respect to such documents, all as more specifically required by F.R.C.P. Rule 25(b)(5)(B), and,

d) in the event Defendants, in the ordinary course of their respective trial and discovery preparation encounter documents that reasonably appear to be subject to a claim of privilege, they shall be governed by Rule 4-4.4(b) of the Florida Rules of Professional Conduct and take appropriate steps to allow B&G to assert whatever privilege it wishes to assert and to have any objections to that privilege judicially resolved.

The December 3 Order goes on to state nothing therein shall be deemed to rule any documents described or discussed actually are privileged in any respect, nor to preclude or hinder any named party in this matter from objecting to any claim of privilege asserted by any other party. Any determination as to whether any documents delivered to the Defendants by means of the "Logik Systems Hard Drive" or the "B&G Hard Drive" shall be made in due course if and when the issue as to a specific document is presented to the Court or the Special Master.

9

In light of the overall circumstances, which includes the role of B&G's agents in creating this unfortunate situation, there was no ruling in the December 3 Order that any Defendant would be required to undertake any special procedure to search out and segregate what might be considered to be privileged documents. Instead, the recommendation and ruling specifically suggests that if a Defendant, in the ordinary course of trial preparation, encounters what appears to be a privileged document, normal ethical standards would be followed to resolve that situation.

As it now stands, therefore, all documents delivered to Lexington with the Logik Systems Hard Drive or the B&G Hard Drive – whether privileged or not – are in Lexington's hands. Contrary to normal practice in which documents are withheld from production before rulings are made on whether or not they are privileged, the opposition will necessarily be getting a "first look" at what might be B&G privileged documents. This regrettable state of affairs puts B&G at a potential disadvantage which should be considered punishment enough for whatever transgressions might have occurred in connection with their document management. It would seem overall considerations of justice would thus dictate that B&G does not need to be further punished by a ruling that they have waived all rights to claim privilege in any respect.

Finally, the recommended ruling submitted December 3, 2008 also specifically suggests that no determination is made as to whether, in fact, any document inadvertently turned over by B&G is privileged or not. If and when situation arises in which either side wishes to secure a final determination as to whether a given document is privileged, that determination will be made. If, as Lexington has suggested on numerous occasions in its October 10, 2008 Memorandum, B&G has produced a contested document three or four times in three or four separate productions, that data may be presented and considered for purposes of determining whether or not a waiver has occurred. The effect of this recommended ruling, however, is to simply hold that the document releases occurring with the delivery of the Logik Hard Drive and the B&G Hard Drive as described above do not, in and of themselves, constitute a waiver of privilege protection.

For the reasons set forth above, it is thus the RECOMMEDNATION and ORDER of the Special Master that the December 3, 2008 Order be confirmed in every respect.

Respectfully Submitted

Lawrence M. Watson, Jr.
Special Master

On December 17, 2008, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following counsel:

Michael A. Shafir, Esquire
Steven J. Brodie, Esquire
Carlton Fields, PA
4000 International Place
100 SE 2nd Street
Miami, FL  331331

Daniel Cramer Brown, Esquire
Carlton Fields, PA
215 S. Monroe Street
Suite 500
Tallahassee, FL  32301

Carl D. Motes, Esquire
Arnold, Matheny & Eagan, PA
605 E. Robinson Street
Suite 730
Orlando, FL  32802

John N. Ellison, Esquire
John B. Berringer, Esquire
Jeremy Hennickel, Esquire
Douglas Widin, Esquire
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103

Drew Williams, Esquire
Kinsey Vincent Pyle
150 S Palmetto Ave, Suite 300
Daytona Beach, FL  32114

Amelia W. Koch, Esquire
Kent A. Lambert, Esquire
Roy C. Cheatwood, Esquire
Steven F. Griffith, Jr., Esquire
Baker Donelson, Bearman, Caldwell & Berkowitz
201 St. Charles Avenue, Suite 3600
New Orleans. LA  70170

Marvin P. Pastel, II, Esquire
Weinstock & Scavo, PC
Suite 300
3405 Piedmont Road, NE
Atlanta, GA  30305

Eric E. Caugh, Esquire
Lindsey A. Davis, Esquire
Zelle, Hofmann, Voelbel, Nason & Gette, LLP
Suite 4000
500 Washington Ave., S
Minneapolis, MN  55415

Bruce DelValle, Esquire
Ocean Waters Management
501 N Atlantic Ave
Daytona Beach, FL  32118