BRAY & GILLESPIE MANAGEMENT
LLC, BRAY & GILLESPIE, DELAWARE
I, L.P., BRAY & GILLESPIE X, LLC, et al.
     **Plaintiffs,**

-vs-           **Case No.  6:07-cv-222-Orl-35KRS**

LEXINGTON INSURANCE COMPANY,
BELFOR USA GROUP, INC., BUILDING
CONSULTING ASSOCIATES, INC.,
VERICLAIM, INC.
      **Defendants.**
_____/

## ORDER

This cause came on for consideration after an evidentiary hearing on the following motion:

| | |
|---|---|
| **MOTION:** | **DEFENDANT LEXINGTON INSURANCE COMPANY'S MOTION FOR DISCOVERY SANCTIONS AGAINST PLAINTIFFS AND TO COMPEL PROPER PRODUCTION OF DOCUMENTS BY PLAINTIFFS (Doc. No. 202)** |
| **FILED:** | **May 27, 2008** |

## I. INTRODUCTION.

This is the fifth order that I have entered in connection with motions filed by Defendant

Lexington Insurance Company ("Lexington"), in addition to numerous discovery conferences and

two days of evidentiary hearings, regarding ongoing difficulties with the form of production of

electronically stored information ("ESI") by Plaintiffs Bray & Gillespie Management, LLC, *et al.*

("B&G").  In the present motion, Lexington seeks an order compelling production of ESI in the

form specified in its requests for production of documents ("RFPs") and awarding sanctions

against B&G based on the continuing noncompliance with Fed. R. Civ. P. 34 and my April 11,

2008, Order (the "April 11 Order") compelling B&G to produce discovery in response to certain

requests in Lexington's RFPs, Doc. No. 181.[1]

On June 25, 2008, I issued an interim order on the motion and directed B&G to produce

ESI from the Extractiva files, discussed below, or in native format. *E.g.* Doc. No. 330 at 198 (the

"June 25 Order").[2] This Order addresses Lexington's request for an award of additional sanctions.

As set forth in detail herein, B&G failed to produce ESI in the form specified by

Lexington. Counsel for B&G's argument that the form of production was substantially justified is

premised on material misrepresentations and omissions regarding facts underlying the form in

which ESI was maintained by B&G and provided to its lawyers. Accordingly, while Lexington

seeks sanctions only against B&G, this Court has also put counsel of record for B&G on notice

that certain lawyers at Reed Smith, LLP, who made the misrepresentations and withheld material

information, Reed Smith, LLP, and B&G's in-house counsel are also subject to sanctions. *See*

Doc. No. 331.

---

[1] Defendant Belfor USA Group, Inc. ("Belfor") also filed motions seeking sanctions for the conduct described herein. Doc. Nos. 217, 282. On December 5, 2008, B&G and Belfor filed a Joint Stipulation of Dismissal of Claims by which B&G dismissed with prejudice its claims against Belfor. Doc. No. 406. Accordingly, I denied Belfor's motions for sanctions as moot. Doc. No. 413.

[2] Throughout this Order, I will refer to the internal pagination of hearing and deposition transcripts, which may be different than the pagination assigned when the transcripts were electronically filed.

## II.    BACKGROUND.

### A.    The Parties and Their Relationship.

B&G owned and operated six resorts in and around Daytona Beach, Florida.  Lexington

issued a Commercial Property Policy which insured all six resorts with a $25 million per

occurrence limit.  B&G alleges that, during August and September 2004, these resorts were

damaged by Hurricanes Charley, Frances, and Jeanne.  B&G submitted claims to Lexington for

payment under the insurance policy for the damage caused by the hurricanes.  This case arose

from a dispute about whether the damage to the resorts resulted from three separate occurrences;

more specifically, whether Hurricane Jeanne caused damage to any property in addition to damage

caused by Hurricanes Charley and Frances.  *See generally* Doc. No. 99 at 2-4, 6-7 & n.5.

Lexington hired former defendant VeriClaim, Inc. ("Vericlaim") to investigate, adjust, and

resolve B&G's insurance claims.  *Id.* at 4.  B&G alleges that Lexington required it to hire former

defendant Belfor to assist in the repair, remediation, and clean-up of its properties.  *Id.* at 5.

Anderson, Kill & Olick, P.C. ("AKO") represented B&G in connection with the

submission of insurance claims to Lexington.  Michael J. Lane, a partner at AKO, handled the pre-

suit matters with the assistance of William Pillsbury, an associate at AKO.  *See, e.g.*, Doc. No. 141

at 13-20; Doc. No. 339-2 ¶ 5; Doc. No. 440 at 229, 241.

### B.    Gathering Information and Submitting Claims.

In May 2006, B&G gathered paper documents, ESI, and other information relevant to the

damage caused by the 2004 hurricanes to B&G properties.  Pillsbury oversaw the collection of

information to support B&G's claims.  Doc. No. 440 at 229.  Student interns scanned paper

documents. *Id.* at 230. Others downloaded ESI, such as e-mails and e-mail attachments, in native

format.[3] *Id.* The scanned documents and the downloaded ESI were copied to a hard drive (the

"Target Hard Drive"). *Id.* at 230-31. Pillsbury carried the Target Hard Drive to AKO's offices,

where a software program called Extractiva was used to convert the scanned documents and ESI to

TIFF[4] images. Extractiva captured the metadata[5] from the ESI, but metadata could not be

electronically captured from the scanned documents. *Id.* at 256-57; *see also id.* at 229-33.

Pillsbury did not instruct anyone to exclude any metadata that would be automatically captured by

Extractiva. *Id.* at 232. The TIFF images and associated metadata were then loaded into a

---

[3] Throughout this Order, I will use ESI to refer only to electronically stored information, not to information that was scanned from paper form to a digital image.

[4] TIFF is an acronym for Adobe's Tagged Image File Format. A TIFF is an image that is "the equivalent of printed pages from the screen." THE SEDONA CONF., THE SEDONA PRINCIPLES 190 (2d ed. 2007). TIFF and other image files, by themselves, "lose searchable text and metadata that might enable better understanding and utility of the evidence." *Id.* at 191.

[5] Metadata is

> essentially the who, what, when, where of th[e] information. So, for example, the who could be not only the author, the to and from of the email, but it could also be the person that generated the Word document, the Excel spread sheet. One of the things that metadata can also tell you, for example, is the location of where that file was stored and the file path in [which] it's located . . . to identify . . . who was the custodian, who was in possession of that particular file. It also answers questions about . . . [w]hen was this file created . . . when and where they were last accessed, when and where they were last modified or saved.

Doc. No. 330 at 65 (testimony of expert witness Daryl Teshima). Litigation databases generally capture metadata in fields. Doc. No. 440 at 416-17. Additional information can be manually coded into the database, such as the author, recipient, and date of paper documents that were scanned, or legal conclusions, for example that a document is privileged. *Id.* at 419-20.

litigation management database referred to as the "Introspect database." *Id.* at 231. After this process was completed, the Target Hard Drive was put in storage. *Id.* at 232-33.

After the documents and ESI were gathered, Lane provided copies of documents in paper form and on discs to Lexington in support of B&G's insurance claims. *See, e.g.,* Doc. No. 141 at 13-20; *see also* Doc. No. 440 at 234.

Initially, Lexington found that the damage to B&G's properties was the result of only one occurrence. Later, Lexington paid an additional $25 million to B&G for losses associated with Hurricane Frances. Doc. No. 99 at 6-7 & n.5. B&G still seeks $25 million for damages caused by Hurricane Jeanne and other relief. Doc. No. 1 at 11-12.

C.     *Present Litigation – The Parties and Their Attorneys*.

On February 13, 2007, B&G filed the complaint in this case. Doc. No. 1. Lane, his partner, John Ellison, and Pillsbury were specially admitted to represent B&G. Doc. No. 12. In October 2007, lawyers with the Orlando office of Boies, Schiller & Flexner, LLC ("Boies Schiller") substituted as AKO's local counsel in place of the previous local counsel. Doc. No. 106. Lane and Pillsbury handled the day-to-day litigation issues, while Ellison consulted on litigation strategy. Doc. No. 339-2 ¶ 10.

In January 2008, Ellison left AKO and joined Reed Smith, LLP ("Reed Smith") as a partner. Lane and Pillsbury remained at AKO. Doc. No. 339-2 ¶¶ 3, 24. Ellison did not withdraw his appearance as counsel for B&G in this case when he joined Reed Smith, and he continued as co-counsel for B&G. *See* Doc. No. 440 at 246.

On March 28, 2008, B&G discharged AKO as its counsel and Ellison effectively became B&G's lead attorney. *Id.* at 229. On April 21, 2008, Ellison filed a response to a request for an expedited discovery conference, and he appeared as counsel for B&G at the conference on April 22, 2008. Doc. Nos. 180, 189. In a motion for a protective order filed on May 9, 2008, Ellison acknowledged that he was lead counsel for B&G. Doc. No. 192 at 8.

On May 2, 2008, Lane and Pillsbury moved to withdraw as counsel for B&G. Doc. No. 190. On May 3, 2008, I granted the motion, subject to the explicit requirement that AKO "deliver to present counsel for the Plaintiffs all discovery materials and other documents or evidence relevant to the pending litigation as requested by current counsel for Plaintiffs." Doc. No. 191.

Sometime after May 2, 2008, John Berringer, a Reed Smith partner, became involved in the case. Doc. No. 330 at 161-62; Doc. No. 440 at 272. Berringer asked Jeremy Heinnickel, an associate attorney at Reed Smith, to assist with electronic discovery issues. *See, e.g.*, Doc. No. 330 at 162; *see generally* Doc. No. 230 (granting motion for Heinnickel to appear specially in this case).

On May 30, 2008, W. Bruce DelValle, formerly outside counsel for B&G, became in-house counsel for B&G and entered a notice of appearance in this case. Doc. No. 209; Doc. No. 338-2 ¶¶ 4, 11. On June 10, 2009, DelValle substituted for the Boies Schiller attorneys as local counsel for the Reed Smith attorneys. Doc. Nos. 219, 220.

In September 2008, B&G filed for bankruptcy protection. Thereafter, Michael Beaudine and other lawyers with Latham, Shuker, Eden & Beaudine, LLP, appeared as co-counsel for B&G. Doc. No. 322.

Throughout the litigation, Lexington has been represented by Daniel C. Brown and other lawyers with Carlton Fields, P.A. ("Carlton Fields"). Belfor was represented by Kent Lambert and other lawyers with Baker Donelson Bearman Caldwell & Berkowitz, P.C. Vericlaim was represented by Carl Motes of Arnold, Matheny & Eagen, P.A.

## III.    STATEMENT OF FACTS.

*A.     Preliminary Negotiations Regarding Discovery.*

On August 1, 2007, counsel for the parties filed a Case Management Report in which they reported that they believed "extensive discovery, including discovery of electronic documents," would be necessary. Doc. No. 78 at 1. They "agreed to confer on [electronic discovery] within the next thirty (30) days and file a supplemental Case Management Report on all issues as to which the parties can come to agreement." *Id.* at 8. Although they conferred further regarding production of ESI, they did not reach an agreement regarding the form in which ESI should be produced. *See* Doc. No. 244 ¶ 4; Doc. No. 330 at 133-39.[6]

*B.     Lexington's First and Second Requests for Production of Documents and B&G's Responses.*

1.     Lexington's Requests for Production of Documents.

On August 17, 2007, Lexington served its first request for production of documents to B&G, Doc. No. 202-2 ("Lexington RFP 1"). In September 2007, Lexington served a second request for production of documents to B&G, Doc. No. 202-3 ("Lexington RFP 2").

---

[6]    Fed. R. Civ. P. 26(f)(3)(C) requires parties to confer and indicate their views and proposals regarding "any issues relating to disclosure or discovery of electronically stored information, including the form or forms in which it should be produced." Rule 26 does not require parties to agree on the form of production of ESI.

As authorized by Fed. R. Civ. P. 34(b)(1)(C), Lexington's RFPs specified "the form or forms in which electronically stored information is to be produced," as follows:

> "**Electronically stored information**" includes all "electronically stored information" as that term is used in Federal Rules of Civil Procedure 26(a)(1)(B) and 34(a)(1). . . .  As used in these Requests for Production a request for "electronically stored information" calls upon you to produce such information, without deletion or alteration of meta-data, in its native form, and to indicate the computer hardware and software program(s) needed to translate the information into usable form in the information's native format.

Lexington RFP 1 at 5 ¶ J (emphasis in original); Lexington RFP 2 at 3 ¶ G (same).

> "**Document**" includes electronically stored information – including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations–stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.

Lexington RFP 1 at 2-3 ¶ I (emphasis in original); Lexington RFP 2 at 2-3 ¶ F (same).

Lexington further instructed B&G regarding the form of production of ESI as follows:

> Please state, for each item of electronically stored information, the hardware, medium (for example, "compact disk" or "compact disk reader") and software program required to inspect the information contained in the item in the native format in which the information is stored and the computer hardware and software required to copy the information in such native format.

Lexington RFP 1 at 5; *see also* Lexington RFP 2 at 4-5.

    2.   <u>B&G's response</u>.

On November 9, 2007, Pillsbury signed and served B&G's responses to Lexington's RFPs.

Doc. No. 202-4.  In a "Preliminary Statement," B&G stated, in pertinent part, as follows:

> Per the agreement reached between counsel for Plaintiffs and counsel for Lexington, we are enclosing with these Objections and Responses . . . discs containing documents Bates stamped B&G000001 (Jeanne) through B&G022501 (Jeanne).  In addition,

> we are attaching the cover letters and indices that were produced along with these documents to Lexington. All of these documents had been produced to Lexington prior to the commencement of this litigation, but Lexington has requested additional copies be forwarded to Lexington.
>
> In addition, Plaintiffs agreed to begin production of documents on a rolling basis beginning on November 16, 2007. Per our agreement, all documents will be provided by sending discs containing scanned copies of the documents; no hard copies of the documents will be provided.

*Id.* at 2-3. Although Rule 34(b)(2)(D) permitted B&G to object to the "requested form for producing electronically stored information," B&G did not object to Lexington's definitions of ESI or Documents or to the instructions requiring B&G to produce ESI in native format with associated metadata. *See also* Doc. No. 330 at 139 (testimony of counsel for Lexington that B&G never indicated problems producing ESI in native format with metadata during Rule 26 conferences). With the response, B&G served twenty-seven discs containing TIFF images of paper documents that had been produced previously to Lexington. Doc. No. 141 at 23.

Daniel Brown, counsel for Lexington, testified that "the agreement reached between counsel," to which B&G referred in its "Preliminary Statement," pertained only to documents that originated in paper form. Doc. No. 330 at 131-36, 150. This understanding of the "agreement" was consistent with B&G's representations that they were producing documents as maintained in the ordinary course of business. *Id.* at 152; *accord* Doc. No. 159 at 7. Pillsbury, the attorney for B&G who signed the responses to the RFPs, also understood the term "scanned" to mean the process of converting a paper document to an electronically stored image. Doc. No. 440 at 252. I credit Brown's testimony that "the agreement reached between counsel" referenced in B&G's

initial responses to Lexington's RFPs pertained only to documents that originally existed in paper form, and not to production of ESI.

      C.     *Lexington's Motions to Compel*.

           1.     <u>Lexington's First Motion to Compel</u>.

On January 14, 2008, Lexington filed its first motion to compel B&G to produce the documents requested in its RFPs. Doc. No. 142. In that motion, Lexington asserted that it had provided B&G "months of extensions" and "[y]et, [as of January 14, 2008], Plaintiffs ha[d] produced no documents beyond the documents they provided pre-suit . . . [and had] not commenced such a good faith 'rolling production,' . . ." *Id.* at 3-4.

On January 21, 2008, B&G served its first supplemental response to the RFPs. Once again, B&G did not object to producing ESI in native format with associated metadata. *See* Doc. No. 170 at 25. On January 28, 2008, B&G responded to Lexington's motion to compel. Doc. No. 160. It represented that it had "agreed to produce Supplemental Responses to the specific requests identified in [Lexington's] Motion," and that the parties had agreed to an additional extension of time for B&G to produce responsive documents "within six weeks and a privilege log within seven weeks" from January 24, 2008. *Id.* at 2-3. Based upon these representations, I denied the motion to compel. Doc. No. 169.

On February 22, 2008, B&G served an amended supplemental response to Lexington's RFPs, again without objection to producing ESI in the form required by the RFPs. Doc. No. 202-6.

2.     The March 14 Disc and B&G's March 2008 Representations Concerning ESI.

Throughout the relevant period, attorneys at AKO, Reed Smith, and Boies Schiller have had remote access to the Introspect database maintained by AKO. Doc. No. 440 at 261, 272-73; *see also* Doc. No. 238 at 88 (counsel with Boies Schiller referred to ability to access AKO database). Various attorneys reviewed the information on the database and selected TIFF images for production; AKO's litigation support specialists copied the selected images to discs. *See* Doc. No. 238 at 88; Doc. No. 440 at 234.

On March 14, 2008, B&G mailed a disc containing its first ESI production, consisting mostly of e-mails, to Lexington (the "March 14 Disc"). *See* Doc. No. 202 at 3; Doc. No. 222 at 5; Doc. No. 330 at 140. The March 14 Disc arrived at Carlton Fields' Tallahassee, Florida office several days later. *Id.* It was forwarded to Carlton Fields' Miami, Florida office to be loaded into the law firm's database once Carlton Fields received the remainder of the production from B&G. *Id.*[7]

On March 18, 2008, I held a discovery conference to discuss, among other things, B&G's production of documents in response to Lexington's RFPs. *See* Doc. No. 173 at 2-3. Local counsel for B&G stated that B&G had "produced about 100,000 e-mail documents categorized by

---

[7] Lexington's counsel, Daniel Brown, testified that he discussed loading the March 14 Disc into Carlton Fields' document management system the after the Miami office received it. Doc. No. 330 at 140-41. His IT department informed him that they were upgrading the system, and that the upgrade would "take a couple of weeks." *Id.* at 141. Brown testified that because Lexington was "going to get the lion's share of the production [from B&G] at the end of April," he instructed his IT department to complete their software upgrade first and to wait to load the March 14 Disc until the rest of the production from B&G arrived in April. *Id.*

senders' e-mail in-box," and that "about 100,000 electronic non-e-mail documents . . . are in the queue and will be produced in the next two weeks or so, perhaps even earlier." Doc. No. 180 at 8. Lexington's counsel did not mention any problem with the form of production of ESI because the March 14 Disc had not been reviewed and counsel were not yet aware that ESI had been produced as TIFF images without metadata. *See* Doc. No. 330 at 139-41; *see also* Doc. No. 180 at 36 (counsel for Belfor stated at the March 18, 2008 hearing that he had not yet looked at the March 14 Disc).

3.   Lexington's Second Motion to Compel and the April 11 Order.

On March 20, 2008, Lexington filed a Renewed Motion to Compel Production of Documents (the "Renewed Motion to Compel"). Doc. No. 178.[8] Lexington's motion sought an order compelling B&G to produce documents responsive to certain requests in its RFPs. Five of the requests at issue specifically required production of ESI. Doc. No. 202-2 (Request Nos. 88, 97, 102, 103, 122). In each of these requests, the reference to ESI was in bold typeface. Lexington also argued that some of the responsive documents were "compute[r]-stored and computer-generated." Doc. No. 178 at 14. Thus, the Renewed Motion to Compel, coupled with the RFPs, gave B&G ample notice that Lexington was seeking production of ESI in the form specified in the RFPs. B&G did not file a response to the motion, and I treated it as unopposed. On April 11, 2008, I granted Lexington's motion and ordered B&G to produce documents responsive to the requests at issue on or before April 30, 2008. Doc. No. 181 at 2.

---

[8]   Shortly thereafter, on March 28, 2008, B&G discharged AKO as its counsel. Doc. No. 182-2. Attorney DelValle directed AKO to provide all legal files to B&G in hard copy and digital format. *Id.*; *see also* Doc. No. 440 at 378-80. As discussed earlier, DelValle later became B&G's local counsel. Doc. Nos. 219, 220, 339-2 ¶ 29.

After the April 11 Order was entered, Ellison "engaged in discussions with Boies Schiller regarding the Court's requirement that Plaintiffs produce responsive documents by April 30, 2008," but he left the actual document production work to Boies Schiller. Doc. No. 339-2 ¶¶ 30-31. Ellison averred that he had "a few telephone conversations with Boies Schiller . . . just to make sure that the [document production] process was ongoing. And I knew there was a hard April 30th deadline that the Judge had made clear needed to be met. So I called [Boies Schiller] to inquire whether any assistance was needed from Reed Smith to meet that deadline . . . ." Doc. No. 440 at 342. Pillsbury and AKO continued to assist B&G by producing selected TIFF images on discs for purposes of discovery until June 2008, when AKO transferred the Introspect database to Reed Smith. *Id.* at 238, 259-61, 278-79.

### 4. B&G's April 30, 2008 Production Compelled by the April 11 Order.

On April 30, 2008, local counsel for B&G delivered seven more discs to counsel for Lexington (the "April 30 Discs"). Doc. No. 202-9 ¶ 4. After receipt of these additional discs, counsel for Lexington directed Carlton Fields' IT department to upload the March 14 Disc and the April 30 Discs into their database system.

At the March 18 discovery conference, counsel for B&G had represented that the March 14 Disc contained e-mails and attachments. *See also* Doc. No. 222-3. When counsel for Lexington examined the March 14 Disc, they discovered that the disc contained 108,845 documents in TIFF format and an index but no metadata. *See* Doc. No. 202-10 ¶¶ 8-9. TIFF images are not the native file format of e-mail or other ESI. *Id.* ¶ 11.

Similarly, Lexington's counsel discovered that the April 30 Discs contained at least 721,331 pages of documents, many of which were e-mails. *See* Doc. No. 202-9 ¶¶ 5-6. All of the documents were TIFF images with no metadata and no coding that would allow the documents to be searched by fields, such as creation date, last modification date, author, or subject. Doc. No. 202-10 ¶¶ 5-7; *see also* Doc. No. 222-2 ¶ 5. Thus, both the March 14 Disc and the April 30 Discs did not comply with Lexington's specifications in its RFPs that ESI be produced in native format without alteration or deletion of metadata. The April 30 Discs also did not comply with the April 11 Order directing B&G to produce documents responsive to the specific requests identified in the Renewed Motion to Compel.

The parties agree that the TIFF files produced without metadata eliminated the search capabilities that would have been available if B&G had produced ESI in native format. *See* Doc. No. 202-10 ¶ 7; Doc. No. 222 at 12. To conduct searches of the documents, Lexington would have had to convert the TIFF images into a searchable text format through optical character recognition ("OCR"). *See* Doc. No. 222 at 12.[9] Accordingly, the March 14 Disc and the April 30 Discs contain ESI that was not in a reasonably usable form.

---

[9] When a person "scans" a document, the resulting electronic output is stored as a picture of the document, such as in the TIFF images produced by B&G in this case. *See* SHIRA A. SCHEINDLIN, DANIEL J. CAPRA, ELECTRONIC DISCOVERY AND DIGITAL EVIDENCE 708 (2009) [hereinafter "ELECTRONIC DISCOVERY"] (A scanner is "[a]n input device commonly used to convert paper documents into images."). OCR used to convert physical documents or electronic images into text files has significant limitations. OCR generally does not recognize handwriting. If the image file is of poor quality, OCR often cannot produce usable text files. *Id.* at 696; *see also* Doc. No. 330 at 109-10.

D.     *Berringer's False Story About How B&G Collected ESI.*

On or about May 19, 2008, Lexington's counsel formally objected to the form of B&G's production. Doc. Nos. 222-5, 222-6; Doc. No. 330 at 156-57; Doc. No. 339-2 ¶ 35. Ellison testified he "worked closely with John Berringer to discuss ways that [Reed Smith] might make this [discovery issue] go away in terms of some negotiated resolution with the other side, which [Berringer] then spearheaded." Doc. No. 440 at 343. In late May and June 2008, junior attorneys at Reed Smith, including Jeremy Heinnickel, were also involved in trying to resolve the ESI production problems. Doc. No. 330 at 162; Doc. No. 440 at 292-93, 354-55.

During the course of the negotiations to resolve the dispute regarding the form of production of ESI, Berringer concocted a story about the process that B&G and AKO used to gather the discoverable documents. Berringer explained that "B&G *printed* the documents from B&G's electronic systems. B&G sent the printed documents to Anderson Kill. Anderson Kill scanned the documents to create TIFF images of them . . . , from which production was then made." Doc. No. 202 at 15 n.11 (emphasis in original) (Counsel for Lexington's description of the explanation). *Accord* Doc. No. 234-4 at 1 (Counsel for Defendant Belfor wrote, "Based upon certain disclosures that Mr. Ellison's partners made at the May 21, 2008 Rule 3.01 conference requested by counsel for Lexington, it is my understanding that the [April 30, 2008] production is comprised primarily of e-mail and other electronically stored information that was manually printed out by the plaintiffs off their computer system(s) and then forwarded to their former counsel of record for review and imaging prior to production in electronic 'TIFF' form."); Doc. No. 238 at 90 (Counsel for Vericlaim stated that the discs produced by B&G "evidently were

-15-

produced from computer files that were printed and then scanned . . . ."); Doc. No. 330 at 163-64 (Berringer testified that "[w]ith respect to the emails, the initial information and my initial understanding was that the documents had been printed out at Bray and Gillespie's offices and shipped to Anderson Kill for review and production."); *id.* at 184 (Counsel for Belfor stated his understanding that the files were printed and then scanned**)**.

In creating this false tale, Berringer ignored numerous facts known or readily available to him about the actual process that was used to collect ESI and produce it to Lexington. On April 9, 2008, Berringer defended a deposition of Harold Lueken, formerly in-house counsel for B&G, who testified that information was "electronically transferred" and given to AKO in 2006. Doc. No. 440 at 333-34. Reed Smith attorneys had access to the Introspect database before and after AKO transferred it to Reed Smith. If he had reviewed the Introspect database, Berringer would have seen that it contained ESI metadata. Finally, Berringer could simply have contacted AKO to learn how the information was gathered. *See id.* at 344 (Berringer did not seek information from AKO about the scope of the agreement to produce scanned copies of documents in lieu of hard copies); *accord id.* at 238, 259-61 (cooperation between AKO and Reed Smith).[10] The false explanation Berringer gave regarding how ESI had been collected was based, at best, on willful

---

[10] On August 29, 2008, Douglas Widin, a Reed Smith lawyer, filed an unsigned copy of a declaration of Sydney Slome, formerly Vice President of Operations for B&G. The declaration stated that Slome believed that "electronic documents were extracted directly from individual computers of B&G employees in 2006, stored on the hard drive, and then given to B&G's attorneys." Doc. No. 304-12 ¶ 16 (unsigned declaration). Widin filed his own declaration attesting that Slome had reviewed the unsigned declaration, believed its contents to be true and correct, and that Slome would execute it as soon as he was able to do so, after which a signed copy would be filed. Doc. No. 304-14. Curiously, the signed declaration that was subsequently filed omitted the paragraphs in the unsigned declaration related to gathering ESI. Doc. No. 309. Ellison filed the signed declaration, but he did not bring the modification of the declaration to the Court's attention or explain why it occurred.

blindness which unreasonably prolonged and multiplied the proceedings regarding the ESI discovery dispute.

Sometime before May 23, 2008, Heinnickel offered to permit Lexington's counsel to have access to the Introspect database, if AKO would permit such access. *See* E-mails between Brown and Heinnickel with copies to Ellison, Lexington Ex. 10 (Dec. 8, 2008, Hrg.). Counsel for Lexington declined the offer because, based on Berringer's recent misrepresentations, he believed that the Introspect database contained only OCR text acquired from printed then scanned documents and would not have provided reasonably usable search functionality. *See* Email from Brown to Heinnickel with copies to Ellison dated May 23, 2008, B&G Ex. 5 (Dec. 8, 2008, Hrg.).

> E. *Lexington's Motion for Sanctions Including a Third Motion to Compel Production of ESI.*

> 1. <u>Lexington's Motion for Sanctions</u>.

On May 27, 2008, Lexington filed the instant motion for sanctions against B&G. Doc. No. 202. Lexington argued, in sum, that B&G violated Rule 34 by failing to produce ESI in the form specified in Lexington's RFPs and violated the April 11 Order by producing the April 30 Discs, which did not comply with the specified form of production of ESI. Lexington sought an order compelling production of ESI in the form specified in Lexington's RFPs, striking portions of B&G's claims to which the requests for production at issue pertained, and awarding Lexington the reasonable costs, including attorney's fees, it incurred in filing the motion.

Ellison signed B&G's response to the motion, which was filed on June 10, 2008. Doc. No. 222. Ellison contended that, in its response to Lexington's RFPs, B&G stated that per the agreement with Lexington it produced discs containing scanned copies of documents. Ellison

argued that (1) Lexington delayed too long in objecting to the form in which ESI had been produced and that, accordingly, B&G's form of production was substantially justified; (2) that Lexington had not properly specified the form of ESI because it did not make the request for that form during the initial case management conference; (3) that Lexington buried the definitions of ESI "in five pages of boilerplate definitions and instructions in its [RFPs]," *id.* at 6; and, (4) that the documents produced on April 30, 2008, were provided "'as they are kept in the usual course of business,'" *id.* at 11. Ellison cited to several out-of-circuit cases in which courts determined that failure to produce metadata did not violate Rule 34.

Ellison also argued that requiring B&G to reproduce the ESI in native format would be unduly burdensome. With B&G's response, Ellison submitted the Affidavit of Frank Martinez, a litigation support analyst with Reed Smith. Doc. No. 222-2. Martinez averred that he had spoken with an AKO technology specialist who stated that "there is no link between the documents in native format and the documents contained in the [Introspect] database where they were reviewed by B&G." *Id.* ¶ 6. Therefore, Martinez attested that reproduction of ESI in native format would require a new privilege review. *Id.*

        2.    <u>Reed Smith's Representations to Lexington's Counsel Before the Evidentiary Hearing on the Motion for Sanctions</u>.

I ordered that an evidentiary hearing on the motion for sanctions be conducted on June 25, 2008. Doc. No. 214; Doc. No. 238 at 41. Shortly thereafter, Berringer finally directed Heinnickel to contact AKO to learn how the ESI had actually been gathered from B&G. Doc. No. 330 at 162. Sometime before June 20, 2008, Heinnickel learned that ESI in native format was gathered at B&G's offices, copied to the Target Hard Drive, and then transferred to the Introspect database in

TIFF format with related metadata. Doc. No. 339-3 ¶¶ 4, 5. About this time, Reed Smith obtained a copy of the Target Hard Drive. Doc. No. 330 at 171-72.

Counsel for the parties continued to confer in an attempt to resolve or narrow the issues to be presented at the June 25 hearing. Doc. No. 339-3 ¶ 5. On June 23, Reed Smith attorneys told counsel for the defendants for the first time that B&G's ESI had not been printed and scanned. Rather, "native format e-mails were collected and then converted into TIFF images using a program that was set to selectively exclude certain types of metadata."[11] June 23, 2008, Letter from counsel for Belfor to Heinnickel, Lexington Ex. 13 (Dec. 8, 2008, Hrg.). During these discussions, Reed Smith attorneys did not disclose what metadata the Introspect database actually contained; did not disclose how the ESI in native format was transferred to the Introspect database; and did not disclose the existence of the Target Hard Drive or that Reed Smith had a copy of it in its possession. Doc. No. 330 at 81-82, 170; Doc. No. 440 at 387-88.[12]

Reed Smith attorneys offered to produce "load files"[13] containing seven basic metadata fields for the TIFF images previously produced – specifically author, recipient, CC, subject, BCC, date sent, and file name. Letter from Heinnickel to Brown and others, B&G Ex. 6 (Dec. 8, 2008,

---

[11] Based on the present record, this representation was not completely truthful because there is no evidence that the Extractiva program was set to exclude any type of metadata, as discussed in Section III. H., *infra*.

[12] Attorney DelValle was not involved in the conferences regarding the discovery dispute before the June 25 hearing. Doc. No. 440 at 371-72.

[13] A load file is "[a] file that relates to a set of scanned images or electronically processed files, and indicates where individual pages or files belong together as documents, to include attachments, and where each document begins and ends. A load file may also contain data relevant to the individual documents, such as metadata, coded data, text, and the like." ELECTRONIC DISCOVERY at 689.

Hrg.). Counsel also discussed production of parent-child relationships and the OCR text of the TIFF images. Doc. No. 330 at 82, 112, 144, 166; Doc. No. 440 at 388-89. At some point, Berringer offered to give Lexington all of the metadata in the Introspect database. Doc. No. 440 at 289; *accord* Lexington Ex. 13 (Dec. 8, 2008, Hrg.) at 2 (referring to discussion in which Berringer offered to provide load files containing all metadata). When defense counsel asked that B&G disclose in writing the metadata contained in the Introspect database, among other things, Berringer withdrew the offer. *See* Lexington Exs. 11, 13 (Dec. 8, 2008 hrg); Doc. No. 440 at 295.

F.     *The June 25, 2008, Evidentiary Hearing*.

At the June 25 hearing, Lexington presented testimony of Daryl Teshima, an expert witness in the handling and production of ESI in litigation. Doc. No. 330 at 57-58. Teshima had examined the March 14 and April 30 Discs produced by B&G. *Id.* at 61. He testified that the discs contained ESI that had been converted to TIFF images, not scanned copies of paper documents. *Id.* at 62-64. The discs had metadata showing the beginning and ending page of each document, but no other metadata and no text search capabilities. *Id.* at 66, 68. There was no ability to link e-mail communications by conversation thread, to determine where the e-mail had originally been stored, or to link attachments to a particular e-mail. *Id.* at 69-73. There also was no hash value – a type of digital fingerprint used to determine whether individual ESI documents are duplicates. *Id.* at 70-71. Teshima also averred that the conversion of spreadsheets to TIFF images made them essentially illegible and did not disclose the underlying formulas for financial calculations. *Id.* at 75.

Teshima concluded from his examination that a processing program called Extractiva was used to convert the ESI in native format to the TIFF images on the discs. *Id.* at 78-80. Teshima attested that Extractiva would automatically capture all metadata from ESI, including the full text of the ESI. *Id.* at 80-81, 115, 122. He opined that the metadata that counsel for B&G offered to produce at the June 20 conference was "a rudimentary subset . . . of the metadata that [he] would expect to find in either the native file or . . . in an Extractiva database." *Id.* at 82. Teshima also testified about the costs Lexington would have to incur to make the discs tendered by B&G searchable and to code information manually, such as to, from, and date fields, as compared with the cost to B&G to reprocess the ESI in native format. *Id.* at 85-94.

After Teshima's testimony, Berringer revealed to the Court for the first time that he had learned that ESI had been copied to the Target Hard Drive and converted to the TIFF images stored in the Introspect database. Ellison and Berringer did not disclose until closing argument, that sometime before June 20, 2008, Martinez, the Reed Smith analyst, reviewed the Introspect database and the Target Hard Drive and told Heinnickel that metadata existed for the documents on the March 14 and April 30 Discs. *Id.* at 178-79.[14]

Ellison and Berringer repeatedly argued that their failure to learn and disclose the correct information about the gathering and production of ESI was the result of AKO's refusal to provide them information. *See, e.g.*, *id.* at 163 (Berringer: "Our communications with Anderson Kill are not great."), 167 (Berringer: "I understand that there had been a number of different attempts to get

---

[14] Analyst Martinez averred on August 29, 2008, that he and Heinnickel conferred with AKO lawyers and technology specialists starting on June 26, 2008, regarding the Extractiva program. Doc. No. 339-4 ¶ 4. This declaration does not undermine Reed Smith's admission that Martinez learned before June 20 about the metadata on the Introspect database and about the Target Hard Drive.

everything from Anderson Kill and it's not been smooth."); 180 (Ellison: "I can't answer for why Anderson Kill won't answer our questions. I can't answer that. The questions have been asked, that's all I can say."). As discussed herein, while there was undoubtedly some animosity between AKO and Ellison, the assertions that AKO refused to provide information concerning ESI when requested were entirely untrue.

At the conclusion of the hearing, I found that B&G "directly or through their agents deliberately manipulated the electronically stored information in such a way as to withhold from the defendants the information that had been requested, specifically metadata." *Id.* at 196.[15] I further found that the problems with the ESI production were caused by B&G and its agents, and therefore "they will be the ones to bear the burden of whatever cost it takes to get" the ESI produced in a usable format. *Id.* at 197-98. Based on the representations that AKO was not cooperating with production of information stored in the Introspect database, I granted interim relief requiring B&G to produce ESI and metadata in their control as follows:

> [O]n or before July 11, 2008, Bray and Gillespie, plaintiffs, shall produce to counsel for Lexington . . . all responsive information to the request[s] for production at issue in the present motions that was in electronically stored format . . . if you can obtain access to the Extractiva program, and if you cannot, in native format with associated metadata.

*Id.* at 198.[16]

---

[15] I also found that any filtering of metadata occurred through manual manipulation of the data. Doc. No. 330 at 196-97. As evidence subsequently developed, however, there is insufficient information for the Court to conclude that metadata was filtered in the transfer from the Target Hard Drive to the Introspect database. *See, e.g.,* Doc. No. 440 at 437-38. Instead, it appears that metadata was deliberately withheld by counsel at Reed Smith.

[16] This order was based on Teshima's analysis and defense counsel's argument about the most efficient and cost-effective way to obtain the missing metadata for the TIFF images. Had Reed Smith

B&G appealed this order to the district judge then assigned to the case. B&G argued that I erred by failing to reduce my oral order to writing and abused my discretion by requiring production of the ESI too quickly thereby unduly burdening B&G. Doc. No. 255. The district judge overruled B&G's objections and affirmed the order in all respects. Doc. No. 256.

G.    *Compliance with the June 25 Order*.

Following the June 25 Order, Heinnickel and Analyst Martinez worked with AKO and outside vendors to obtain ESI from existing Extractiva files. *See* Doc. No. 339-3, 339-4. To the extent that Extractiva files were not maintained, B&G conducted a review of the documents on the Target Hard Drive. *See* Doc. No. 276 at 37, 39-40. DelValle involved IT staff with B&G in the process of gathering information from the Target Hard Drive. Doc. No. 440 at 375-76.

On July 16, 2008, I ordered Lexington to supplement its "motion[ ] for sanctions disclosing whether and to what extent Plaintiff produced discovery on July 11, 2008, as required by my oral order requiring such production." Doc. No. 258. In the response, Lexington informed the Court that on July 15, 2008, Logix Systems, an outside vendor working with B&G, provided Lexington with a hard drive (the "Logix Systems Hard Drive") containing metadata obtained from the extant Extractiva files.[17] Doc. No. 264 ¶¶ 3, 7; Doc. No. 276 at 36-37; *accord* Doc. No. 270. On July

_____

revealed the complete scope of the metadata contained in the Introspect database, and AKO's willingness to produce information from the Introspect database on request, it may have been more efficient and cost-effective to require production of load files for the Introspect database that contained the metadata. *See* Doc. No. 440 at 332-33, 404-06, 434-35; *accord id.* at 383 (DelValle conceded, "I think, in retrospect, if we could have just produced the underlying data, we probably wouldn't have had to [produce] Extractiva files and documents from the Target Hard Drive.").

[17]  Not all of the Extractiva files were maintained. *See* Doc. No. 276 at 36-37.

18, 2008, B&G provided Lexington with a hard drive (the "B&G Hard Drive") containing ESI not within the extant Extractiva files. Doc. No. 264 ¶ 8; *accord* Doc. No. 270.

Through the assistance of expert witness Teshima, Lexington was able to correlate the information in the Logix Systems Hard Drive with the previously produced TIFF images. Doc. No. 440 at 396-97. The information provided in the B&G Hard Drive, however, was not complete, not in the original format, and not as maintained by B&G in the ordinary course of business. *Id.* at 398-403.

### H.   *Reopening of the June 25 Hearing.*

On October 2, 2008, I issued a notice to Reed Smith, Ellison,[18] and DelValle[19] affording them an opportunity to file a supplemental response to the sanctions motion addressing why sanctions should not be imposed against any or all of them as the attorney(s) responsible for the allegedly sanctionable conduct. Doc. No. 331.[20] I later issued a notice reopening the June 25 evidentiary hearing. Doc. No. 351. In that notice, I specifically advised B&G and its counsel that it could "present evidence from previous counsel of record regarding good faith conferences

---

[18]  Ellison was listed individually because he has been counsel of record throughout this case, while Reed Smith only became involved in the case in 2008.

[19]  DelValle was listed individually because the record indicates he was counsel for B&G at relevant times. *See* Doc. No. 190 at 6 (Letter from DelValle to Lane, dated Mar. 28, 2008, stating "I am outside counsel for Bray & Gillespie, LLC and its related entities.").

[20]  I did not issue the notice to Berringer individually because his material misrepresentations about the way ESI was gathered from B&G, and his deliberate failure to apprise Lexington and the Court that Reed Smith lawyers always had unrestricted access to the ESI in the form requested and ordered to be produced, were not apparent until evidence was presented at the reopened sanctions hearing conducted on December 8, 2008. Because Berringer is a partner with Reed Smith, his conduct is imputed to the law firm for purposes of this Order.

among counsel, the meaning of terms in discovery responses, and other information." *Id.* at 5 n. 2.[21]

B&G submitted sworn statements in response to my October 2, 2008 Order. *See* Doc. Nos. 338-39 (attachments). Berringer, Ellison, and DelValle also testified at the reopened hearing. Doc. No. 440 at 270-386. Pillsbury, accompanied by AKO partner Jeffrey Glen, voluntarily appeared and testified at the hearing. *Id.* at 208, 228-69. Finally, expert witness Teshima presented additional testimony. *Id.* at 386-439.

In their supplemental response to the motion for sanctions, Reed Smith and Ellison again asserted that "[b]ecause of the poor communication with prior counsel, and the termination of B&G's prior chief legal officer, it has proven difficult for Reed Smith and John Ellison to get the facts about Plaintiffs' document production." Doc. No. 339 at 10. At the reopened hearing on December 8, 2008, Pillsbury testified, and Attorney Glen represented, that contrary to these assertions, AKO always cooperated with Reed Smith with respect to turning over documents and allowing the Reed Smith and Boies Schiller lawyers unrestricted remote access to the Introspect database. Doc. No. 440 at 238, 259-61. Additionally, the evidence in the record reflects that AKO attorneys and staff provided information whenever it was requested by Reed Smith and its staff. *See, e.g.,* Doc. No. 222-2 ¶ 6; Doc. No. 330 at 165-66; Doc. No. 339-4 ¶ 4; Doc. No. 380-8 at 84 (Pillsbury provided information to B&G's Rule 30(b)(6) representative); Doc. No. 440 at 297.

---

[21] I also filed a Preliminary Statement of Adjudicative Facts to give the parties and counsel further guidance on the matters I considered relevant, but I stated that these facts were neither findings of fact nor a complete statement of the facts the Court would consider. Doc. No. 397. In the document, I noted that the Court had been provided conflicting information about the production of ESI by B&G in another case, *Bray & Gillespie IX, LLC v. The Hartford Ins. Co.,* Case No. 6:07-cv-326-Orl-DAB.

In his testimony, Ellison conceded that the asserted problems with communications with AKO were "overstated." *Id.* at 348-49. He could not provide any specific example of information requested from AKO regarding discovery that was not provided. *Id.* at 350.

Regarding Reed Smith's "good faith" efforts to resolve the discovery dispute, Berringer conceded that he had incorrectly advised defense counsel that the ESI contained in the Introspect database had been printed and scanned. *Id.* at 280 ("It was my understanding, until we heard expert testimony on the 25th, that the documents had been downloaded and then scanned from hard copy into the target hard drive."); *accord id.* at 277 ("I screwed up and told them that everything had been downloaded . . . ."). When asked about the basis of this understanding, Berringer testified as follows:

> I asked Jeremy [Heinnickel] and I'm sure we asked the client, how did this target hard drive come about? Every time we raised the question, we were told that Maya Cater and Leuken were involved. "You'd have to talk to them." But every time we raised the question, somebody talked about the [student interns]. And I guess what happened was I just translated that, because the only thing I could ever take from most of these discussions was that [the student interns] stood in front of scanners, scanning documents for a full weekend; and I just – I guess I made an unconscious leap then and assumed that they had scanned everything.

*Id.* at 280-81.

Berringer also acknowledged that he did not disclose the existence of the Target Hard Drive containing the ESI in native format during the negotiations with Lexington's counsel. *Id.* at 292, 327; *see also* Doc. No. 339-3 ¶ 5. As of the date of the reopened hearing, Berringer had not looked at the Introspect database and could not testify about the scope of the metadata contained in that database. Doc. No. 440 at 272-73, 276, 290, 305-06, 312.

Berringer was evasive and dissembling when asked to explain why Reed Smith did not simply produce the metadata in the Introspect database associated with the TIFF images when it produced the March 14 and April 30 Discs.[22] He testified that B&G would have had to find the documents in native format and conduct another privilege review. *Id.* at 275, 281. Berringer knew, however, that the documents in the Introspect database already had been reviewed for privilege, and that privileged documents already had been segregated. *Id.* at 290. Berringer did not dispute that the TIFF images on the March 14 and April 30 Discs could be linked back to the TIFF images in the Introspect database where the privilege review had already been done. *Id.* at 276.

Berringer also knew that the Introspect database was searchable by fields that contained metadata such as name, date, subject matter, to, from, and CC. *Id.* at 278-79, 305-06. Berringer testified, "I know that the fields that *we told them* [the Introspect database] had were to, from, date, a re line, if there was one, cc's, bcc's."). *Id.* at 304-05 (emphasis added). Berringer identified a letter in which Reed Smith offered "to produce load files containing certain metadata fields for the e-mails produced" that included, but were not limited to, those set forth in the letter. *Id.* at 313. Thus, there was no need to search the ESI in native format before determining the scope of the metadata in the Introspect database, and no need to conduct a privilege review of the ESI in native format. Rather, B&G and Reed Smith could easily have produced for each TIFF image on the March 14 and April 30 Discs a corresponding load file containing the metadata for each image as stored in the Introspect database.

---

[22] Berringer testified that if he had understood the April 11 Order to require production of metadata, his "approach would have been totally different . . . ." Doc. No. 440 at 285; *see also id.* at 430.

The evidence also provides ample reason for this Court to believe that B&G still has not disclosed all of the metadata in the Introspect database. Pillsbury testified that the Introspect database contained full text and other ESI metadata. *Id.* at 245, 256-57. Pillsbury did not give instructions to the individuals making the conversion from the Target Hard Drive to the Introspect database about what metadata to capture. *Id.* at 231-32. Teshima opined that Extractiva would automatically have captured all the ESI metadata, including the full text. *Id.* at 389-93. Accordingly, there is no evidence that anyone caused Extractiva to "selectively exclude certain types of metadata." *See* June 23, 2008 Letter from counsel for Belfor to Heinnickel, Lexington Ex. 13 (Dec. 8, 2008, Hrg.).[23]

If the Introspect database has other metadata not produced in the Logix Systems Hard Drive, then Lexington may have incurred additional, unnecessary expense in translating the information on the Logix Systems Hard Drive into usable form. The problems with the information on the B&G Hard Drive could also easily have been resolved at the outset by producing the complete metadata load files from the Introspect database for the TIFF images on the March 14 and April 30 Discs. *See* Doc. No. 440 at 396-400.

## IV.    ANALYSIS.

### A.    *ESI Discovery and B&G's Violation of Rule 34.*

Rule 26 requires parties to meet before a scheduling order is entered and to prepare a discovery plan. Fed. R. Civ. P. 26(f). The discovery plan should include, among other things, the parties' views and proposals on disclosure of ESI, including the form or forms in which it should

---

[23] *But see* Doc. No. 339-4 ¶ 12 (Analyst Martinez averred that Logix Systems indicated that a searchable text field was not available in Extractiva).

be produced.  Fed. R. Civ. P. 26(f)(2), (f)(3)(C) (eff. Dec. 1, 2006).  Counsel for the parties

discussed ESI during their initial meeting to prepare the case management report, and they

discussed ESI afterward, but they did not reach an agreement.  These efforts complied with Rule

26(f).

Rule 34 permits a party requesting production of documents to "specify the form or forms

in which electronically stored information is to be produced."  Fed. R. Civ. P. 34(b)(1)(C) (eff.

Dec. 1, 2006).  It also permits the party responding to such a request to "state an objection to a

requested form for producing electronically stored information . . . [and] state the form or forms it

intends to use."  Fed. R. Civ. P. 34(b)(2)(D).  If the request for production "does not specify a form

for producing electronically stored information, a party must produce it in a form or forms in

which it is ordinarily maintained or in a reasonably usable form or forms."  Fed. R. Civ. P. 34

(b)(2)(E)(ii).

In its RFPs, Lexington set forth definitions of terms in separate paragraphs, with each

defined term set forth in bold typeface. In the paragraph defining ESI, Lexington specified the

form in which ESI should be produced – in native form without deletion or alteration of metadata.

Five of the requests for production at issue in the Renewed Motion to Compel specifically

requested ESI, and each reference to ESI was in bold typeface.  Lexington RFP 1 (Request Nos.

88, 97, 102, 103, 122).  Therefore, B&G had ample notice of Lexington's specification, but it did

not object to the specified form.

Even if the Court construed B&G's preliminary statement that "[p]er our agreement, all

documents will be provided by sending discs containing scanned copies of the documents; no hard

copies of the documents will be provided," to be an objection under Rule 34(b)(2)(D), that "objection" was abandoned when B&G failed to respond to the Renewed Motion to Compel. Doc. No. 181 at 2. I found that B&G waived any objections to Lexington's RFPs by failing to support the objections in a response to the Renewed Motion to Compel. Accordingly, B&G violated Rule 34 by failing to produce ESI in the form specified by Lexington. *See* Fed. R. Civ. P. 37(a)(3)(B)(iv).

  *B. Violation of the April 11 Order.*

  In the April 11 Order, I directed B&G to produce by April 30, 2008, all responsive documents within its possession, custody, or control to the extent requested in the Renewed Motion to Compel. B&G could have produced ESI in the specified form without difficulty by April 30, 2008, at least with respect to the ESI gathered in 2006, because it had been copied in native format to the Target Hard Drive and transferred to the Introspect database. B&G violated the April 11 Order by failing to produce ESI in the specified form.

  *C. Available Sanctions.*

   1. <u>Rule 37 Sanctions</u>.

  Rule 37(a) provides that when, as here, a motion to compel was granted for failure to disclose requested information, the Court must require the party or the attorney advising the conduct, or both, to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. The only exceptions to this requirement are when the movant "filed the motion before attempting in good faith to obtain the . . . discovery without court action," when the

nondisclosure "was substantially justified," or when "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).

Rule 37(b) provides additional sanctions for violation of a discovery order, including the following:

(i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)    striking pleadings in whole or in part;

(iv)    staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part;

(vi)    rendering a default judgment against the disobedient party; or

(vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). "Instead of or in addition to" these sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

"[A] motion for sanctions under Rule 37, even one which names only a party, places both that party and its attorney on notice that the court may assess sanctions against either or both unless they provide the court with a substantial justification for their conduct." *Devaney v. Continental Am. Ins. Co.*, 989 F.2d 1154, 1160 (11th Cir. 1993). Thus, "a party listing only its opponent in a motion for sanctions does not absolve the opponent's attorney of potential liability. Instead, the movant merely provides the court with the double option of holding responsible either the opponent or the attorney either under the motion or *sua sponte*." *Id.*

The determination of appropriate sanctions under Rule 37 is within the district court's sound discretion. *See Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 642 (1976).

> The magnitude of sanctions awarded is bounded under Rule 37 only by that which is "reasonable" in light of the circumstances. Permissible purposes of sanction[s] include: 1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney.

*Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985) (internal citations omitted). "Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999).

The Court need not find that the party or its counsel acted willfully or in bad faith before imposing Rule 37 sanctions, unless the sanction is dismissal of the complaint or entry of a default judgment. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994). In *BankAtlantic,* the Eleventh Circuit cited to dicta in *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958), in which the Supreme Court observed that "the willfulness or good faith [of the disobedient party] can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with [the disobedient party's] failure to comply." *BankAtlantic*, 12 F.3d at 1049 (emphasis omitted).

2.    <u>Inherent Power</u>.

Courts have the discretion to sanction conduct that abuses the judicial process even if procedural rules exist that govern the same conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45, 48-49 (1991). In fashioning appropriate sanctions, courts have the inherent power to impose sanctions on parties, lawyers, or both. *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006). The court may tax attorney's fees and costs "when either has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) (internal quotation omitted). In general, "the severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d at 1306 (internal citation and quotation omitted).

The court's inherent power also includes sanctioning non-parties for bad faith conduct. *See generally Chambers*, 501 U.S. at 43; *see also Helmac Prods. Corp. v. Roth (Plastics) Corp.*, 150 F.R.D. 563, 564-67 (E.D. Mich. 1993) (citing *Chambers* as authority to sanction non-parties). The sanctioning of non-parties requires additional safeguards. I find persuasive the decision in *Helmac Products* that a non-party must "(1) have a substantial interest in the outcome of the litigation and (2) substantially participate in the proceedings in which he interfered." *Helmac Prods. Corp.*, 150 F.R.D. at 568.

A finding of bad faith is required to impose sanctions under the court's inherent power. "A finding of bad faith is warranted where an attorney . . . knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also

-33-

demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Byrne*, 261 F.3d at 1121 (citations omitted). "[F]alse statements alone do not indicate bad faith," but they "can be evidence of bad faith, if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose." *Id.* at 1125.

D.      *Imposition of Sanctions.*

B&G and its counsel have had an opportunity to review and respond to Lexington's motion for sanctions. In an abundance of caution, the Court offered B&G, Reed Smith, Ellison, and DelValle a second opportunity to review and respond to the motion and the Court's specific notice concerning the imposition of sanctions. Therefore, I conclude that B&G, Reed Smith, Ellison, and DelValle have had a sufficient warning and the requirements of due process have been satisfied. *See In re Walker*, 532 F.3d 1304, 1309-10 (11th Cir. 2008) (citing *Chambers* and requiring courts to afford due process to a party sanctioned under the court's inherent power).

1.      <u>Substantial Justification</u>.

"The Supreme Court has clarified that an individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Devaney*, 989 F.3d at 1163 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations omitted)).

B&G and its counsel argue that they were substantially justified in failing to produce ESI in the form specified by Lexington because (1) B&G's response to Lexington's RFPs referred to an agreement to produce scanned copies of documents; (2) Lexington delayed in objecting to the form of production of ESI; and, (3) B&G was entitled to produce ESI as maintained in the usual

course of business and in a reasonably usable form. *See* Fed. R. Civ. P. 34(E)(i), (ii). B&G also

relies on case law from other jurisdictions in which courts found that a party did not err by failing

to produce ESI in native format with metadata. I will discuss these assertions in turn.

### a.      The Agreement Among Counsel.

B&G contends that it believed that the parties had agreed to produce all discovery,

including ESI, as scanned documents. B&G's representation regarding the parties' agreement was

not justified. First, the evidence establishes that the agreement among counsel related only to

documents that were maintained in paper form. This is consistent with the complete preliminary

statement – "Per our agreement, all documents will be provided by sending discs containing

scanned copies of the documents; *no hard copies* of the documents will be provided [emphasis

added]."[24] Second, B&G *did not* produce all documents as scanned copies. Rather, B&G's

attorneys manipulated ESI to convert the searchable text with metadata to a TIFF image stripped of

metadata. These facts undermine B&G's assertion that it justifiably relied on the agreement to

produce discs containing scanned copies of documents.

### b.      Lexington's Delay in Objecting.

B&G also argues that it was substantially justified in producing ESI as TIFF images

without metadata because Lexington did not object to the form of production until after the March

14 and April 30 Discs were tendered. This argument might carry some weight if B&G had

produced ESI in a form permitted by Rule 34 at the outset. Because it did not, and instead

---

[24] It is telling that in the response to the sanctions motion, B&G omitted the part of the agreement that refers to no hard copies being provided. *See* Doc. No. 222 at 3 ("In the Preliminary Statement of B&G's Responses, B&G stated that '[p]er our agreement, all documents will be provided by sending discs containing <u>scanned copies of the documents</u> . . . .'") (emphasis and omission in original).

concealed and misrepresented that ESI was always available in the form specified, Lexington's

delay in objecting is irrelevant.

> **c. ESI Was Not Produced as Kept in the Usual Course of Business or in a Reasonably Usable Form.**

Rule 34 provides that when there is no specification of the form in which ESI should be

produced, a responding party "must produce documents as they are kept in the usual course of

business . . . ." Rule 34(b)(2)(E)(i). In addition, Rule 34 requires that the ESI must be produced in

a "form or forms in which it is ordinarily maintained or in a reasonably usable form or forms."

Fed. R. Civ. P. 34(b)(2)(E)(ii).

B&G has never contended that it kept its emails and other ESI in TIFF format with no

associated metadata. Rather, as Pillsbury testified, the ESI was kept on computers and gathered

electronically. B&G's attorneys created the TIFF images without metadata for the sole purpose of

producing them to Lexington. Thus, B&G did not produce the ESI as kept in the usual course of

business.

B&G also did not produce the ESI in reasonably usable form. The Advisory Committee

notes to Rule 34 caution as follows:

> [T]he option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation. If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature.

Fed. R. Civ. P. 34, Advisory Comm. Notes, 2006 Amend.

B&G kept e-mail and other ESI in computer files that were full text searchable with associated metadata. The ESI B&G produced as TIFF images without metadata eliminated the search capabilities that would have been available if B&G had produced ESI in native format. To conduct searches, Lexington would have had to convert the TIFF images into a searchable text format through OCR. *See* Doc. No. 222 at 11. Because of the significant limitations of OCR discussed above, the ability to search would only have been as good as the ability of the OCR software to translate what appeared in the TIFF images. OCR also would not identify metadata that did not appear in the TIFF images, such as dates of creation and modification of ESI. Thus, I find the form of production selected by B&G removed or significantly degraded Lexington's ability to search the ESI and, accordingly, that it was not in a reasonably usable form as required by Rule 34.

>    **d.**    **Case Law Regarding Production of ESI**.

B&G relies on three out-of-circuit district court cases to support its argument that it was substantially justified in not producing ESI in native format with associated metadata: *Kentucky Speedway, LLC v. NASCAR, Inc.*, Civ. Action No. 05-138-WOB, 2006 WL 5097354 (E.D. Ky. Dec. 18, 2006); *Michigan First Credit Union v. Cumis Ins. Soc'y, Inc.*, No. 05-74423, 2007 WL 4098213 (E.D. Mich. Nov. 16, 2007); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* ("*In re Payment Card*"), No. MD 05-1720(JG)(JO), 2007 WL 121426 (E.D.N.Y. Jan. 12, 2007). None of the cases is binding on this Court, and none support B&G's position, as discussed below.

In *Kentucky Speedway*, the movant did not specify the manner in which electronically stored information should be produced. 2006 WL 2927878, at *7-9. Therefore, the court denied a belated request for production of the ESI in native format. The court noted that *on the facts of that case*, the production of metadata was not warranted. *Id.* The reasoning does not apply in the present case, because Lexington specified that manner in which ESI should be produced.

In *Michigan First Credit Union*, the court ordered the defendant to supplement its previous production of documents, including ESI, but the court did not address the defendant's earlier objection to plaintiff's specification that ESI should be produced in native format with intact metadata. 2007 WL 4098213, at *2-3. Based on these facts, the court held that, because its order to produce did not resolve the objection regarding the form of production of ESI, the defendant did not violate the order by failing to produce the ESI in the manner specified by the plaintiff. In contrast, B&G did not object to Lexington's specification of the form in which ESI should be produced. This Court had no reason to address in the April 11 Order an objection that B&G did not assert. Moreover, B&G did not even respond to Lexington's Renewed Motion to Compel and thereby conclusively waived any objection it may have had to the form of production of ESI specified in Lexington's RFPs.

In *In re Payment Card*, the defendants specified production of ESI with metadata. The individual plaintiffs responded that they would produce ESI in the manner required by the rules, but that they would not comply with any additional definitions or instructions specified by the defendants. Thereafter, the individual defendants "rather laboriously stripped their text-searchable electronic documents of metadata that would not appear in printed form, and then converted them

back into text-searchable electronic documents without that subset of metadata." 2007 WL 121426, at *1.

The court elected to apply the amendments to Rule 34 that had been published but were not yet effective, and determined that the method in which the plaintiffs produced ESI was not reasonably usable. *Id.* at *4 (citing the Rule 34 Advisory Comm. Notes, 2006 Amend.). Nevertheless, in view of the defendants' failure to object to the form of production of ESI for several months after discovery had been produced, the court found that it would not be fair to impose the costs of reproduction of the ESI on the individual plaintiffs. The court admonished plaintiffs that, in the future, they would likely be required to reproduce any ESI that was produced in a form that was not reasonably usable. *Id.*

To the extent that B&G relied on *In re Payment Card* in deciding which form of ESI to produce in response to my April 11 Order, that decision put B&G on notice that stripping ESI of metadata and converting it to a form that was not text searchable would violate Rule 34, as amended in 2006. Unlike the situation in *In re Payment Card*, B&G knew that the amendments to Rule 34 applied when it produced the March 14 and April 30 Discs. Accordingly, B&G's knowledge of the decision in *In re Payment Card* provides additional support for the finding that the form in which it produced ESI to Lexington was not substantially justified.[25]

---

[25] B&G also cited *Wyeth v. Impax Labs., Inc.*, 248 F.R.D. 169 (D. Del. 2006), for the proposition that when counsel do not agree on the form of production of ESI, a party is not required to produce ESI in native format. The *Wyeth* court's decision was based on local discovery standards that directed parties to produce ESI as image files if they could not agree on a different form of production. *Id.* at *4-5. This Court does not have local discovery standards that establish the default form of production of ESI in the absence of agreement of the parties.

**e.      If B&G and Its Attorneys Believed They Were Substantially
Justified in the Form of Production of ESI, They
Would Not Have Engaged in a Pattern and Practice of
Concealing and Misrepresenting Material Information.**

Most telling, if B&G and its attorneys believed the form in which they produced ESI was

substantially justified, there was no reason for them to conceal information and make material

misrepresentations about the way ESI was collected and the form in which it was kept in the

Introspect database.  Instead, Reed Smith and its attorneys went to great length to fabricate

explanations about why they could not produce ESI.  In response to the April 11 Order, they

asserted the costs and burden B&G would incur in producing ESI without disclosing to the Court

and the parties that ESI with associated metadata was readily available in the Introspect database.

During the December 8, 2008, hearing, counsel for Reed Smith still argued that production of ESI

in native format would have been unduly burdensome because the privilege review had not been

conducted of the ESI on the Target Hard Drive.  In making this argument, counsel ignored the

evidence that a privilege review had been done in the Introspect database, and that the metadata

associated with the TIFF images on the March 14 and April 30 Discs could be produced from the

Introspect database.  Such deliberate or reckless disregard of the truth can never provide

substantial justification under Rule 37.

Accordingly, B&G and its counsel have not established that their production of ESI and

their response to the April 11 Order were substantially justified.

2.    <u>Sanctions Against B&G</u>.

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton*, 178 F.3d at 1374. Although dismissal for a violation of a discovery order is an option, less drastic remedies should be considered. *Mene v. Marriott Int'l, Inc.*, 238 F. App'x 579, 581-82 (11th Cir. 2007). Any sanction should "penaliz[e] the guilty party or attorney" responsible for the conduct, and should be the least onerous sanction the Court finds necessary to meet the purposes the Eleventh Circuit outlined in *Carlucci*. 775 F.2d at 1453. In addition to awarding attorney's fees and costs, Lexington "requests that the Court strike the allegations and claims of the Amended Complaint" addressed by Lexington's RFPs and preclude B&G "from offering evidence relating to such allegations and claims." Doc. No. 202 at 19. I decline to impose the harsh sanction of striking B&G's claims because it appears that the prejudice Lexington unquestionably has suffered can be ameliorated at this stage of the litigation by less onerous sanctions. S*ee Mene*, 238 F. App'x at 581-82.

Lexington has been prejudiced by (1) being unable to complete discovery after receiving ESI in a form that was not reasonably usable; (2) incurring additional expense in using ESI that was produced in a form that limited its ability to search it; and, (3) incurring attorney's fees, costs, and litigation expenses in establishing that ESI had not been properly produced. The interim relief that I granted resulted in production of the Logix Systems Hard Drive and B&G Hard Drive, but B&G still has not produced all specified ESI in reasonably usable form.

B&G previously offered to produce to Lexington the Introspect database, except for ESI designated as privileged or protected that had already been segregated from other ESI. Production

of the Introspect database should provide Lexington the same data and search capability that B&G has had throughout this case. Accordingly, B&G shall provide to Lexington the Introspect database, except for information already segregated as privileged or protected. B&G shall bear all costs related to this production, including purchasing software or paying license fees for Lexington's use of the database software, and hiring professionals to copy the database, if necessary. Lexington may elect the form or forms in which it wishes the production of the Introspect database to be made – it may ask for a copy of the Introspect database, remote access to the database, or both.

To ensure that B&G complies with this Order, B&G shall provide a computer expert selected by Lexington direct access to the Introspect database maintained by Reed Smith, so that the expert can confirm that all information loaded into the Introspect database, except the information already designated privileged or protected, has been produced to Lexington.

Finally, I will reopen the fact discovery period as to Lexington only for another 60 days. This will provide Lexington an opportunity to view the ESI in the Introspect database and conduct follow-up discovery as necessary. This extension of time also extends the time for Lexington only to file motions related to discovery, including a motion for sanctions due to spoliation of evidence.

While B&G, as the client, has the obligation to supervise its lawyers, the evidence establishes that B&G's outside counsel made the decision how to produce ESI. Additionally, B&G has already spent considerable time and effort to reproduce some ESI in native format, although problems remain with the form of that production. Under these circumstances, I find that it is not appropriate to require B&G to pay the attorney's fees, costs, and expenses Lexington

incurred in filing the motion for sanctions and participating in the proceedings related to that

motion. Should B&G fail to monitor its counsel's actions going forward, however, it will subject

itself to all available sanctions should additional problems occur.

3. Sanctions Against DelValle.

Rule 37 provides that the party or the attorney advising the sanctionable conduct, or both,

are subject to sanctions. Fed. R. Civ. P. 37(a)(5)(A), (b)(2)(C). The Eleventh Circuit has

explained that "[t]he phrase 'attorney advising such conduct' does not . . . exclude . . . an

attorney's willful blindness . . . ; to the contrary, the phrase instructs that when an attorney advises

a client in discovery matters, he assumes a responsibility for the professional disposition of that

portion of a lawsuit and may be held accountable for positions taken or responses filed during that

process." *Devaney*, 989 F.2d at 1161-62. In this respect, "[s]anctions exist, in part, to remind

attorneys that service to their clients must coexist with their responsibilities toward the court,

toward the law and toward their brethren at the bar." *Id.* at 1162.

DelValle entered the case in May 2008 and became local counsel for B&G in June 2008. I

credit his testimony that he did not participate in the production of ESI until after my June 25

Order requiring reproduction of ESI. Accordingly, I find that he was not an attorney advising

B&G with respect to the production of ESI in March and April 2008. I remind DelValle, however,

that blindly relying on outside counsel falls short of the duty he has as an officer of the court, as

counsel of record, and as an advocate for his client.

4. <u>Sanctions Against Ellison</u>.

Ellison has been one of the lead counsel of record in this case since its inception. While he presented evidence that he was not involved in production of discovery before April 2008, the evidence shows that he began advising B&G regarding discovery before the April 30 Discs were produced. The improper production of ESI on the April 30 Discs and the discovery misconduct that followed was done under Ellison's supervision, and necessitated the motion for sanctions and proceedings related thereto. As such, Ellison was "an attorney advising" B&G regarding the discovery misconduct, and he is personally liable for Rule 37 sanctions.

Ellison's argument that his local counsel was in charge of the production of the April 30 Discs does not relieve him from personal liability because counsel of record in a case may not avoid sanctions for his own conduct on the basis that another attorney was advising the client regarding the discovery matter at issue. In *Stuart I. Levin & Assocs., P.A. v. Rogers*, 156 F.3d 1135 (11th Cir. 1998), Newton Simmons was represented by a law firm that engaged in "obstructive tactics" with respect to discovery, including failing to produce documents in response to court orders. Thereafter, the law firm withdrew. Stuart Levin, Esq., later appeared as substitute counsel for Simmons. The Court notified Levin of the numerous discovery requests that remained unanswered and the numerous motions pending to which no responses had been filed. Simmons and Levin simply ignored the discovery requests and court orders. *Id.* at 1139.

A magistrate judge held an evidentiary hearing on the question of what sanctions to impose against Simmons' attorneys as a result of the discovery misconduct. An associate in Levin's law firm appeared at the hearing. The magistrate judge found that the law firm that originally

represented Simmons had engaged in "obstructive tactics," and that Levin failed to respond to discovery requests and pending motions. The Court imposed monetary sanctions against both Simmons' original law firm and against Levin and his law firm. *Id.*

On appeal, Levin argued that he should not have been sanctioned because he was not the "attorney advising" Simmons regarding discovery; he had delegated that task to his associate. The Eleventh Circuit rejected Levin's argument. *Id.* at 1141. The court observed that while Levin "may have delegated some of these duties to his associate, such a delegation-while it may provide a ground for sanctioning [his associate]-did not relieve Levin of his own duties." *Id.* The Eleventh Circuit noted that "[a]s counsel of record, Levin owed a duty to his client fully to represent his interests, and he owed a duty to the court to comply with the court's orders." *Id.* Accordingly, the Eleventh Circuit found that the district court had not abused its discretion in imposing Rule 37 sanctions against Levin.

As in *Levin*, because Ellison's own conduct was not substantially justified, he is subject to sanctions under Rule 37 and shall pay the reasonable attorney's fees, costs, and expenses Lexington incurred in filing the motion for sanctions and in the matters arising therefrom. These costs include the fees and expenses of expert witness Teshima. In addition, Ellison shall pay the Court's court reporter, Diane Peede, for the cost of transcribing the December 8, 2008, hearing on the motion for sanctions.

5.    <u>Sanctions Against Reed Smith</u>.

Reed Smith, through its partners and associate attorneys, was also responsible for the discovery misconduct. When attorneys have engaged in a pattern of withholding and concealing

information concerning discoverable material and misrepresenting to the court and opposing counsel material facts about numerous failures to comply with discovery requests and Court orders–including falsely blaming a lack of third-party cooperation and fabricating a false story about the form in which ESI was gathered and stored–courts in this circuit have not hesitated to impose significant sanctions against the law firms that employed the attorneys responsible for this sanctionable conduct.

In *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510 (11th Cir. 1986), the Eleventh Circuit upheld a post-judgment Rule 37 sanctions award against a law firm and its corporate client, finding the law firm failed in its duty of candor to the court and in dealing honestly and fairly with opposing counsel. The *Pesaplastic* court criticized the sanctioned firm for "conveniently ignor[ing] the realities of the situation" concerning third-party control of documents in the case, *id.* at 1520, and admonished the law firm that "[a]dvocacy does not include 'game playing.'" *Id.* at 1522-23; *accord BankAtlantic*, 12 F.3d at 1045 (upholding sanction against law firm for Rule 37 violations).[26]

The evidence establishes that Reed Smith, particularly through its partners Ellison and Berringer, acted in bad faith with respect to the events that occurred after Lexington objected in May 2008 to the form of B&G's production of ESI. Specifically, Berringer falsely told opposing counsel that B&G had caused all of its ESI to be printed and scanned to support the position that B&G could not produce metadata or text searchable documents. He made no reasonable effort to determine whether the story he told was true – such as looking at the information in the Introspect

---

[26] *Cf. Levin*, 156 F.3d at 1440 n.3 (Eleventh Circuit declined to decide whether law firm was liable for Rule 37 sanctions).

database or asking AKO. Counsel for Lexington and the Court were deceived by Berringer's deliberate fabrication, and it resulted in a significant waste of resources for Lexington and the Court. Berringer finally disclosed to Lexington's counsel on the eve of the June 25, 2008, hearing that B&G's ESI had been obtained in electronic form and transferred to the Introspect database, but that disclosure remained deceptive and incomplete. He did not disclose what metadata the Introspect database contained or the extent to which the ESI therein had full text search capacity. He did not reveal, until after Teshima testified at the June 25 hearing, that B&G possessed the Target Hard Drive on which the ESI in native format was stored.

Berringer continued this pattern of deliberate misrepresentation through willful blindness in his testimony at the December 2008 hearing. He testified about the metadata on the Introspect database, even though he never examined the database to determine what it contained. He was evasive about why B&G did not simply disclose the metadata on that database before the hearing.

Berringer and Ellison also made material misrepresentations to the Court about the reason they did not produce the metadata from the Introspect database to resolve the production problems. Both of them repeatedly told the Court that AKO had been asked to provide necessary information, but refused to do so. Instead, as the evidence established, throughout the relevant period, AKO made the Introspect database remotely accessible without restrictions to Reed Smith. AKO and its staff also provided information whenever Reed Smith asked for it. When pressed on this issue at the December 8, 2008, hearing, Ellison could not identify any instance in which AKO refused to provide requested information.

The totality of this conduct establishes that Reed Smith's actions in this regard were deliberately designed to impede Lexington's ability to discover and reasonably use ESI maintained by B&G. This bad faith conduct disrupted and delayed the discovery process and caused significant prejudice to Lexington. The bad faith conduct also unreasonably multiplied the proceedings in this case.

Accordingly, pursuant to Rule 37 and the Court's inherent power, I find that Reed Smith is jointly and severally liable with Ellison to pay the reasonable attorney's fees, costs, and expenses Lexington has incurred in filing the motion for sanctions and in the proceedings related thereto. These costs include the fees and expenses of expert witness Teshima, whose testimony was essential to uncovering the misrepresentations made regarding ESI. Reed Smith is also jointly and severally liable with Ellison to reimburse the Court's court reporter for the cost of transcribing the December 8, 2008, hearing on the motion for sanctions.

Finally, I will issue an order to show cause why John Berringer, Esq., should not also be personally sanctioned for his conduct in this case.

## V.     CONCLUSION.

Based on the foregoing findings of fact and conclusions of law, is it **ORDERED** as follows:

(1)     Defendant Lexington Insurance Company's Motion for Discovery Sanctions Against Plaintiffs and to Compel Proper Production of Documents by Plaintiffs, Doc. No. 202, is **GRANTED** in part as provided for herein and in the June 25 Order;

(2)     Fact discovery is reopened as to Lexington only through April 10, 2009, during

which time Lexington may also file motions related to discovery disputes, including

a motion seeking sanctions for spoliation of evidence;[27]

(3)     On or before March 13, 2009, B&G shall cause its attorneys to provide a copy of

the Introspect database, excluding only information segregated as privileged or

protected, to Lexington at B&G's expense, in whatever form(s) Lexington elects to

receive it;

(4)     On or before March 13, 2009, B&G shall cause its attorneys to permit a computer

expert retained by Lexington to have direct access to the Introspect database as

maintained by B&G's counsel, if requested by Lexington;

(5)      On or before March 13, 2009, John Ellison, Esq., and Reed Smith shall pay to

Diane Peede, court reporter, the sum of $1,205.65, which is the cost of transcribing

the December 8, 2008, hearing;

(6)     On or before a date to be established by the Court by separate order, John Ellison,

Esq., and Reed Smith shall pay Lexington the reasonable attorney's fees, costs, and

expenses it incurred in filing the motion for sanctions and the proceedings arising

therefrom, which shall include the following: the time spent preparing for and

attending good faith conferences and hearings; the fees and expenses of Daryl

Teshima and his firm, FTI, rendered in connection with the motion for sanctions,

including analyzing the March 14 and April 30 Discs, participating in conferences

---

[27]  The Court will address B&G's separate motion to modify the discovery schedule, Doc. No. 458, in a subsequent order.

-49-

regarding the discovery dispute, testifying, examining the Logix Systems Hard Drive and B&G Hard Drive and converting information therein to usable form; and, the fees and expenses of the computer expert who examines the Introspect database as provided for in this Order, if such examination is conducted.

(7)     On or before March 13, 2009, counsel for the parties shall confer in a good faith effort to resolve the amount of attorney's fees, costs, and expenses to be paid pursuant to paragraph (6) above.  If they fail to reach agreement, Lexington shall file on or before April 10, 2009, a motion for assessment of attorney's fees, costs and expenses supported by evidence of the reasonable hourly rate and reasonable number of hours worked by legal professionals, and evidence of the actual costs and expenses incurred.

(8)     On or before March 27, 2009, Lexington shall advise the Court in writing whether the Introspect database contains metadata in addition to that which B&G and its attorneys offered to produce before the June 25 hearing.  If so, the Court will then entertain a motion for further sanctions, including a request that the Court dismiss the amended complaint.

(9)     Following receipt of the information required in paragraph (8) above, or as

otherwise determined appropriate, the Court will issue an order to show cause why

John Berringer, Esq., should not be subject to sanctions arising from his conduct in

this case.

**DONE** and **ORDERED** in Orlando, Florida on March 4, 2009.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE