BRAY & GILLESPIE MANAGEMENT LLC,
BRAY & GILLESPIE, DELAWARE I, L.P.,
BRAY & GILLESPIE X, LLC, et al.
    **Plaintiffs,**

-vs-            Case No. 6:07-cv-222-Orl-35KRS

LEXINGTON INSURANCE COMPANY,

      **Defendants.**
_____/

# ORDER

This cause came on for consideration without oral argument on Defendant Lexington Insurance Company's Motion for Rule 37 Discovery Sanctions (Treasure Island Room Folios), Doc. No. 526 ("Motion for Sanctions"), as supplemented, Doc. No. 529. B&G and its counsel responded to the motion. Doc. Nos. 532, 575.[1]

## I. INTRODUCTION.

In Count V of the amended complaint, Doc. No. 13 ¶¶ 266-72, the Bray & Gillespie Plaintiffs ("B&G") allege that Defendant Lexington Insurance Company ("Lexington") breached the commercial property insurance policy that it sold to B&G by refusing to pay any of B&G's losses caused by Hurricane Jeanne, which made landfall south of Daytona Beach, Florida, on September 26, 2004. Among the significant components of damages that B&G seeks to recover

---

[1] The Court permitted supplemental responses by B&G's counsel pursuant to an Order and Notice of Opportunity to Respond. Doc. No. 569.

under Count V are business interruption losses, extra expenses, and corporate expenses (collectively, "business interruption losses") caused by Hurricane Jeanne at the Treasure Island Resort ("Treasure Island"), one of B&G's hotel properties in Daytona Beach, Florida. Lexington has argued, among other things, that Hurricanes Charley and Frances, which made landfall in central Florida only weeks before Hurricane Jeanne, and for both of which Lexington already paid B&G the $25 million per occurrence policy limits, caused all of the damage, or substantially greater damage, to Treasure Island than Hurricane Jeanne caused, and that Treasure Island was not open to the public following Hurricane Frances. Doc. No. 515 ¶¶ 61-62, 65, 69.

Both B&G and Lexington rely on expert witness testimony, supported by B&G's records produced in discovery, to prove the amount of, or lack of, business interruption losses caused by Hurricane Jeanne at Treasure Island.

The focus of Lexington's Motion for Sanctions is B&G's failure to timely produce records, collectively known as "room folios," of guests who stayed at Treasure Island during the relevant period, despite Lexington's repeated requests for them. In April and June 2008, the Court ordered B&G to produce the room folios, among other things. As shown in more detail herein, B&G did not even begin to look for Treasure Island room folios until late December 2008. On January 9, 2009, B&G produced some Treasure Island room folios to Lexington. Peter Fogarty, Lexington's damages expert regarding business interruption losses, relied heavily on the room folios produced on January 9, 2009, in formulating the opinions expressed in his expert report, which Lexington provided to B&G's counsel on March 30, 2009.

The deplorable conduct of B&G and its counsel after receiving Fogarty's report is at the heart of Lexington's Motion for Sanctions. As discussed in detail herein, this conduct was calculated to deceive Lexington, prevent Lexington from conducting discovery regarding some of the facts underlying B&G's alleged business interruption losses, sabotage Fogarty's expert opinions and analysis, and exploit B&G's continuing discovery misconduct to Lexington's detriment, and to B&G's benefit. Lexington has been severely and incurably prejudiced by the actions of B&G and its counsel.

As the following discussion shows, B&G and its counsel have been serial violators of the Federal Rules of Civil Procedure and orders of the Court throughout this lawsuit. The Court has repeatedly warned B&G and its counsel of their obligations under the Federal Rules of Civil Procedure and the Court's orders to make all reasonable efforts to search B&G's records for all responsive documents and information. At numerous points, the Court has imposed various sanctions against B&G and its counsel for discovery misconduct. None of the Court's efforts have been effective to deter B&G and its counsel from continuing their pattern of stubborn defiance of the Court's orders and the Federal Rules. This conduct warrants imposition of severe sanctions that this Court declined to impose in previous orders sanctioning B&G and its counsel for discovery misconduct.

## II.    FACTS AND PROCEDURAL HISTORY.

### A.    Lexington's Request 97 and B&G's Objections.

In October 2006, B&G, through its counsel Anderson Kill & Olick ("AKO"), first presented B&G's claim for business interruption losses attributable to Hurricane Jeanne to Lexington. Doc.

No. 526-6 at 3, 5.[2]  On February 13, 2007, B&G filed the complaint in this case.  Doc. No. 1.

During the claims settlement process preceding and following the filing of this lawsuit, representatives of Navigant Consulting, Inc. ("Navigant"), including Stan Johnson, on behalf of B&G, and representatives of Hagen Streiff Newton & Oshiro, Accountants, P.C. ("HSNO"), including Peter Fogarty, on behalf of Lexington, discussed B&G's business interruption insurance claim  for Treasure Island and other property resulting from Hurricane Jeanne.  Doc. No. 526-6 at 5-6.  At HSNO's meetings with Navigant and in HSNO's document request letters dated April 2, 2007, and May 22, 2007, HSNO asked for copies of the hotel bills (room folios) for each hotel stay by location, from August 13, 2004, through December 21, 2004, for any hotel for which a business interruption claim was being asserted.  *Id.* at 10-11.  B&G responded that the requested information was not relevant and was simply duplicative of materials already produced.  *Id.* at 12.

On May 23, 2007, B&G filed an amended complaint.  Doc. No. 13.  On August 17, 2007, Lexington served its First Request for Production of Documents to B&G ("RFP 1").[3]  Doc. No. 202-2.  Request 97 of RFP 1 requested the following documents:

> Each and every document, including without limitation **electronically stored information**, in your possession, custody, or control that constitutes, embodies, records, or memorializes room folios and bills for each stay, by location, from

---

[2]  To the extent that the pagination assigned when documents were electronically filed differs from the internal pagination of the documents, I will cite to the internal pagination.

[3]  In September 2007, Lexington served a second request for production of documents on B&G  ("RFP 2").  Doc. No. 202-3.

August 13, 2004 through the present for each **Property** for which **you** assert a business interruption claim.

*Id.* at 32. Lexington specified "the form or forms in which electronically stored information was to be produced" as follows:

> "**Electronically stored information**" includes all "electronically stored information" as that term is used in Federal Rules of Civil Procedure 26(a)(1)(B) and 34(a)(1) . . . As used in these Requests for Production a request for "electronically stored information" calls upon you to produce such information, without deletion or alteration of meta-data, in its native form, and to indicate the computer hardware and the software program(s) needed to translate the information into useable form in the information's native format.

RFP 1 at 3 ¶ J.

On November 9, 2007, B&G served objections and responses to Lexington's RFP 1. Doc. No. 202-4. B&G asserted the following objection to Request 97:

> Plaintiffs object to this Request to the extent it seeks information that is already within the possession of, or equally available to, Lexington. Plaintiffs further object to the extent that this Request seeks information for an unreasonable and irrelevant period of time. Plaintiffs also object that this Request seeks information that is irrelevant, immaterial, or not reasonably likely to lead to the discovery of admissible evidence. Finally, Plaintiffs object to the extent this request seeks documents containing confidential information and the parties have not entered into a valid confidentiality agreement.

*Id.* at 66-67.

On January 14, 2008, Lexington filed a motion to compel B&G to produce the documents requested in many of the requests contained in RFP1 and RFP2, including Request 97. Doc. No. 142. In its opposition served on January 28, 2008, B&G represented that, in light of its supplemental responses and agreement on production, most of the issues raised in the motion to compel were either moot or not ripe for consideration by the Court. Doc. No. 160. Based on B&G's representations, I denied Lexington's motion without prejudice. Doc. No. 169.

On February 11, 2008, B&G served amended, supplemental objections and responses to Lexington's RFP1 and RFP2. Doc. No. 202-6. B&G asserted the following amended objection to Request 97:

> Plaintiffs object that this Request seeks information that is irrelevant, immaterial, or not reasonably likely to lead to the discovery of admissible evidence. Plaintiffs further object that this request is unduly burdensome. Specifically, the information sought is not related to any of the claims at issue or likely to lead to relevant information. Furthermore, even if this information is tangentially related to the business interruption claim, as asserted by Lexington, assembling the folios and bills for each stay, by location, for a period of over three years is an unduly burdensome undertaking and will provide no additional information necessary for Lexington to fully defend the claims brought by Plaintiffs against it.
>
> Subject to and without waiver of any of the above specific objections, Plaintiffs respond that, because of Plaintiffs objections, *no responsive documents will be produced.*

*Id.* at 36-37 (emphasis added).

B.    Lexington's Renewed Motion to Compel and the April 11, 2008 Order.

On March 20, 2008, Lexington filed a Renewed Motion to Compel Production of Documents (the "Renewed Motion"). Doc. No. 178. In its Renewed Motion, Lexington sought an order requiring B&G to produce documents responsive to several specific requests for production, including Request 97. Regarding Request 97, Lexington argued that the requested room folios and bills were

> plainly relevant to Plaintiffs' claim that, before Hurricane Jeanne, the Treasure Island hotel was open to the public and operational, but not afterward. (Amended Complaint ¶ 64). Lexington has reason to believe that Treasure Island was not generally open to the public after an earlier storm (Hurricane Franc[e]s) and that, after Franc[e]s, rooms at Treasure Island [were] rented by Plaintiffs only or mostly to businesses working on property repairs (such as Belfor) to temporarily house workers. Only the requested room folios will show to whom Plaintiffs actually made rooms available at Treasure Island and other properties, and on what terms.

Doc. No. 178 at 14.[4]  Lexington continued: "The requested room folios are computer-stored and

computer-generated documents.  They are documents Plaintiffs maintain in the ordinary course

of doing business, and are the back-up documents for Plaintiffs' accounting records."[5]  *Id.*

B&G did not file a response to the Renewed Motion, which put B&G and its counsel on

notice that B&G's unqualified refusal to produce room folios in response to Request 97 was an

issue for which Lexington sought relief from the Court.[6]  On April 11, 2008, I entered an order

granting the Renewed Motion as unopposed.  Doc. No. 181 (the "April 11 Order").  Specifically,

I ordered that, "on or before April 30, 2008, the plaintiffs shall produce *all responsive documents*

within their possession, custody or control to the extent requested in the motion.  All objections

to these discovery requests, other than legal privileges and protections, have been abandoned

by failing to provide support for them in a timely response to the present motion."  *Id.* at 2

(emphasis added).

---

[4]  Lexington's argument accurately portrayed how its expert Peter Fogarty would subsequently rely on the Treasure Island room folios in his March 30, 2009**,** expert report. Doc. No. 526-6.

[5]  In support of its memorandum in opposition to the Motion for Sanctions, B&G submitted the affidavit of Katherine Martin.  Doc. No. 532-3.  Martin identified "IQWare" as the property management system used for Treasure Island and other B&G hotels. *Id.* ¶ 4.  "One function of IQWare is to create and maintain guest records for both individuals and group functions.  This includes guest folio data for each guest stay.  All room folios for Treasure Island were created and stored in IQWare in the regular course of B&G's business. There was no other place at B&G where Treasure Island room folios were regularly maintained (electronically or otherwise)."  *Id.*

[6]  B&G discharged AKO as its counsel on March 28, 2008. At that time, Attorney John Ellison, formerly with AKO, and his current law firm, Reed Smith LLP, effectively became B&G's lead counsel.  Doc. No. 460 at 6.  Attorney Ellison had been counsel of record for B&G since the filing of the complaint.

Since April 11, 2008, B&G has been subject to a Court order to produce all room folios responsive to Request 97. On April 30, 2008, counsel for B&G delivered seven discs (the "April 30 Discs") to counsel for Lexington. Doc. No. 202-9 ¶ 4. The April 30 Discs did not contain electronically stored information ("ESI") in the form specified in Lexington's RFPs as required by the April 11 Order. *Id.* ¶¶ 5-7; Doc. No. 460 at 14. Neither B&G nor its counsel presented evidence that B&G produced any Treasure Island room folios on the April 30 Discs.[7]

C.    <u>Lexington's First Motion for Sanctions and the June 25, 2008 Order</u>.

On May 27, 2008, Lexington filed its first motion for sanctions against B&G. Doc. No. 202. Lexington argued, in sum, that B&G violated Rule 34 by failing to produce ESI in the form specified in Lexington's RFPs and violated the April 11 Order by producing the April 30 Discs which did not comply with the specified form of ESI production.

On June 25, 2008, I conducted an evidentiary hearing on Lexington's motion for sanctions. Doc. No. 330. At the conclusion of the hearing, I made interim findings and ordered interim relief as follows:

First, I advised "in no uncertain terms" that the B&G companies had been the plaintiffs from the inception of the case and they have "responsibility to litigate this case in good faith and

---

[7] In B&G's response to the Motion for Sanctions and in the Supplemental Memorandum by Plaintiffs' Counsel in Response to Order and Notice of Opportunity to Respond, Doc. No. 575 ("Supplemental Memorandum"), B&G and its counsel appear to concede, without directly admitting, that B&G did not produce any Treasure Island room folios before January 9, 2009. *See, e.g.*, Doc. No. 532 at 4-5 (acknowledging that production of the room folios began following a December 2008 meeting, culminating with Attorney Berringer's January 9, 2009, production). As discussed herein, B&G has the burden of establishing that B&G complied with Court orders or that compliance was impossible.

in full compliance with all the rules and orders of the Court." *Id.* at 195. I told counsel for B&G, specifically Attorneys John Ellison and John Berringer,[8] that they must "go back to your clients and determine whether you have all of the responsive information. Stop going through [AKO]. Go to your client. Verify what you should have verified before ever responding to these motions or actually getting us to the place we are in these motions, and determine what has been done." *Id.* at 198. Finally, I admonished B&G and its counsel as follows: "I don't want to hear again about the fight between old counsel and new counsel and old counsel and the plaintiffs. This is plaintiffs' responsibility. . . . [I]f that means doing everything over at Bray and Gillespie companies' expense, so be it. . . . If you don't know and you can't get it [from AKO], you've got to do it over." *Id.* at 195.[9]

Second, I found that B&G and its agents caused the problems with the ESI production. *Id.* at 196-97. Specifically, I found that "the Bray & Gillespie companies directly or through their agents deliberately manipulated the electronically stored information in such a way as to withhold from the defendants the information that had been requested." *Id.* at 196.

---

[8] Attorney Berringer and other attorneys affiliated with Reed Smith LLP appeared as counsel of record for B&G after B&G terminated AKO as its counsel.

[9] This is the first of several admonitions given to B&G and its counsel that they could not rely on the adequacy of B&G's initial collection of documents as being sufficient to identify all documents and information that Lexington later requested in discovery and that B&G was ordered to produce.

I granted the following interim relief: "[O]n or before July 11, 2008, Bray & Gillespie, plaintiffs, shall produce to counsel for Lexington . . . *all responsive information to the request[s] for production at issue* in the present motions that was in electronically stored format . . . ." *Id.* at 198 (the "June 25 Order")(emphasis added); *see* Doc. No. 460 at 22.[10] The "request[s] for production at issue" included Request 97. Thus, since June 25, 2008, B&G has been subject to two orders of this Court requiring it to produce to Lexington all room folios, including those in electronic form, as described in Request 97.[11]

D. July 29, 2008 – B&G's Revelations Regarding IQWare and Electronic Storage of Room Folio Data.

On July 29, 2008, Matt Carlock testified as a Rule 30(b)(6) witness for B&G regarding, *inter alia*, various accounting records maintained by B&G in electronic format. Attorney Berringer represented B&G at the Rule 30(b)(6) deposition. Attorney Berringer made it very clear throughout the deposition that Carlock was not testifying individually but as the representative of B&G. *See, e.g.,* Doc. No. 526-8 at 74 (Attorney Berringer: "But as the corporate witness, his testimony is that every email that was on their files when they were downloaded, was loaded onto the disk."); 108 (Attorney Berringer: "This is a [Rule] 30(b)(6) corporate witness. Why

---

[10] B&G appealed the June 25 Order. Doc. No. 255. B&G argued, among other things, that it was improper not to reduce the oral order to writing and that I abused my discretion in requiring B&G to produce the information so quickly. The Honorable Patricia C. Fawsett, then the presiding district judge in this case, overruled B&G's objections and affirmed the June 25 Order. Doc. No. 256.

[11] In its response to the Motion for Sanctions, B&G completely ignores Lexington's RFPs, the Renewed Motion to Compel, and the April 11 and June 25 Orders, including the finding that all objections to the RFPs were waived, claiming that it produced the folios only because of Lexington's "persistence" about them, over B&G's duly lodged objections. *See* Doc. No. 532 at 2 ¶ 2.

[opposing counsel] is delving into [the witness's] background is beyond me. . . . Actually, you're not entitled to any background.").

Carlock testified that B&G used IQWare, B&G's electronic property management system, to back up its accounting data, *id.* at 33-34; that IQWare was installed on B&G's three servers, *id.* at 34-35; that the property management system contained room folio data, which was created electronically and stored on one of those servers, *id.* at 36; and that if room folios existed for Treasure Island, they would be stored electronically on those servers, *id.* at 37-38. Carlock also testified that from the time he became employed by B&G in October 2006, *id.* at 5, through the date of the deposition, he had not been asked to search B&G's servers for electronically stored Treasure Island room folios. *Id.* at 37, 70. He also had not conducted a historical search for electronically stored financial and accounting records directly or in coordination with B&G's accounting department. *Id.* at 119-20.

Attorney Berringer did not personally examine the Introspect database on which information initially gathered by B&G was stored to determine whether the Treasure Island room folios were contained therein. *See* Doc. No. 440 at 312. Neither B&G nor its attorneys presented evidence that Attorney Berringer or any other representative of B&G made any effort after the B&G Rule 30(b)(6) deposition and before December 2008 to determine whether the Treasure Island room folios had been produced.

E.    <u>The September 24, 2008, Discovery Conference and September 25, 2008, Order</u>.

On September 24, 2008, I conducted a discovery conference, in part to ascertain from B&G's attorneys how they anticipated that B&G's recent bankruptcy filing would impact future proceedings in this case; and in part to ascertain the status of B&G's document production in response to my June 25 Order.  Doc. No. 375.  B&G was represented at the hearing by Attorney Berringer, in-house counsel Bruce DelValle, and Attorneys Michael J. Beaudine, Daniel Coultoff and R. Scott Shuker from the Orlando law firm Latham, Shuker, Eden & Beaudine, LLP.[12]

On behalf of Lexington, Attorney Michael Shafir asserted, "[a]s far as the defendants are concerned, your [June 25] order still hasn't been complied with."  *Id.* at 67.  Attorney Berringer represented, "after I determined how our predecessors had pulled together documents, we've decided . . . we're doing another due diligence check as we speak to determine whether there are any relevant and produceable documents two or two and a half years after the hurricane."  *Id.* at 62.

In response, I noted that B&G already had found additional responsive documents that were not within the information gathered before the complaint was filed and transferred to AKO, citing an earlier order in which, after a new search, B&G produced responsive information not previously disclosed.[13]  *Id.* at 67.  Further, I again directed that documents stored electronically

---

[12]  Attorneys Beaudine and Coultoff, as well as their firm, appeared as co-counsel on September 19, 2008.  Doc. No. 322.

[13]  The earlier dispute involved production of documents regarding Ocean Waters Development, LLC ("LLC").  First, B&G objected to a request for production of these documents, served in November 2007, because LLC was not a party in the case.  Doc. No. 325 at 2.  In December 2007, a defendant issued a subpoena for production of documents to LLC.  *Id.* at 2-3.  In response to the subpoena, B&G's counsel argued that

should be produced in electronic form and that documents maintained in paper form should be produced in paper form.  *Id.* at 72-73, 88.

On September 25, 2008, I entered an Order in which I (1) extended the date for completion of fact discovery and filing discovery motions to February 27, 2009, Doc. No. 327 ¶ 1; and (2) reiterated that "[g]oing forward, the parties may produce documents and other information requested in discovery in paper form if that is the form in which they are maintained," *Id.* ¶ 2.  Nevertheless, I cautioned counsel that "this is not an authorization to print information currently electronically stored to avoid production of electronically stored information in native format with metadata," *Id.* at 1 n.1.

F.    Reopened Hearing on Lexington's Renewed Motion.

On December 8, 2008, after issuing a notice to Reed Smith, Ellison, and DelValle giving them the opportunity to file a supplemental response to Lexington's Renewed Motion addressing why sanctions should not be awarded against them, and reopening the June 25, 2008, evidentiary hearing, Doc. No. 351, I conducted an evidentiary hearing which was attended by Attorneys Berringer, DelValle and Beaudine.  Doc. No. 440 at 2.  The focus of the hearing was

---

the use of a subpoena was improper because LLC was a company affiliated with B&G. *Id.* at 3.  In response to a motion to compel production of the documents, Attorney Ellison, counsel for B&G and LLC, indicated in June 2008 that "To the extent [LLC] is able to locate unique 'corporate documents' that are relevant to this case, [LLC] will produce these documents.'" *Id.* at 4 (quoting Doc. No. 235) (alterations in original).  I granted the motion to compel production of the LLC documents and permitted defendants to take a Rule 30(b)(6) deposition of LLC.  Doc. No. 250.  B&G and LLC did not begin to look for responsive documents until after the order compelling production was granted and the Rule 30(b)(6) deposition was scheduled.  Doc. No. 325 at 4.  B&G finally produced responsive documents in July 2008, one day before the Rule 30(b)(6) deposition.  *Id.*  I found that "the documents were readily available and produced within a week after [an employee] was tasked with finding them."  *See id.* at 10.

the role of Reed Smith and Attorneys Ellison and DelValle in B&G's failure to produce the documents that I ordered B&G to produce in the April 11 Order, Doc. No. 181, in native format with metadata, and the extent, if at all, Reed Smith and Attorneys Ellison and DelValle misrepresented and concealed facts from Lexington's counsel in a deliberate effort to impede and obstruct Lexington's discovery.

My findings of fact, conclusions of law and the relief granted to Lexington are contained in my Order entered March 4, 2009. Doc. No. 460 (the "March 4 Order"). In sum, I found that B&G gathered documents and ESI in 2006 related to the three hurricanes that made landfall in Florida in 2004 and copied that information to a hard drive (the "Target Hard Drive"). The information on the Target Hard Drive was transferred by AKO IT personnel to the Introspect database. In the process, the ESI was converted to TIFF files and stripped of its metadata, with the metadata stored in separate Introspect database load files. Thereafter, B&G produced only the TIFF images, without the related metadata, despite Lexington's specific request for ESI in native format with metadata.

Among other things, I found as follows:

Reed Smith, particularly through its partners Ellison and Berringer, acted in bad faith with respect to the events that occurred after Lexington objected in May 2008 to the form of B&G's production of ESI. Specifically, Berringer falsely told opposing counsel that B&G had caused all of its ESI to be printed and scanned . . . . He made no reasonable effort to determine whether the story he told was true . . . . Berringer continued this pattern of deliberate misrepresentation through willful blindness in his testimony at the December 2008 hearing. . . . Berringer and Ellison also made material misrepresentations to the Court about the reason they did not produce the metadata . . . .

Doc. No. 460 at 46-47. I did not issue a notice and opportunity to respond to the Renewed Motion for Sanctions to Attorney Berringer individually only "because his material

misrepresentations about the way ESI was gathered from B&G, and his deliberate failure to apprise Lexington and the Court that Reed Smith lawyers always had unrestricted access to the ESI in the form requested and ordered to be produced, were not apparent until evidence was presented at the reopened sanctions hearing conducted on December 8, 2008." *Id.* at 24 n.20.[14]

Attorney Beaudine made the closing argument for B&G and Attorney DelValle. Regarding the conduct of B&G and Attorney DelValle, Beaudine asserted:

> I have five binders of all the previous proceedings, the underlying motions, responses, exhibits, et cetera. So I've looked at the previous hearing. I've been here all day today. I haven't seen any evidence whatsoever of any willful or deliberate misconduct of anyone internally at Bray & Gillespie. In fact, you know, *the target hard drive that was created back in May of 2006 was created for the purpose of producing the entire universe of documents*.

Doc. No. 440 at 454 (emphasis added).

In response to Lexington's contention that B&G should be sanctioned by being "precluded from presenting evidence about [Treasure Island Hotel]," *id.* at 466, Beaudine argued:

> [S]trik[ing] the Treasure Island claim from the case . . . is probably the most severe sanction that you could impose, other than striking all of our pleadings . . . . It is potentially a $25 million claim. It is admittedly our largest claim in this case . . . . We think that we are going to be able to prove substantial damage on Treasure Island alone. *They have the documents. They've had the documents*,[15] and they

---

[14] Reed Smith and Attorney Ellison filed objections to my finding that they acted in bad faith. Doc. No. 500. Neither B&G nor its counsel objected to my finding that B&G violated Rule 34 and the April 11 Order by failing to produce ESI in the specified form or to the sanctions imposed on them. *See id.*; Doc. No. 501 (Reed Smith's agreement to pay the sanction "without waiving the right to file an objection to the Magistrate Judge's finding of 'bad faith.'").

[15] In conjunction with his earlier comment about the Target Hard Drive, Attorney Beaudine's statement that Lexington has the documents and has had the documents to defend the Treasure Island claim was an unqualified representation to the Court that B&G had produced all of the documents, including ESI, that Lexington requested from

will be able to defend on the merits.

*Id.* at 476-77 (emphasis added).

      G.     January 9, 2009 – B&G's First Production of Treasure Island Room Folios.

On December 15, 2008, Lexington Attorney John Camp sent an e-mail to Attorney Berringer with copies to Attorneys Coultoff and Beaudine, in which he listed "certain outstanding discovery matters" that Lexington's attorneys were prepared to discuss at a discovery conference on December 16, 2008. Doc. No. 526-4 at 2. In relevant part, Camp wrote that Lexington and his firm had

> not been able to find in either of the August 2008 productions by B&G the room folios for Treasure Island (and possibly other properties). Lexington specifically requested the production of these documents via its document request to B&G, but it appears that they have never been produced. We would like to confirm whether these documents exist and have been produced, and, alternatively, if they exist but have not been produced to date, when we can expect to receive them.

*Id.*[16]

---

B&G and that I twice ordered B&G to produce. Based upon the evidence currently before the Court, it is evident that Attorney Beaudine did not make a reasonable effort, if he made any effort at all, to ensure that B&G had produced the Treasure Island room folios before he made this unqualified representation to the Court.

   [16] Lexington submitted a declaration from Donna Knapton, an attorney in the Miami office of Carlton Fields (counsel for Lexington), who averred that in November 2008 she began searching B&G's August 2008 production of documents for documents that contain, or were likely to contain, individual room charges and related information for hotel guests that rented rooms at Treasure Island. Doc. No. 526-3 ¶¶ 2-5. Knapton's searches did not yield any guest folios, guest ledgers, or registration slips for any Treasure Island hotel guests on any date; or any documents that reflected the individual Treasure Island guests and/or their corresponding hotel charges during the period from August 1, 2004, through December 1, 2004. *Id.* ¶ 6. In the response to the present motion, B&G argues that Knapton's search was not broad enough. *See* Doc. No. 532 at 6 n.1. B&G did not present any evidence, however, that it produced any room folios for Treasure Island before January 9, 2009.

16

In mid-to-late December 2008, Katherine Martin, an in-house legal assistant who had worked for B&G for approximately two years, "was asked to search for guest (room) folios for the Treasure Island Resort for the period commencing August 2004 and continuing thereafter." Doc. No. 532-3 ¶¶ 3-4. In her affidavit, Martin testified under oath as follows:

> 4.      In mid- to late-December 2008, I was asked to search for guest (room) folios for the Treasure Island Resort for the period commencing August 2004 and continuing thereafter. Based on my experience, I believed that the room folios would be located in "IQWare," the Property Management System that was used for Treasure Island and other B&G hotels. . . .
>
> 5.      When I accessed IQWare, I found a large number of room folios, registration cards and cancellation records for Treasure Island for the requested time period. I printed all such records that were available in IQWare, and they were transmitted to B&G's outside counsel in this case on December 31, 2008. I had to print these documents for production because the proprietary software used by IQWare does not permit downloading or exporting data to a disk or other electronic storage means.
>
> 6.      The room folios that I found in IQWare appeared to be comprehensive, and I had no reason to believe that they were not complete. Due to the volume of the materials and the goal of providing the documents to outside counsel as quickly as possible for prompt productions to Lexington, I did not analyze the room folios and attempt to compare them to other financial reports of B&G reflecting occupancy levels on a daily basis.

*Id.* at 1-2.

By e-mail dated December 31, 2008, Bruce DelValle, in-house counsel for B&G, advised Attorneys Berringer, Beaudine and others that he was attaching "the COMPLETE SET, as best as can be determined, of the registration cards and room folios for Treasure Island from August 2004 forward. . . . These documents are from the hard copy. Any native format is incapable of being downloaded because it comes from proprietary software that prohibits download – AS I

UNDERSTAND IT AND HAVE BEEN INFORMED." Doc. No. 575-2 at 5 (emphasis in original).[17]

The evidence establishes that B&G and its attorneys did not make any effort at that time to determine whether the Treasure Island room folios DelValle forwarded with the e-mail supported B&G's internal financial reports regarding the number of rooms rented at Treasure Island during the relevant time.[18]

In a January 9, 2009, letter to Attorney Camp, with copies to Attorneys Beaudine and DelValle, sent via regular mail and e-mail, Attorney Berringer wrote, *inter alia*: "As discussed, we recently located Treasure Island folios, registration cards and cancellations. Although we believe some of this material may already have been produced, we are producing these materials in an abundance of caution and in an effort to avoid continued discovery conflicts."[19] Doc. No. 532-2. Berringer enclosed a disc containing documents bates numbered BG-TI0000001 through BG-TI 0001463, and sent PDF copies of the documents via e-mail as well. *Id.* These documents

─────────────────

[17] Producing ESI in printed form violated the April 11 and June 25 Orders as well as the September 25, 2008 Order. Counsel for B&G do not indicate that they conferred with counsel for Lexington regarding the form of production of the electronically stored room folios to determine whether a method could be found to give Lexington access to the information in electronic form. B&G also could have sought a protective order from the Court to permit it to produce the ESI in printed form. It did not take either course, opting instead to produce ESI in a form of its choosing rather than as specified by Lexington and as required by orders of the Court.

[18] At the later deposition of Lexington's expert, Attorney Beaudine termed the production "obviously incomplete." Doc. No. 526-7 at 123.

[19] B&G did not cite the information on which Attorney Berringer relied to support his belief that B&G may have previously produced some of the Treasure Island room folios.

showed that, with one possible exception,[20] only employees of Florida Power & Light ("FPL") were registered guests at Treasure Island after Hurricane Frances made landfall in Florida on September 4, 2004.   Doc. No. 532-5.

H.    December 30, 2008, Discovery Conference and January 7, 2008 Order.

On December 30, 2008, I conducted a discovery conference at which Attorneys Berringer and Beaudine appeared for B&G. Doc. No. 554.[21]  At the request of counsel for Lexington and B&G, I extended by thirty days the dates for disclosure of expert reports, so that B&G's expert reports were due on March 16, 2009, and Lexington's expert reports were due on March 30, 2009.  *Id.* at 13.  The close of expert discovery remained on May 15, 2009, *id.* at 12; and the close of fact discovery remained on February 27, 2009, *id.* at 14.

During this discussion, I reminded counsel that the Court had not provided for rebuttal expert reports in the case management and scheduling order.  Doc. No. 575-3 at 13.  I noted, however, that the parties could supplement the original expert reports as permitted under the Federal Rules of Civil Procedure.  *Id.*  The scope of examination of expert witnesses during their discovery depositions was not discussed, and the Court did not enter an order limiting areas of inquiry at the expert witnesses' depositions.

---

[20]  A summary of the room folios reflects that Leslie Mote stayed at Treasure Island from September 22 through 24, 2004.  The name of the company with which Mote was affiliated was redacted.  Two other individuals with no company affiliation who apparently had reservations to stay at Treasure Island during this period were given refunds.  *See* Doc. No. 532-5 at 4-6.

[21] The question of missing Treasure Island room folios was not addressed at the hearing. The record reflects that the parties were working to resolve the problem and, thus, that presentation of that issue to the Court would have been premature.

At the hearing, I set January 30, 2009 as the date for the parties to supplement mandatory pretrial disclosures and written discovery, which were to be final "absent a later showing of good cause of something belatedly learned that couldn't have been anticipated." *Id.* at 42. I emphasized the binding effect of these supplementation requirements:

> [T]hat's going to require some hard look-see, talking to your clients and whatnot and making sure that you've gathered what you needed to gather, corrected anything that needed to be corrected, added anything that needed to be added. As I'm sure you gather, the purpose behind it not only is *to have all these facts assembled by the close of fact discovery*, but also *to lock everybody in to those facts* so that we don't find several months down the road that, oh gee, we forgot to tell you about this person or that person, whoever it may be.

*Id.* at 44-45 (emphasis added). On January 7, 2009, I issued an Order, which was erroneously dated January 9, 2009, in which I confirmed the extended dates for disclosure of expert reports, while leaving the May 15, 2009 deadline for expert discovery unchanged. Doc. No. 442 at 1 (the "January 7 Order"). I concluded the Order as follows:

> Additionally, pursuant to Fed. R. Civ. P. 26(e)(1)(B), the Court further **ORDERS** that the parties shall serve supplemental disclosures of the information required by the mandatory disclosure provisions of Rule 26(a)(1)(A)(i), (ii) and (iii), and supplemental responses or disclosures to written discovery requests and requests for admissions as required by Fed. R. Civ. P. 26(e)(1) on or before January 30, 2009. *If additional supplementation is required, the supplemental disclosure or response shall be served not later than five business days after the supplemental information is discovered by counsel for the disclosing party.* Any supplementation of mandatory disclosures and supplementation of responses or disclosures to written discovery requests and requests for admissions made after the close of fact discovery must be supported by a statement of good cause for failing to make the supplementation in a more timely manner.

*Id.* at 2-3 (emphasis added).

I.    March 2009 – Service of the Parties' Expert Reports.

### 1.    B&G's Expert Report Regarding Business Interruption Losses at Treasure Island – March 16, 2009.

B&G served its Rule 26(a)(2)(C) expert report of Stan D. Johnson ("Johnson Report"), Doc. No. 526-5, on Lexington on March 16, 2009. Johnson, a managing director of Navigant, Doc. No. 532-4 at 7, opined that business interruption losses caused by Hurricane Jeanne at Treasure Island totaled $4,030,302.00, extra expense damages at Treasure Island totaled $76,428.00, and extra corporate expenses totaled $69,783.00.  Doc. No. 526-5 at 10. Johnson relied on daily and monthly operating statistics and other data provided by B&G, *id.* at 2, "to determine the count of rooms out of service before and after each storm to determine the extent of impact to room availability caused by each event . . . ." *Id.* at 8.   Johnson did not consider the Treasure Island room folios in rendering his opinion.  Doc. No. 532-4 at 136.

Johnson determined the portion of the total aggregate business interruption losses to B&G as a result of Hurricanes Charley, Frances and Jeanne allocated to Hurricane Jeanne "based on the rooms out of service . . . starting immediately at the date of loss extending through the end of the theoretical periods of restoration for damage caused by Hurricane Charley and Frances." Doc. No. 526-5 at 8.

### 2.    Lexington's Expert Report Regarding Business Interruption Losses at Treasure Island – March 30, 2009.

Lexington served Defendant's Expert Report of Peter Fogarty, CPA, CFE ("Fogarty Report"), Doc. No. 526-6, on B&G on March 30, 2009.[22] Fogarty, chief operating officer of HSNO,

---

[22]  Fogarty started working on his report in early March 2009, after fact discovery closed.  Doc. No. 526-7 at 44.  He spent more than 100 hours preparing it.  *Id.*

Doc. No. 526-7 at 6, was retained in December 2006 to analyze B&G's original Hurricane Jeanne claim for business interruption losses submitted on October 26, 2006, Doc. No. 526-6 at 3, among other things. Based on documentation provided by B&G, Fogarty opined that (1) Treasure Island was not open to the general public following Hurricane Frances, *id.* at 9-10; and (2) no additional business interruption or extra expense losses can be attributed to Hurricane Jeanne, *id.* at 9-15. Throughout his expert report, Fogarty identified the "room folios"[23] produced by B&G [BG-TI0000001 – BG-TI0001463] as the foundation of his opinions regarding the unreliability of Johnson's methodology for calculating business interruption losses. Doc. No. 526-6 at 10-12.[24] Based on the room folios produced on January 9, 2009, Fogarty concluded as follows, "Our review of the documents provided indicates that during the period subsequent to Hurricane Frances Treasure Island did not sell another room to transient guests (the public)." *Id.* at 10. Fogarty further observed,

> The total number of rooms sold according to the room folios provided does not equal the number of rooms sold on the Treasure Island internal early bird reports for the same period suggesting that either we were not provided with all of the room folios or that the Treasure Island rooms sold statistics were over stated.

*Id.*

---

[23] Johnson described a room folio as "the hotel's internal record of the billings and activity of a guest during their stay at the property." Doc. No. 532-4 at 136-37. It reflects the room number rented, the guest name and all the activity of the guest for each day of the rental. *Id.* at 137.

[24] Fogarty also concluded that the allocation methodology and calculations in Johnson's Report were not reliable under recognized accounting principles, and were not supported by the documents produced by B&G. The merits of Fogarty's critiques of Johnson's Report are beyond the scope of this Order.

J.  April 2009 – B&G's Search for and Identification of Additional Treasure Island Room Folios.

Counsel for B&G received Fogarty's expert report on March 30, 2009. Doc. No. 532 at 2. They recognized that "Fogarty observed that there was a large disparity between the number of rooms rented according to the room folios and the number of rooms rented according to B&G's financial records. . . . Based on the room folios that were produced, Mr. Fogarty found that only Florida Power & Light and Belfor workers stayed at Treasure Island after Hurricane Frances." *Id.* They further appreciated that

> Fogarty's comparison of the room folios to the Early Bird Reports revealed a large disparity in the number of occupied room nights set forth in the two sets of documents. In the month of September 2004, the room folios analyzed by Mr. Fogarty showed a total of 316 occupied room nights, whereas the Early Bird Reports (and B&G's Daily Operating Reports) showed a total of 871 occupied room nights. The greatest difference occurred during the nine-day period from September 15 through September 23, 2004: The room folios showed only 13 occupied room nights, whereas the Early Bird Reports and Daily Operating Reports showed a total of 412 occupied room nights.

*Id.* at 8-9.

In support of the Supplemental Memorandum, Attorney Beaudine attests that "[w]hile preparing for the depositions of Stan Johnson (scheduled for April 29, 2009) and Peter Fogarty (scheduled for May 14, 2009), I focused on, among other things, the room folio analysis by Mr. Fogarty in his Expert Report that indicated that a large number of TI room folios had not been produced." Doc. No. 575-4 ¶ 4. On April 29, 2009, at Attorney Beaudine's direction, Martin resumed her search for the rest of the Treasure Island room folios. *Id.*; Doc. No. 532-3 ¶ 7. She "went back to IQWare to try to determine why the room folios maintained there might not be complete." *Id.* After determining that there were no additional room folios in IQWare, Martin

23

reviewed an index of boxes stored in a B&G off-site storage facility. *Id.* ¶ 8. Martin knew that room folios were sometimes included in daily "audit packs," so she pulled two boxes that the index reflected contained daily audit packs. She found in those boxes some audit packs that contained up to ten room folios each while other audit packs had no room folios. *Id.* Without comparing the room folios she found in the audit packs to those she previously found in IQWare, Martin copied all the room folios she found in off-site storage and sent them to outside counsel for B&G on May 4, 2009. *Id.* Martin apparently was not instructed to determine whether these were all the room folios that existed, and she stopped looking for additional folios at that time. Doc. No. 532-3 ¶¶ 8-9.

Attorney Beaudine avers that he received the additional Treasure Island room folios from Martin on May 4, 2009. Doc. No. 575-2 ¶ 5. He gave the room folios to his legal assistant with instructions to "review the room folios, identify and pull any that duplicated (in whole or in part) what B&G had produced in January, and determine how complete (or incomplete) the additional folios were in relation to the gap that was identified by Mr. Fogarty." *Id.* On May 8, 2009, at the conclusion of that review, the legal assistant gave Attorney Beaudine 138 pages of Treasure Island room folios that B&G had not produced. *Id.* ¶ 6. Attorney Beaudine conferred with expert witness Stan Johnson on May 11, 2009, at which time he concluded that "a large number of TI room folios were still missing." *Id.*

As of May 11, 2009, neither Attorney Beaudine nor any other representative of B&G had advised counsel for Lexington that B&G's counsel possessed a large number of Treasure Island room folios that were not produced on January 9, 2009, and that B&G's counsel had now determined that Attorney Berringer's earlier representation that Treasure Island room folios

produced on January 9, 2009 were complete was incorrect. Instead, B&G and its counsel consciously chose to wait until May 18, 2009 to provide copies of the 138 pages of room folios to counsel for Lexington, ten business days after B&G's counsel received them on May 4, 2009. *Id.* ¶ 7; Doc. No. 532-8. This was twice the five-business-day period specified in the January 7 Order regarding supplementation of discovery.[25]

According to Attorney Beaudine, "From a further analysis of those room folios, B&G's counsel realized on May 11, 2009, that a large number of room folios were still missing." Doc. No. 532 at 11. Accordingly, Martin was told that Treasure Island room folios were still missing.

_____

[25] In B&G's response to the Motion for Sanctions, Attorney Beaudine represents that, at Fogarty's deposition, he "informed Lexington's counsel [John Camp] that B&G had been able to locate some additional folios but that B&G's search was not finished." Doc. No. 532 at 3. He further represents that "Mr. Camp asked B&G's counsel to produce the partial set of additional room folios as soon as possible, with the understanding that B&G would continue to search for other folios and produce the rest that could be found when the search was complete." *Id.* In the Supplemental Memorandum, B&G's counsel again represents that "[d]uring the deposition of Mr. Fogarty on Thursday, May 14, 1009, Mr. Beaudine informed Mr. Camp that B&G had found additional room folios *and that it was searching for more.*" Doc. No. 575 at 7 (emphasis added). Review of Fogarty's deposition reveals, however, that Attorney Beaudine's representations are a skewed and inaccurate characterization of what occurred. Attorney Beaudine advised counsel for Lexington that B&G had located additional Treasure Island room folios only *after* Attorney Beaudine questioned Fogarty about whether he had a complete set of Treasure Island room folios and *after* Attorney Camp demanded production of any additional room folios in B&G's possession. Doc. No. 526-7 at 118-19. Attorney Beaudine told Camp only that B&G had a binder of additional Treasure Island room folios from September 2004, which he had not brought with him to the deposition. *Id.* at 123. Attorney Beaudine did not represent that B&G was continuing to search for additional Treasure Island room folios until his May 29, 2009, letter, Doc. No. 532-9, which he sent seven days after Lexington filed the Motion for Sanctions. Contrary to Beaudine's representation, B&G's Katherine Martin avers that B&G undertook no "continuing" search, but that the searches were actually two separate searches: one beginning April 29, 2009, and ending May 4, 2009, and a second search beginning on or after May 11, 2009, for an eight-day period ending May 26, 2009. *See* Doc. No. 532-3 ¶¶ 8-9.

She again reviewed the index of boxes in off-site storage and "identified the last two boxes for Treasure Island that might possibly contain room folios." *Id.* ¶ 9.  She located approximately fifty more pages of room folios, which she copied and sent to B&G's outside counsel on May 26, 2009.  *Id.*

On May 29, 2009, B&G sent these documents, bates numbered BG-TI0001602 through BG-TI0001651, to counsel for Lexington.  *See* Doc. No. 532-9.[26]  In a cover letter, Attorney Beaudine revealed for the first time that, as of May 14, 2009, B&G was "continuing our search for the balance of the missing room folios." *Id.*  Beaudine continued, "The enclosed documents, together with those that were furnished to you by letter dated May 18, 2009, supplement our production of documents in this matter on January 9, 2009." *Id.*[27]

    K.    <u>April 29 and May 14, 2009 – Depositions of the Parties' Experts</u>.

    **1.**    **April 29, 2009 –  Stanley D. Johnson**.

On April 29, 2009, Attorney John Camp, counsel for Lexington, took Johnson's deposition. Doc. No. 532-4.  Camp asked Johnson several questions which compared the lack of detailed information in the B&G documents on which Johnson relied, to the detailed information available in the room folios.  *See, e.g., id.* at 126, 133-40, 148.  During this inquiry, the following exchange

---

[26]  Counsel for B&G represents that the belatedly-produced room folios show that individuals other than employees of FPL and Belfor, the company performing remediation work, stayed at Treasure Island after Hurricane Frances and before Hurricane Jeanne. B&G has not provided copies of these room folios or a summary of them with its response to support this representation.

[27]  B&G concedes that it has not found all of the Treasure Island room folios for September 2004 that are reflected in B&G's financial reports and records.  Doc. No. 532 at 3.

occurred:

> CAMP:       . . . The Treasure Island room folios show that the period after Frances, the only rooms that were rented out, in Treasure Island, were to Florida Power and Light employees, and to [Belfor] employees. . . .
>
> JOHNSON:  What are you basing that on?
>
> CAMP:       The room folios.
>
> JOHNSON:  What folios?
>
> CAMP:       Treasure Island. . . .
>
> JOHNSON:  Well, where did you get the folios?
>
> CAMP:       From Bray & Gillespie.
>
> JOHNSON:  Okay. Have you assessed whether you have a complete assembly of those room folios, or [are] you using summaries?
>
> CAMP:       That's a good point. We asked for all the room folios, and we got what we assumed were all the room folios we had, because we asked for them. There appear to be some missing. But we got only what Bray & Gillespie gave us. They're in complete control of them. . . .
>
> JOHNSON:  How do you conclude that it was only FP&L, and only [Belfor], if you don't have - -
>
> CAMP:       Of the room folios that we saw, and the room folios that were produced by Bray & Gillespie in this case for Treasure Island, those room folios reflect only that rooms were rented to [Belfor] and Florida Power and Light.
>
> JOHNSON:  But they're not complete. They don't agree with the financials.

*Id.* at 243-44.

Near the conclusion of the deposition, Camp tried to question Johnson about Fogarty's report. *Id.* at 283-86. Johnson acknowledged that he had read Fogarty's report. *Id.* at 283. He testified further that he had not reached any final conclusions about it and that nothing in

Fogarty's report changed his opinions. *Id.* at 284. Nevertheless, Johnson testified as follows:

JOHNSON: The only thing I might have done, had I known . . . some of the roads he was going to go down is I would have just gone ahead and addressed that right up front in my report.

CAMP: Like what?

JOHNSON: Well, the whole folios, and the assumption that the hotel was . . . closed before Jean[ne] hit . . . the information exists to counter that.

CAMP: . . . I understand you haven't finished your analysis of Mr. Fogarty's report, but do you have any criticisms of the report that you've been able to determine, as of this date?

BEAUDINE: I'd just again caution to you, to the extent you've been talking about it, and to the extent you haven't completed any analysis, I would caution you not to testify.

CAMP: . . . And what is the basis of your cautioning him not to testify - - . . . .

BEAUDINE: You can ask him about his expert report, but asking him about any preliminary reviews he has of other expert reports is obviously not appropriate.

CAMP: So you're not claiming - - you're not instructing him not to answer on the basis of attorney-client privilege.

BEAUDINE: No, but I will tell him not to answer, and we'll move for a protective order, if you force the issue. Because obviously that's overreaching on your part. . . . .

CAMP: And you think a basis [exists], under the Federal Rules, to instruct a witness not to answer?

BEAUDINE: Yes. We move to limit the deposition at this time. Correct. . . .

CAMP: Do you anticipate supplementing your report at all, between now and May 15th?

JOHNSON: Do you want me to answer the first question, or - -

BEAUDINE: No, we're moving on.

*Id.* at 284-87. In the Supplemental Memorandum, Attorney Beaudine explained that he instructed Johnson not to answer these questions in order to gain a strategic advantage during the upcoming deposition of Peter Fogarty, Lexington's business interruption losses expert witness. Doc. No. 575 at 5 (stating that Attorney Camp's questions were "clearly designed to elicit testimony – Mr. Johnson's criticisms of Mr. Fogarty's analysis and opinions – that would provide a glimpse into the planned areas of inquiry by B&G's counsel of Mr. Fogarty . . . .").[28]

### 2. May 14, 2009 – Peter Fogarty.

On May 14, 2009, one day before the close of expert discovery, Attorney Beaudine took Fogarty's deposition in Providence, Rhode Island. Doc. No. 526-7. Even though B&G's counsel received additional Treasure Island room folios on May 4, 2009, and, by May 8, 2009, determined that 138 pages of those room folios had not been produced to Lexington, neither Attorney

---

[28] Fed. R. Civ. P. 30(c) permits an attorney to instruct a witness not to answer a question only (1) when necessary to preserve a privilege, (2) to enforce a limitation ordered by the Court, or (3) to present a motion for a protective order. Attorney Beaudine did not state any of these reasons for instructing Johnson not to answer questions on the record during the deposition. In the Supplemental Memorandum, Attorney Beaudine attempts to justify his instructions by transparently pretextual arguments. He argues that answers to Attorney Camp's questions would effectively permit Johnson to rebut Fogarty's opinion, in violation of the Court's instruction that rebuttal expert reports would not be permitted. Doc. No. 575 at 4. The Court had not, however, entered any order limiting the scope of examination of experts during depositions. Rather, as discussed herein, on December 30, 2008, during a discussion of deadlines to serve expert reports, the Court reminded counsel that rebuttal expert reports had not been authorized in the case management order, but counsel were aware that they could request leave to serve rebuttal reports by motion. Doc. No. 575-3 at 12-13. Moreover, if Attorney Beaudine truly believed that his instruction to Johnson not to answer was proper, he could have contacted the Court to schedule a telephone hearing to resolve the issue, *see id.* at 47, or he could have followed up his oral motion to limit Johnson's deposition by filing a written motion for a protective order with the Court, as required by Rule 30(c)(2). He did not avail himself of either option.

Beaudine nor any other representative of B&G told counsel for Lexington that B&G and its counsel possessed 138 pages of Treasure Island room folios that had not been produced.

Several pages of the transcript of Attorney Beaudine's interrogation of Fogarty, before he disclosed that B&G had located additional room folios, reflect his intention to demonstrate that Fogarty's analysis of room occupancy at Treasure Island during the twenty-two days between Hurricanes Frances and Jeanne and immediately following Hurricane Jeanne was inaccurate because it was based on an incomplete set of room folios. *See, e.g.,* Doc. No. 526-7 at 95-100, 116-18.[29] For example, the following exchange occurred:

BEAUDINE:      . . . Let's say from September 8 through the 15[th], you would agree you didn't have a complete set of room folios for that period of time, did you?

FOGARTY:      No.  We don't have a complete set.  It's never been supplied to us.

BEAUDINE:      All right.  And then you don't have any for the period after. You have three guests but, essentially, from September 15 on, with the exceptions of those three . . . , you don't have any other room folios reflected for the guests that stayed there, correct?

FOGARTY:      We're missing folios.  No question about it.

BEAUDINE:      . . . . [O]ther than those that you specifically listed, do you have any knowledge as to who stayed at the Treasure Island during September of 2004?

FOGARTY:      I don't believe so, no.

CAMP:          Let me just note for the record that the room folios that are the basis

---

[29]  As such, Attorney Beaudine's argument in the response to the motion that he "never intended to question Mr. Fogarty about documents that had not yet been produced," Doc. No. 532 at 12, is sophistry.

of this discussion were requested by Lexington well over a year ago, and were not produced in any form until January of 2009, at which point we were presented with what we were told were the room folios for Treasure Island,[30] and which are reflected in Mr. Fogarty's report. . . .

BEAUDINE:    Let me also say that I don't know precisely the form of the request you're referring to for the room folios, so I can't speak to that. I can't say whether or not you specifically asked for room folios. I'm saying Lexington, not Mr. Fogarty.

During the course of the litigation, I will say and agree that on January 9 of this year we produced a set of room folios. . . . [W]e decided to avoid further discussion and debate over whether those should be produced, and we produced what we believed to be the room folios for Treasure Island. We produced those on January 9th.

We never heard one word since then from anyone, Mr. Fogarty or anyone representing Lexington that the room folios were apparently incomplete. We did not come to realize that until you submitted your expert report . . . .

And at that time we saw that you were making an issue of it in this, your expert report, and we went back to verify whether or not your list of the room folios was accurate based on what we produced. . . . I think every line item in your exhibit is correct, but it does appear that there is a gap . . . from September 15 through the end of the month . . . .

It was unclear to the extent to which the documents exist but there is a gap. . . . And so after receiving his report and being notified for the first time that there was an issue in this respect, we went back and started searching again.

It is unclear why not all of the room folios were supplied. . . . But we have found additional room folios. If you want them, as you say, we're more than happy to supply them.

*Id.* at 117-21.

---

[30] Camp identified Attorney Berringer as having "represented that these are the room folios for Treasure Island." *Id.* at 121.

L.      Counsel for B&G's Admissions Regarding the Importance of the Room Folios to Lexington.

In its memorandum in opposition to the Motion for Sanctions, Doc. No. 532, B&G made several admissions of fact that establish B&G is aware that it caused prejudice to Lexington by its failure to disclose approximately 188 pages of room folios that it did not produce until May 18 and May 29, 2009.  The following statements appear in B&G's memorandum:

> Lexington asked B&G to produce room folios showing guest stays at the Treasure Island Resort ("Treasure Island").  Lexington believed that Treasure Island was not open to the general public before Hurricane Jeanne struck, and if that were true, Lexington argued, this fact would undermine B&G's business interruption claim.

Doc. No. 532 at 1-2.

> In order to probe B&G's position, Lexington asked for room folios to see who was staying at Treasure Island.  The partial set of room folios that B&G produced on January 9, 2009, led Lexington's expert (Mr. Fogarty) to conclude that Treasure Island was not renting any rooms to the transient public after Hurricane Frances and before Hurricane Jeanne.

*Id.* at 14-15.

> The additional room folios that B&G more recently located reveal dozens of transient guests who stayed at Treasure Island from September 8 through September 23, 2004, just before Hurricane Jeanne struck the area.  Mr. Fogarty (and Lexington) can no longer maintain, consistent with the additional folios, that Treasure Island was closed before Jeanne.

*Id.* at 3.

> Lexington is complaining now only because the additional room folios produced [in May 2009] – the same folios that B&G allegedly "withheld" from Lexington – undercut the theory that Treasure Island was closed to the public before Hurricane Jeanne, a notion that was given life only from the incomplete production of folios.

*Id.* at 7.

Had all of the available room folios been produced on January 9, 2009, Lexington would not have been able to use the folios to support that argument, because the additional folios confirm that Treasure Island was in fact open before Jeanne. What Lexington is really complaining about is the removal of a factually flawed ground for attacking B&G's business interruption claim.

*Id.* at 17.

In sum, B&G unabashedly contends that it is entitled to benefit from the prejudice to Lexington resulting from B&G's late production of Treasure Island room folios.

## III. APPLICABLE LAW.

A.    <u>Sanctions for Violation of Discovery Orders</u>.

Rule 37(b)(2)(A) sets forth sanctions for violation of a discovery order, including the following:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii)   striking pleadings in whole or in part;

(iv)   staying further proceedings until the order is obeyed;

(v)    dismissing the action or proceeding in whole or in part;

(vi)   rendering a default judgment against the disobedient party; or

(vii)  treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). "Instead of or in addition to" these sanctions, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or

other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

B.    Sanctions for Violation of the Duty of Supplementation.

Federal Rule of Civil Procedure 26(e) requires "[a] party who has made a disclosure under Rule 26(a)–or who has responded to an interrogatory, request for production, or request for admission–[to] supplement or correct its disclosure or response" in two enumerated instances:

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

(B) *as ordered by the court.*

Fed. R. Civ. P. 26(e)(1)(emphasis added). "The obligation to supplement disclosures and discovery responses applies whenever a party learns that its prior disclosures or responses are in some material respect incomplete or incorrect." Fed. R. Civ. P. 26 Advisory Comm. Notes (1993).

Fed. R. Civ. P. 37(c)(1) provides that when a party fails to supplement its disclosures in accordance with Rule 26(e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial. . . ." Fed. R. Civ. P. 37(c)(1). Additionally, the Court may "order payment of the reasonable expenses, including attorney's fees, caused by the failure," or "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." The only exceptions to this requirement are when the "failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

C.    Court's Authority to Enforce Its Pretrial Orders.

Fed. R. Civ. P. 16(f)(1)(C) gives the Court the authority to enforce its pretrial orders upon motion or *sua sponte*. The Court may impose the sanctions authorized by Rule 37(b)(2)(A)(ii) - (vii). "Instead of or in additional to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses – including attorney's fees – incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2).

## IV.    ANALYSIS.

A.    B&G Violated the April 11 Order and the June 25 Order Requiring Production of the Treasure Island Room Folios, and the January 7 Order Establishing the Time Within Which Supplementation of Discovery Must Be Made.

On August 17, 2007, Lexington served RFP 1, in which, in Request 97, it unambiguously requested that B&G produce every document that "constitutes, embodies, records, or memorializes room folios or bills for each stay, by location, from August 13, 2004 . . . for each **Property** for which you assert a business interruption claim." Doc. No. 202-2 at 31. In February 2008, B&G stated categorically that "no responsive documents will be produced" in response to Request 97. Doc. No. 202-6 at 35-36. Lexington filed the Renewed Motion to compel production of information and ESI responsive to Request 97, among other requests. Lexington correctly argued that the room folios for Treasure Island and other B&G properties "are computer stored and computer generated documents," which Plaintiffs "maintain in the ordinary course of business, and [which] are the back-up documents for Plaintiff's accounting records." Doc. No. 178 at 14. B&G chose not to file a response to the Renewed Motion. On April 11, 2008, I granted the Renewed Motion as unopposed. I ordered B&G to produce all documents responsive

to the requests at issue, including Request 97, on or before April 30, 2008.

On May 27, 2008, Lexington filed its first motion for sanctions against B&G. Doc. No. 202. It asserted, among other things, that B&G had not produced ESI as specified in Request 97 and other requests, as required by the April 11 Order. On June 25, 2008, I again ordered B&G to produce, on or before July 11, 2008, all information responsive to Request 97, among others, in electronically stored format.

On July 29, 2008, B&G testified during a Rule 30(b)(6) deposition that from August 17, 2007, through July 29, 2008, it did not search IQWare, the property management system in which room folios were electronically stored in the regular course of business, for Treasure Island room folios. Lexington presented evidence that it was unable to locate any Treasure Island room folios in B&G's discovery production as of December 15, 2008. After Lexington made this prima facie showing that B&G violated the April 11 and June 25 Orders, the burden shifted to B&G to produce evidence showing "an impossibility to comply with the discovery orders." *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989). B&G failed to carry its burden.

The evidence before the Court establishes that, if it had made reasonable efforts to comply with the Court's orders, B&G would have been able to produce all of the Treasure Island room folios it eventually produced within the time required by each order. The evidence establishes that B&G did not begin searching for Treasure Island room folios until mid-to-late December 2008, and that it produced Treasure Island room folios only on January 9, 2009, May 18, 2009, and May 29, 2009.

The record before the Court shows that the relevant Treasure Island room folios have been in B&G's possession, custody, or control at all times in this lawsuit; that B&G could have produced them on or before April 30, 2008, as required by the April 11 Order; and that B&G could have produced them on or before July 11, 2008, as required by the June 25 Order. Therefore, B&G violated both the April 11 Order and the June 25 Order by failing to produce Treasure Island room folios by the dates required in each order.

The January 7 Order required the parties to make all supplemental disclosures responsive to written discovery requests on or before January 30, 2009. B&G partially complied with this order by producing the Treasure Island room folios stored in IQWare on January 9, 2009. Curiously, B&G argues that *Lexington* should have known that this production was incomplete. B&G presented no evidence to support that argument.[31]  More importantly, B&G had the obligation to continue to search for Treasure Island room folios to ensure that it completely supplemented its response to Request 97, as required by two Court orders, before January 30, 2009.  It did not do so.  As such, B&G violated the January 7 Order by failing to produce the Treasure Island room folios in B&G's off-site storage by January 30, 2009.

Finally, the January 7 Order directed that if either party located additional information responsive to discovery requests after January 30, 2009, that party must disclose and serve the

---

[31]  If, as B&G now contends, it was obvious that the January 9, 2009 production of Treasure Island room folios was incomplete, B&G should have directed Martin to continue the search she began in December 2008 to locate all the Treasure Island room folios in B&G's possession, including those in off-site storage. *See also* Doc. No. 554 at 44-45 (in which I admonished B&G's counsel that they needed to talk with their clients and make sure that "you've gathered what you needed to gather, corrected anything that needed to be corrected, added anything that needed to be added.").

belatedly-discovered information no later than five business days after its counsel discovered the supplemental information. Attorney Beaudine received additional Treasure Island room folios on May 4, 2009. He did not serve them on Lexington until May 18, 2009, ten business days after he received them, and three days after the close of all discovery. B&G's failure to produce the additional Treasure Island room folios within five business days also violated the January 7 Order.

B. B&G's Violations of the Discovery Orders Were Not Substantially Justified.

"[A]n individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" *Devaney v. Continental Am. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citations omitted)). "Rule 37 'places the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust.'" *Hawkins v. Fulton County*, 96 F.R.D. 416, 421 (N.D. Ga. 1982)(quoting Fed. R. Civ. P. 37 Advisory Comm. Notes (1970)).

No reasonable person could conclude that B&G's failure to search for and timely produce all Treasure Island room folios responsive to Request 97, after being ordered twice to do so, was reasonable or justified. Nevertheless, B&G argues that, because it did not intend to rely on the Treasure Island room folios, and because Lexington did not specifically ask about them until Attorney Camp inquired about them in December 2008, B&G had no reason to know that its productions were incomplete. This argument attempts to shift to Lexington the burdens and obligations imposed on B&G by Federal Rule of Civil Procedure 34 and the Court's orders. The duty to obey Court orders applies irrespective of whether the opposing party demands such

38

compliance. *See, e.g.,* Fed. R. Civ. P. 16(f)(1)(C).

Moreover, B&G and its counsel offer no evidence, other than self-serving statements, to support their contention that they had no reason to know that B&G's earlier productions of documents did not include the Treasure Island room folios. On the contrary, as I often admonished B&G and its counsel, they could not rely on the completeness of B&G's earlier productions, particularly because their actual experience demonstrated to them that B&G's presuit collection of documents, which was all that was contained on the Target Hard Drive, was incomplete. *See, e.g.*, Doc. No. 325. B&G testified during a Rule 30(b)(6) deposition on July 29, 2008, that B&G had not searched for Treasure Island room folios as of that date.[32]  As of December 8, 2008, Attorney Berringer had never looked at the Introspect database from which B&G made its discovery productions, and, thus, he had no basis to conclude that the Treasure Island room folios were contained therein or had been produced.

B&G had the obligation to search diligently for and produce all requested Treasure Island room folios in response to the April 11 and June 25 Orders. The Treasure Island room folios B&G ultimately produced were always within B&G's possession and were readily accessible once B&G conducted a diligent search for them. As such, this case is factually distinct from *Dorsey v. Academy Moving & Storage, Inc.,* 423 F.2d 858 (5th Cir. 1970), and *Marianjoy Rehabilitation*

---

[32]  Attorney Berringer argues in his affidavit in support of the Supplemental Memorandum that "Lexington's counsel made it clear that the question [to the corporate representative] was limited to what the <u>deponent</u> was asked to do [regarding searching for room folios] . . . ." Doc. No. 575-2 ¶ 3.  This after-the-fact reasoning directly conflicts with Attorney Berringer's repeated admonitions to opposing counsel during the Rule 30(b)(6) deposition that the witness was not testifying as an individual.  *See, e.g.,* Doc. No. 526-8 at 74, 108.

*Hospital v. Williams Electronics Games, Inc.*, No. 94 C 4918, 1996 WL 411395 (N.D. Ill July 19, 1996), relied upon by B&G and its counsel.  In *Dorsey*, the Fifth Circuit reversed sanctions of dismissal and prohibiting introduction of evidence on certain claims based on the plaintiff's failure to provide complete supplemental responses to interrogatories and to produce documents because, among other things, Plaintiff Dorsey established that she did not have the responsive information in her possession, and that she was attempting to obtain it from nonparties.  423 F.2d at 860-62.  Similarly, in *Marianjoy*, the plaintiff established that it did not possess the records that were belatedly disclosed when it responded to the defendant's discovery requests.  Furthermore, counsel for the plaintiff both informed the defendant that it was searching for additional records and produced them when it obtained them.  1996 WL 411395, at *3.

In the present case, the Treasure Island room folios were always accessible to B&G, but B&G did not make any effort before mid-to-late December 2008 to begin searching for them. After producing a quantity of room folios to Lexington on January 9, 2009, B&G made no effort to determine whether or not the room folios it produced were consistent with summary reports derived from them or to search off-site storage for additional room folios.  B&G did not begin searching for additional Treasure Island room folios until late April 2009, when B&G's counsel determined that B&G might gain a strategic advantage regarding business interruption losses by conducting a more thorough search.  Only after B&G's counsel and B&G's business interruption losses expert concluded, on May 11, 2009, that numerous Treasure Island room folios were still missing, did B&G begin searching diligently for all Treasure Island room folios in B&G's possession, custody and control.  Even then, B&G's counsel did not advise Lexington or the Court that they possessed 138 room folios not previously produced or that B&G's search for

additional Treasure Island room folios was continuing. If B&G had made a reasonable effort to search its own records for Treasure Island room folios that were readily accessible, B&G could easily have found and produced them in time to comply with the April 11, June 25 and January 7 Orders. Therefore, B&G has not established that its failure to produce Treasure Island room folios as requested by Lexington and as required in the April 11 Order, the June 25 Order, and the January 7 Order was substantially justified.

      C.    <u>B&G's Violations of the Discovery Orders Are Not Harmless.</u>

B&G contends that its failure to produce the Treasure Island room folios as required by the Court's orders is harmless because, once produced, those room folios prove that the opinion of Lexington's expert that Treasure Island was not open to the public after Hurricane Frances was founded on a demonstrably false factual premise. As a matter of law, however, "[p]rejudice from unreasonable delay is presumed . . . . Failure to produce documents as ordered is sufficient prejudice, whether or not there is belated compliance." *In re Seroquel Products Liability Litig.*, 244 F.R.D. 650, 665 (M.D. Fla. 2007) (internal citations omitted).

Moreover, B&G's argument demonstrates precisely the reason that Lexington has suffered severe, actual prejudice. B&G's failure to produce all of the Treasure Island room folios as required in the April 11 Order, the June 25 Order, and the January 7 Order gave Lexington, through Fogarty, the factual basis to opine that Johnson's reliance on summary reports was flawed because those reports were not consistent with the room folios produced on January 9, 2009, which showed that only emergency workers stayed at Treasure Island after Hurricane Frances.

Lexington, through Fogarty, was harmed because it did not have all of the Treasure Island

41

room folios in B&G's possession when Fogarty was formulating his opinions. Fogarty did not begin preparing his expert report until March 2009, after the close of fact discovery when all of the Treasure Island room folios in B&G's possession should have been produced. Lexington is not required to accept B&G's after-the-fact conclusion that the belatedly produced room folios completely undermine Fogarty's opinion that Treasure Island was not open to the public after Hurricane Frances.[33]  Further, assuming that the late-produced room folios, in fact, undermine Fogarty's opinions, Fogarty would have had an opportunity to evaluate those folios, which are still incomplete, in addressing the sufficiency of the summary reports on which Johnson relied.

B&G also argues that Lexington knew or should have known that B&G's production of Treasure Island room folios was incomplete and, accordingly, Lexington relied to its peril on the incomplete production. *See, e.g.,* Doc. No. 532 at 15 n.9.  B&G cites no evidence to support the argument that Lexington knew before the close of fact discovery that B&G had not produced all room folios for Treasure Island.  Moreover, in light of the three orders requiring B&G to produce all Treasure Island room folios and to complete supplementation of discovery by specific dates, Lexington, through Fogarty, was entitled to rely on the Treasure Island room folios produced by

_____

[33]  B&G has not produced evidence to the Court to support its assertion that the belatedly produced room folios show that members of the public stayed at Treasure Island after Hurricane Frances, and Lexington has not had an opportunity to test this assertion because discovery was closed before these additional room folios were produced.  Thus, B&G deprived Lexington of an opportunity to contact the individuals who purportedly stayed at Treasure Island after Hurricane Frances to determine, for example, whether they actually stayed at Treasure Island or were housed at another B&G property; the condition(s) of the room(s) in which they stayed at Treasure Island; or whether they sought or were given a refund because the hotel was not habitable. This prejudice cannot be cured this late in these proceedings.

B&G as being all that B&G had in its possession, custody or control.

Finally, the timing of the production of Treasure Island room folios after the close of all discovery was especially detrimental to Lexington's ability to conduct full discovery and to prepare its defenses for trial. Dispositive and *Daubert* motions were due to be filed on June 12, 2009, and trial is scheduled for November 2009. Doc. No. 122. "[A]s a discovery deadline or trial date draws near, discovery conduct that might have been 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and the Court." *In re Seroquel Products Litig.*, 244 F.R.D. at 665 (internal citation omitted).

     D.    <u>Severe Sanctions Are Necessary Based on B&G's Stubborn Disobedience of the Orders of the Court</u>.

Lexington asks that the Court dismiss the amended complaint based on B&G's continuing refusal to comply with discovery orders and its obligations under the Federal Rules of Civil Procedure. It asks, alternatively, that the Court preclude B&G from presenting evidence of business interruption losses at Treasure Island. Because dismissal of the amended complaint is a case-dispositive sanction, the presiding district judge must make that determination. I will, therefore, address the request for that sanction in a separate Report and Recommendation.

Sanctions for discovery violations that are not case dispositive are properly resolved by a magistrate judge. *See, e.g.*, *Merritt v. Int'l Bhd. of Boilermakers*, 649 F.2d 1013, 1016-17 (5th Cir. June 2, 1981).[34] Accordingly, I consider here Lexington's alternative request that B&G be precluded from presenting evidence regarding one element of B&G's asserted damages –

---

[34] Decisions of the United States Court of Appeals for the Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

business interruption losses at Treasure Island caused by Hurricane Jeanne.

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999). The determination of appropriate sanctions under Rule 37 is within the district court's sound discretion. *See Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 642 (1976).

> The magnitude of sanctions awarded is bounded under Rule 37 only by that which is "reasonable" in light of the circumstances. Permissible purposes of sanction[s] include: 1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney.

*Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985) (internal citations omitted). The Court should impose the least onerous sanction the Court finds necessary to meet the purposes the Eleventh Circuit outlined in *Carlucci*. *See Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 481-82 (11th Cir. 1982). The Court need not find that the party or its counsel acted willfully or in bad faith before imposing Rule 37 sanctions, unless the sanction is dismissal of the complaint or entry of a default judgment. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994).

Even before this lawsuit was filed, B&G knew that Lexington intended to rely on the room folios to evaluate any business interruption losses that B&G attributed to Hurricane Jeanne. HSNO requested the room folios during settlement discussions before B&G filed the original complaint. Lexington formally requested production of the room folios in Request 97 of RFP 1. In its Renewed Motion to compel production of the room folios, Lexington told B&G and the Court why the room folios were necessary to determine whether Hurricane Jeanne caused any

business interruption losses at Treasure Island. Lexington explained that it had reason to believe that Treasure Island was not generally open to the public after Hurricane Frances, and that only the requested room folios would show whether members of the public stayed at Treasure Island after Hurricane Frances and before Hurricane Jeanne.

The Court issued two orders requiring B&G to produce all documents, including ESI, responsive to Request 97 – the first on April 11, 2008, and the second on June 25, 2008. Despite these orders, B&G admitted on July 29, 2008, through the testimony of its corporate representative during a Rule 30(b)(6) deposition, that it had not searched IQWare for the Treasure Island room folios in response to Lexington's document requests or as required by the Court's orders. Attorney Berringer defended this Rule 30(b)(6) deposition on behalf of B&G. There is no evidence that he took any steps to require B&G to search for the Treasure Island room folios, promptly or otherwise, after learning that B&G had not searched for them.

During the two days of evidentiary hearings regarding B&G's failure to produce ESI in the form specified in Request 97, and other requests made by Lexington, neither Attorney Berringer nor anyone else on behalf of B&G revealed that B&G had room folios that were in electronic form in the IQWare system but that were not within the Target Hard Drive, which contained materials gathered by B&G in 2006, and that the Treasure Island room folios had not been produced to Lexington. On September 24, 2008, Attorney Berringer told the Court that B&G was doing another "due diligence check" for discoverable information, but it is apparent that, if any search was done, it did not include searching for Treasure Island room folios responsive to Request 97.

When Attorney Beaudine first appeared in the case as counsel for B&G, he commented on the extensive discovery disputes in this case, observing that litigating such disputes was "not the way I try to practice. I think really counsel should try to resolve these things and really what it's done is just drive up the cost for everybody . . . ." Doc. No. 375 at 19. Yet, Attorney Beaudine continued the same discovery misconduct that has been B&G's *modus operandi* throughout this case.

Attorney Beaudine did not cause B&G to conduct a complete search for Treasure Island room folios before the close of discovery. He admitted that he did not require a search for missing room folios to be performed until he focused on the room folio analysis in the expert report of Peter Fogarty, in which Fogarty relied on the limited number of Treasure Island room folios produced to opine that B&G's expert was relying on insufficient summary data. Attorney Beaudine then instructed B&G's business interruption losses expert, Stan Johnson, not to answer questions posed by Lexington's counsel regarding whether additional Treasure Island room folios that had not been produced existed to prevent Johnson from revealing Beaudine's planned cross-examination of Peter Fogarty regarding the incomplete set of Treasure Island room folios on which Fogarty relied in forming his expert opinions.

Most egregiously, after he received a large number of Treasure Island room folios on May 4, 2009, Attorney Beaudine did not disclose their existence to counsel for Lexington within five business days as required by the January 7 Order. Rather, he made a calculated, strategic decision to withhold the documents from Lexington to prevent Fogarty from using them to prepare for his deposition on May 14, 2009. Beaudine continued to withhold them for three days after expert discovery closed to prevent Fogarty from evaluating their impact on his opinions regarding

46

business interruption losses at Treasure Island caused by Hurricane Jeanne. Withholding the room folios from Lexington enabled Attorney Beaudine to lay a trap during Fogarty's deposition, which he evidently intended to spring at trial, by questioning Fogarty about the documentary foundation for his opinion that Treasure Island was not open to the public after Hurricane Frances.

Because B&G did not produce the Treasure Island room folios served on May 18, 2009, within the time required by the January 7 Order, and because that failure was neither substantially justified nor harmless, Fed. R. Civ. P. 37(c)(1) automatically precludes B&G from using these documents in support of a motion, at a hearing, or at trial.

B&G argues that exclusion of the late-produced Treasure Island room folios at trial would give the jury a false version of the facts. B&G's argument supports the conclusion that simply precluding B&G from using the late-produced folios will not cure the unfair prejudice to Lexington because, among other things, the dispute regarding the basis for the information relied upon by the business interruption losses experts would remain unresolved.

After carefully considering several possible sanctions,[35] I conclude that the most appropriate, nondispositive sanction is to prohibit B&G from presenting any evidence in support of a motion or response, at a hearing, or at trial regarding business interruption losses at Treasure Island caused by Hurricane Jeanne. As part of this sanction, the portion of the expert witness report of Stan D. Johnson setting forth his opinion regarding business interruption losses

_____

[35] Because fact and expert discovery has closed, and dispositive motions have been filed, reopening discovery would significantly delay this litigation and increase expenses to all parties.

at Treasure Island caused by Hurricane Jeanne will be stricken, and B&G will be prohibited from presenting Johnson's testimony or otherwise relying on his opinion or other evidence regarding these damages in support of a motion or response, at a hearing, and at trial. Additionally, B&G will be prohibited from introducing the Treasure Island room folios into evidence or relying on the information contained in them for any purpose.

As it has in the past, *see, e.g.*, Doc. No. 440 at 454, B&G may argue that this severe sanction should not be imposed on it because the decisions regarding B&G's discovery in this case were made by its lawyers, not B&G.[36] The affidavits of Martin, Berringer, and Beaudine show that B&G's in-house counsel, Bruce DelValle, and legal assistant Katherine Martin made decisions regarding, and personally participated in, the conduct which resulted in the late production of Treasure Island room folios to Lexington. Moreover, I warned B&G and its in-house counsel repeatedly and unequivocally that B&G could not blame the conduct of its outside

---

[36] On July 31, 2009, Soneet Kapila, the Creditor Agent appointed under the plan of reorganization in B&G's bankruptcy case, made an unauthorized filing in which he requested that the Court not impose sanctions on B&G because doing so would harm bankruptcy creditors of B&G. Doc. No. 574. As of the writing of this Order, Kapila had not entered an appearance in this case, or otherwise established that he is the real party in interest for Plaintiffs. Even though he admits that he had personal knowledge of the Motion of Sanctions as of July 22, 2009, Kapila did not file a motion requesting leave to file a response to that motion. More importantly, the Court did not appoint counsel for B&G in this case; counsel chosen by B&G, some of whom also represent B&G in the bankruptcy proceeding, have prosecuted this case. *In re Southeast Banking Corp.*, 204 F.3d 1322 (11th Cir. 2000), which Kapila cited, has no bearing whatsoever on the circumstances of this case. Unlike that case, the Court is not dealing with misconduct by a court-appointed trustee and his attorney, and B&G's creditors have had knowledge of this litigation and the ability to monitor it since the inception of the bankruptcy proceeding. Finally, any incidental harm to B&G's creditors cannot outweigh the prejudice caused to Lexington as a result of B&G and its counsels' stubborn refusals to abide by orders of this Court.

counsel to avoid discovery sanctions. *See, e.g.*, Doc. No. 460 at 43. Yet, the pattern of refusal

to comply with Court orders has continued. Because B&G is responsible for the conduct of its

counsel, sanctions against it are warranted. *See, e.g., State Exch. Bank v. Hartline*, 693 F.2d

1350, 1353 (11th Cir. 1982) ("[T]he large sum of money involved, lengthy period during which the

suit remained pending without going to trial, and the changes of counsel suggest that defendants

must have acquiesced in the delays that their attorneys were improperly causing.").

Moreover, sanctions for discovery violations must also address "the institutional values that

Rule 37 is designed to protect. Rule 37 sanctions are imposed not only to prevent unfair

prejudice to the litigants but also to insure the integrity of the discovery process." *Aztec Steel

Co.*, 691 F.2d at 482. If B&G is permitted to hide behind its chosen counsel to avoid discovery

sanctions, "'other parties to other lawsuits would feel freer than we think Rule 37 contemplates

they should feel to flout other discovery orders of other District Courts.'" *Id.* (quoting *Nat'l Hockey

League*, 427 U.S. at 643).

Lexington is also entitled to be compensated for the reasonable expenses it has incurred,

including expert's and attorney's fees and costs. Rule 37(b)(2)(B) requires the Court to "order

the disobedient party, the attorney advising that party, or both, to pay reasonable expenses,

including attorney's fees caused by the failure" to comply with a Court order. "[A] motion for

sanctions under Rule 37, even one which names only a party, places both that party and its

attorney on notice that the court may assess sanctions against either or both unless they provide

the court with a substantial justification for their conduct." *Devaney*, 989 F.2d at 1160. Thus, "a

party listing only its opponent in a motion for sanctions does not absolve the opponent's attorney

of potential liability. Instead, the movant merely provides the court with the double option of

holding responsible either the opponent or the attorney either under the motion or *sua sponte*."
*Id.*[37]

Both Attorney Berringer and Attorney Beaudine advised B&G regarding production of the Treasure Island room folios. Attorney Berringer informed the Court that B&G was conducting another "due diligence" search for documents, including ESI, that Lexington requested and I ordered to be produced. Yet, even after attending a deposition in which B&G's corporate representative revealed that IQWare had not been searched for requested room folios, Attorney Berringer did not require a prompt search for and production of the room folios.

Similarly, at the close of the reopened sanctions hearing, Attorney Beaudine represented to the Court that Lexington already had all documents regarding Treasure Island, without determining that, in fact, B&G had made all reasonable efforts to produce all documents that Lexington requested in its RFPs and that the Court had ordered be produced. Attorney Beaudine did not take steps to ensure that B&G searched thoroughly for all room folios in its possession before the expiration of the period for supplementing responses to written discovery requests established by Court order. Finally, in flagrant disregard of the January 7 Order, Attorney Beaudine deliberately and deceptively withheld from Lexington 138 Treasure Island room folios he received from B&G on May 4, 2009, until May 18, 2009, after the close of all discovery. Only after Lexington filed the instant motion did Beaudine attempt in his May 29, 2009, letter to concoct

---

[37] B&G and its counsel have been advised of the reasons for an award of sanctions through Lexington's Motion for Sanctions and the Court's Order and Notice of Opportunity to Respond, and they have filed responses. Therefore, due process has been satisfied.

a cover story to partially, but not fully, explain his deceptive actions.

Both Attorney Berringer and Attorney Beaudine "have conducted themselves in a manner not befitting officers of the court. It is axiomatic that attorneys owe a duty of candor to the court. Moreover, attorneys also have a duty to deal honestly and fairly with opposing counsel. [Attorneys Berringer and Beaudine] have clearly failed to fulfill these duties." *See Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1522 (11th Cir. 1986). "Our judicial machinery is dependent upon the full support of all members of the bench and bar. Advocacy does not include 'game playing.' Conduct such as that engaged in here must not, can not and will not be tolerated." *Id.* at 1522-23.[38] Accordingly, Attorney Berringer and Attorney Beaudine shall be jointly and severally responsible with B&G to pay Lexington its reasonable expenses.

Counsel and the parties will have an opportunity to resolve the amount of the monetary sanctions to be paid, including the expert expenses incurred regarding Fogarty's work on the Treasure Island business interruption losses. If the parties are unable to resolve the amount to

---

[38] Judge Fay expounded on these same concerns in *Carlucci*, as follows:

Some years ago a very wise and experienced trial judge said, "Professional courtesy is the lubricant that allows the wheels of justice to turn smoothly." The courts of this nation cannot function without the full support of all members of the bar. Attorneys are officers of the court. It is their *primary* responsibility to see that our system of jurisprudence works. . . . Appellant is a member of one of our nation's most respected law firms. Clearly, he should have known his conduct was totally abhorrent to the standards of our profession. No client-large or small, rich or poor, with or without influence-can be allowed to corrupt our system of jurisprudence to protect his, her or its self interests.

*Carlucci*, 775 F.2d at 1454 (Fay, J., concurring) (internal citation omitted).

be paid, Lexington may file a motion for assessment of monetary sanctions.

## V.    CONCLUSION.

For the reasons stated herein, it is **ORDERED** that Defendant Lexington Insurance Company's Motion for Rule 37 Discovery Sanctions (Treasure Island Room Folios), Doc. No. 526, is **GRANTED** in part, as follows:

1.    The expert report of Stan D. Johnson is **STRICKEN** to the extent that it addresses business interruption losses, extra expenses, and corporate expenses incurred at or arising from alleged damage to Treasure Island caused by Hurricane Jeanne, and the Bray & Gillespie Plaintiffs are **PROHIBITED** from offering Johnson's opinion on the Treasure Island business interruption losses, extra expenses, and corporate expenses arising from damage caused by Hurricane Jeanne in support of motions or responses thereto, during hearings, or at trial;

2.    The Bray & Gillespie Plaintiffs and their counsel are **PROHIBITED** from offering or otherwise relying upon the Treasure Island room folios for any purpose and are **PROHIBITED** from relying upon other evidence or argument regarding business interruption losses, extra expenses, and corporate expenses incurred at or arising from damage to Treasure Island caused by Hurricane Jeanne in support of motions or responses thereto, during hearings, or at trial;

3.    The Bray & Gillespie Plaintiffs, John B. Berringer, Esq., and Michael J. Beaudine, Esq., jointly and severally, are **ORDERED** to pay to Lexington Insurance Company the reasonable expenses incurred in filing the present motion, including the expert's

and attorney's fees and costs incurred in connection with the preparation of the expert report by and deposition of Peter Fogarty. Counsel and the parties shall confer in a good faith effort to determine the amount of these expenses. It is further **ORDERED** that, on or before August 31, 2009, counsel shall advise the Court in writing of the agreement reached or request a schedule for briefing and filing evidence in support of a motion for assessment of such expenses.

**DONE** and **ORDERED** this 3rd day of August, 2009.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE