IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:07-cv-222-Orl-35KRS

BRAY & GILLESPIE MANAGEMENT, LLC,

et al.,

      Plaintiffs,

v.

LEXINGTON INSURANCE COMPANY, a

Delaware Corporation,

      Defendant.

_____/

**DEFENDANT'S RESPONSE TO OBJECTIONS TO THE AUGUST 3, 2009
ORDER STRIKING B&G'S TREASURE ISLAND BUSINESS INTERRUPTION CLAIM
AND IMPOSING SANCTIONS (DE 576)**

B&G attributes $41 million of its claimed damages to property damage at the Treasure

Island hotel and another $4 million to Treasure Island business interruption losses. DE. 440 at

476-77. The guest room folios for that hotel are highly relevant to those claims, and B&G was

obligated to produce them.  B&G's calculated failure to do so, either timely or in full, warrants,

at a bare minimum, the limited sanction imposed by the Magistrate Judge in the challenged order.

In fact, as the Magistrate Judge expressly acknowledged, that sanction alone cannot address the

"incurable" prejudice to Lexington, leading her to recommend dismissal of the suit altogether. DE 578, pp. 8 - 9.

Lexington requested B&G's room folios before this suit was filed because they were needed to evaluate and adjust B&G's Treasure Island insurance claims, and its claims for the other insured hotels. B&G is a sophisticated business entity, well experienced in insurance claims and in federal litigation over insurance claims, and B&G was represented by experienced counsel during the pre-suit claim adjusting process. Nevertheless, B&G did not produce the room folios. DE 538-2, p.3; DE 526-6. As soon as B&G's amended complaint was served on Lexington in May 2007 (the initial February 2007 complaint never having been served), Lexington formally requested production in this lawsuit of the folios. DE 202-2.

B&G produced some room folios for hotels as to which it does not claim business interruption damages. But, notwithstanding successive court orders, B&G failed to produce any Treasure Island room folios at all for sixteen months after Lexington served its formal requests for them. It was not until January 2009, that B&G finally produced some Treasure Island room folios, and that production was incomplete. On May 14, 2009, the eve of the close of expert discovery and more than two months after the close of fact discovery, B&G disclosed for the first time that it had more of these critical folios that it had never produced to Lexington. These folios indisputably were in B&G's possession when it filed this lawsuit, and should have been produced at the outset of the litigation, not at its very end. DE 576, pp. 25, 29 – 30.

Moreover, although B&G belatedly produced some Treasure Island room folios, it admittedly has destroyed many of the Treasure Island room folios Lexington requested and was entitled to receive. That critical evidence is forever lost to Lexington, to its prejudice in defending against the claimed business interruption and property damage claim with respect to

2

this hotel.  Thus, at a very minimum, the Magistrate Judge's recommended sanction, precluding evidence by B&G on the claim to which these documents relate, is warranted.

B&G's discovery violations are detailed in the recommendation.  No objector denies that the conduct the Magistrate Judge found to be a discovery violation in fact occurred.  Therefore, Lexington will not reiterate those violations at length.  Lexington instead begins with three essential points.

First, B&G itself is largely responsible for the incurable prejudice Lexington has suffered because B&G did not honor either (1) its contractual duty to cooperate with Lexington and preserve the back-up documents relating to its claim even though they were requested during the adjustment process, or (2) the discovery obligations imposed on it as a plaintiff in the federal court system and court orders in this case.  Lesser sanctions were ineffective in procuring B&G's compliance with its discovery obligations imposed by rule and by explicit court orders.  This is so even though B&G and its in-house counsel were well aware of the Magistrate Judge's warnings that additional sanctions could be imposed for continued non-compliance.

Second, as a result of B&G's discovery misconduct, highly material evidence is now destroyed, and other important evidence was produced for the first time only on the eve of trial.  The prejudice to Lexington from B&G's tardy and incomplete production is so severe that it cannot be remedied at this late point in time in the litigation by some lesser sanction.  To do anything less than the Magistrate Judge ordered in DE 576 on the facts here would be to penalize the only innocent party involved -- Lexington -- for the misconduct of B&G.  As the Magistrate Judge stressed, even with the imminent approach of trial in this protracted litigation, "neither the court nor Lexington can have any confidence that B&G has produced all documents and information in its possession, custody or control as requested by Lexington and as ordered by the

Court."  DE 578, p.5.

Third, the bankruptcy creditors, through Mr. Kapila, stepped into B&G's shoes as though they always have been B&G in this case, and hence they are bound by the consequences of B&G's misconduct.  They are not "innocent" new parties, as Mr. Kapila would have it.  The one Eleventh Circuit case he cites as supposedly establishing that they can escape the consequences of B&G's conduct says no such thing, as the Magistrate Judge noted, and his argument is instead at odds with established law.

Under the creditors' theory, only Lexington can be punished for B&G's discovery failures.  That is not the law.  The Magistrate Judge's sanction properly punishes the wrongdoer and alleviates at least some of the resulting prejudice to Lexington.

## ARGUMENT

**I.    B&G'S DIRECT CULPABILITY RESULTED IN IRREPARABLE PREJUDICE TO LEXINGTON'S ABILITY TO DEFEND AGAINST B&G'S TREASURE ISLAND CLAIMS.**

### A.    B&G WAS DIRECTLY RESPONSIBLE FOR THE DISCOVERY VIOLATIONS.

B&G's own discovery misconduct -- not just that of its lawyers -- has irreparably harmed Lexington's defense of the Treasure Island claims.   The conduct of B&G's lawyers certainly compounded and worsened the prejudice, but the fundamental prejudice to Lexington was caused by B&G itself.

B&G ignored its discovery obligations from the very beginning.  B&G anticipated filing this lawsuit in May 2006 and knew the room folios would be important evidence relating to its claims.  Indeed, Lexington had explicitly requested them as part of the claim adjustment process. Moreover, before this suit was filed, B&G's lawyers specifically counseled B&G to preserve

4

documents and records. (*See* Testimony of William Pillsbury, transcript of December 8, 2008 hearing (DE 440), pp. 268 – 269.) This would have preserved the Treasure Island room folios (and the folios of the other hotel for which B&G claims business interruption damages), which were electronically created and stored. DE 576, pp. 10 – 11; DE 583 (Berringer and Reed Smith Objection), p. 8.

The insurance policy imposes a duty on B&G to cooperate with Lexington (DE 171, p. 32) and specifically provides that "[t]he Company may examine and audit the Insured's books and records at any time during the Policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance." DE 171, p.33, ¶ 34. An audit provision such as this is merely one aspect of the insured's broad duty to cooperate in the investigation and adjustment of a claim under the policy, a duty that necessarily includes an obligation to preserve documents and evidence relevant to the insured's claim. *See, e.g., Gayer v. Fine Const. & Elec., Inc.*, 970 So. 2d 424, 426 (Fla. App. Dist. 2007) (noting that insured's duty to cooperate with workers' compensation carrier in "investigating and prosecuting claims...must necessarily include a duty to preserve evidence" and quoting the *General Cinema Beverages of Miami v. Mortimer*, 689 So. 2d 276, 279 (Fla. App. 3 Dist. 1995)): *accord Jimenez v. Community Asphalt Corp.*, 968 So. 2d 668, 672 (Fla. App. 4 Dist. 2007) (noting general duty to cooperate under worker's compensation law includes duty to preserve evidence).

Therefore, B&G was contractually obligated to preserve this ESI as part of its duty to cooperate with Lexington's adjustment of the claim. That is especially the case as B&G knew that Lexington had specifically requested this information during its efforts to adjust the claim.

5

Even apart from B&G's contractual obligations, an obligation to preserve relevant documents and ESI arose at the time it anticipated filing suit.[1] *See, e.g., Optowave Co. v. Nikitin*, 2006 WL 3231422, at *7 (M.D. Fla. Nov. 7, 2006); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-18 (S.D.N.Y. 2003) (*quoting Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)); *Silvestri v. General Mtrs. Corp.*, 271 F.3d 583 (4th Cir. 2001). B&G was so advised by its outside lawyers.

Notably, B&G itself well understood the central relevance of the information in the room folios to this lawsuit. On March 22, 2006, when B&G was planning this suit, B&G's Senior Vice President wrote an email to B&G personnel saying, "I will need to prove that we had guests at T.I. [Treasure Island] just before storm 3 [Jeanne] – what do we have please? – need records from the PMS at that time – . . . . how can we extract this info?" (Defendant's Exhibit 43, previously filed under DE 533.)

Nonetheless, B&G did not act to preserve this crucial ESI (or other relevant ESI) then, or even in May 2006, when its lawyers advised it to do so. DE 276 (App. A, pp. 31 – 38, 50 -53, 65 - 67, 89). It did not do so even when it filed suit in February 2007. It still did not do so in August 2007, when Lexington formally requested ESI, including the Treasure Island room folios, in this lawsuit.

B&G's discovery misconduct with regard to the failure to preserve ESI is set out in detail

---

[1] Federal Rule of Civil Procedure 37(e)'s "safe harbor" provision, precluding sanctions where ESI is purged as a result of routine, good-faith operations, does not apply where, as here, the party had a substantive obligation to preserve the records for litigation purposes long before the ESI was destroyed. *See, e.g.*, Fed. R. Civ. P. 37(f), Advisory Committee Notes (2006) ("The good faith requirement of Rule 37(f) means that a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve."). B&G has made no suggestion that it is protected by this "safe harbor" and any such suggestion would be without merit.

in Lexington's August 15, 2008 Renewed Motion for Discovery Sanctions (DE 276), which Lexington incorporates here.   As explained there, if B&G had taken the required step of instituting a litigation hold to prevent documents then stored on its computer servers from being deleted, as its counsel advised, all the critical ESI, including all room folios, from August 1, 2004 through April 30, 2005 (the most critical time period) would be available to Lexington for trial.   But B&G did not do so.

As a result, the complete set of electronically stored Treasure Island room folios for the critical time period can <u>never</u> be produced for Lexington's use in this litigation.   Instead, as objectors Berringer and Reed Smith admit, "certain folios are no longer in existence." DE 583 p. 22.   In fact, "it was fortuitous that *any* of these room folios were available," since all Treasure Island room folios should have been purged by the end of 2006 because of routine system settings.   DE 583, p. 9 n.13, p. 10.   But this system purge would not have occurred had B&G followed its lawyers' <u>May 2006</u> directions to comply with its legal obligation to institute a document preservation regimen.

In the absence of a litigation hold, a large number of room folios are gone forever.   That is clear from the affidavit of Peter Fogarty (Appendix A), which contains a comparison of:

- The room days rented at Treasure Island from September 8, 2004, right after Frances, through September 24, right before Jeanne, according to B&G's summary statistical reports (called "Early Bird" reports); and

- The room days indicated from all Treasure Island room folios B&G produced in January and May 2009, for those same days in September 2004.[2]

---

[2] In this *de novo* review of the Magistrate Judge's recommendation, the Court may receive and consider further evidence. *See* 28 U.S.C. § 636(b)(1)(C); *Fed.R.Civ.P.* 72(b)(3). *See generally, Williams v. McNeil*, 557 F.3d 1287 (11 Cir. 2009).

The "Early Bird" statistics show 782 room days rented in that time period. Yet, the room folios B&G has produced to date only reflect guest stays for 636 room days in that same time period. Thus, room folios are missing for <u>146 room rental days</u> during the time period between Hurricanes Frances and Jeanne.

The gap is due to B&G's misconduct with respect to the room folios and other requested ESI, which began at the outset, with B&G stonewalling both Lexington's specific request for the room folios and Lexington's request for ESI in general. *See* DE 141 and attachments, DE 142, 160, 169, 178, 181, 202, 330). Although the room folios contain information undeniably relevant to its claims, B&G first refused to produce them at all, objecting they were "irrelevant, immaterial, or not reasonably likely to lead to the discovery of admissible evidence" and "unduly burdensome" to produce. *See* DE 178, pp. 13, 14.

Indeed, the only documents B&G initially produced were copies of materials B&G had given to Lexington pre-suit during the claim adjustment process. See DE 141 and attachments. B&G produced none of the other documents Lexington had sought in August 2007 that were central to B&G's claims in <u>any</u> format until March and April 2008, almost a year after B&G served Lexington with this suit. *See* DE 330. In fact, as the Magistrate Judge found, in its March – April 2008 production of email and other electronically generated documents, B&G directly or through its attorneys "deliberately manipulated the electronically stored information in such a way as to withhold from the defendants the information that had been requested" -- *i.e.,* metadata necessary to conduct a search of the hundreds of thousand of pages involved. DE 330, p. 196; DE 576, p. 9.

As a result, Lexington did not receive ESI from B&G in a form that was "reasonably useable" until late Summer 2008, after the Magistrate Judge ordered B&G to make a compliant

production.  DE 460, pp. 14, 36.  When Lexington finally received a compliant production, its searches established that B&G had not produced its room folios.

B&G did not produce these documents even though, in April 2008, the Magistrate Judge had ordered B&G to produce all the room folios – including the Treasure Island folios -- <u>within 30 days</u>.  DE 181, p. 2.  In violation of that order, B&G did not undertake a systematic effort – or indeed any effort at all – to locate and produce room folios until December of 2008.  DE 576, p. 17.  At the end of December 2008, <u>B&G</u> represented to its lawyers that it had found and was tendering for production a "complete set" of folios.  DE 582, p.2; DE 583, pp. 21-22.  In fact, B&G had not conducted a thorough search of its ESI to find such folios as might remain there, or of other sources.  DE 582, 583, *passim*.

Not until January 2009 -- almost two years after it filed suit -- did B&G produce any Treasure Island room folios to Lexington.  B&G represented to its lawyers that this was a "complete set" of Treasure Island folios.  Those folios confirmed what Lexington's informal information had indicated: The rentals of Treasure Island rooms between Frances and Jeanne were to Belfor employees (the general contractor working on the hotel) or other emergency first responders, such as Florida Power & Light employees.  Lexington's expert, Mr. Fogarty, relied on this folio production in coming to his opinions.  DE 576, pp. 18, 19, 21, 22.

We now know, as detailed by the Magistrate Judge, that even this woefully late January 2009 room folio production by B&G was not complete at all, as B&G had told its lawyers.  In late May 2009, B&G produced additional room folios suggesting some rooms at Treasure Island were rented to the public between Frances and Jeanne.  B&G made this new production <u>after</u> fact discovery had closed, <u>after</u> Lexington's experts had submitted their reports, and <u>after</u> expert discovery had closed.  Yet the documents were readily available to B&G and were found almost

immediately once a B&G employee finally was directed to locate them.  Significantly, earlier in the case, in July 2008, B&G exhibited this same pattern of sluggish production of other documents only after court order, even though those documents were also readily obtained once a B&G employee was tasked to find them.  DE 576, p. 12 n. 13.

This is not simply lawyer misconduct.  This is not simply lawyers disregarding court orders.  This is B&G itself callously disregarding the Court's explicit orders.  The Magistrate Judge found that this pattern of conduct showed "B&G's unrelenting campaign to thwart Lexington's legitimate discovery efforts has caused significant, incurable prejudice to Lexington . . . .  Nondispositive sanctions imposed by the Court have not been effective to induce B&G and its counsel to comply with the Federal Rules of Civil Procedure and this Court's orders."  DE 578, p. 8. (Emphasis added.)  As the Magistrate Judge further found, even now, on the eve of trial, "neither Lexington nor the Court can have any confidence that B&G has produced all documents and information in its possession, custody or control as requested by Lexington and as ordered by the Court."  DE 578, p. 5. (Emphasis added.)  In her words, "[a]t this stage of the proceedings, B&G's misconduct has incurably prejudiced Lexington's ability to defend this case".  DE 578, p. 8. (Emphasis added.)

Thus, B&G cannot absolve itself of the discovery misconduct by blaming its attorneys.  B&G, a sophisticated corporate litigant with in-house counsel, controlled the path that its outside counsel took on its behalf with respect to producing its documents and ESI in this litigation.  In fact, having elected to disregard its lawyers' admonition at the start of this litigation that it should preserve ESI and documents, B&G cannot lay the loss of that critical evidence at the feet of its lawyers.  *See Optowave Co., Ltd. v. Nikitin*, 2006 WL 3231422 at *1 (M.D. Fla. Nov. 7, 2006) (despite warnings not to destroy evidence, defendant allowed crucial electronic evidence

to be destroyed, thus failing to produce it; as a result, defendant not allowed to contest the issue that evidence related to); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943, 945 (11th Cir. 2005) (sanction of dismissal appropriate where plaintiff failed to preserve evidence, notwithstanding fact that it knew where evidence was but ignored defendant's request for evidence).

Instead, by any measure, B&G itself must accept substantial responsibility for its failure to satisfy its discovery obligations. This is especially the case since B&G indisputably knew of the discovery issues and discovery orders. The Magistrate Judge admonished B&G on June 25, 2008 that it was "the <u>Bray and Gillespie companies' responsibility</u> to litigate this case in good faith and in full compliance with all the rules and orders of the court." DE 330, p. 195. (Emphasis added.) She likewise warned B&G in April 2009 that: "[A]t some point, <u>[B&G's] got to be accountable</u> for the actions of their lawyers. And this just seems to me to be another example . . . of the continuing practice of litigation by the plaintiffs in this case of saying, 'Well, once you can prove that I did something wrong, well, then I'll fix it.'" DE. 518-2 at 66:13 - 66:17 (April 2, 2009 hearing). (Emphasis added.)

B&G accordingly was on fair notice of its responsibility to cure the discovery misconduct in a full and timely manner and to abide by the obligations imposed by discovery rules and the court's orders. It quite properly was sanctioned for failing to do so. *See Gratton v. Great Am. Comms.*, 178 F.3d 1373, 1375 (11th Cir. 1999) (affirming trial court's refusal to shift blame for discovery violations to attorney where party "bore 'substantial responsibility' for the discovery misconduct").

It remains only to note that, even assuming B&G bore no responsibility at all for the multiple discovery violations in this case -- as it in fact plainly did -- B&G still must be held

11

responsible for its lawyers' misconduct under the extraordinary circumstances presented here. Lexington certainly had no fault for B&G's failure to preserve the ESI requested by Lexington or for B&G's grossly untimely production of its documents on an incomplete basis. As between two "innocent" parties, the one who could have forestalled prejudice to the other party must be held accountable for the misconduct of its agents creating that prejudice. *See Central Fla. Council of Boy Scouts v. Rasmussen*, 2009 WL 2781540 *2 (M.D. Fla. Aug. 28, 2009) (where any other sanction not cure the harm the attorney's misconduct caused to the party seeking sanctions, dismissal or default may be appropriate regardless of client's fault). The Magistrate Judge's sanction must be affirmed in order to eliminate the prejudice to Lexington.

Indeed, sanctions against a party have been upheld even where the attorney's misconduct related to matters that were quintessentially the attorney's responsibility in the case.[3] *See, e.g., Goforth v. Owners,* 766 F.2d 1533 (11th Cir. 1985) (upholding dismissal with prejudice where plaintiff's counsel failed to submit pretrial statement, attend pretrial conference, or show up for trial; although plaintiff was not personally at fault, defendants suffered significant prejudice). Here, of course, B&G's failure to preserve its own documents and ESI -- as its lawyers advised it to do -- is not something that can be laid at the lawyers' feet alone. B&G must be held accountable for its discovery violations and failure to comply with court orders with respect to the Treasure Island room folios that are central to its claim.

---

[3] Although not controlling on this Court, the Florida Supreme Court has set forth a measured set of factors to determine when a sanction of dismissal can be imposed where the misconduct is solely that of the attorney, not the client. *Kozel v. Ostendorf*, 629 So.2d 817 (Fla. 1993). Those factors fully support the lesser sanction ordered here, as well as the recommended dismissal sanction, even if the discovery violations could be said to be the sole responsibility of B&G's outside lawyers.

**B.     LEXINGTON HAS BEEN SEVERELY PREJUDICED BY B&G'S DISCOVERY VIOLATIONS.**

The prejudice Lexington has suffered to its ability to defend against B&G's damages claims is both undeniable and severe.  Indeed, that prejudice does not end just with hamstringing Lexington's ability to defend against the Treasure Island business interruption claim.  B&G's misconduct also has irreparably prejudiced Lexington's defense of the property damage claim B&G asserts for Treasure Island.  Even now, at the end of discovery and expert work, the Court cannot have "any confidence" in B&G's discovery responses.

The claimed Treasure Island damages are the centerpiece of B&G's case, and always have been.  In turn, the heart of those claims is B&G's assertion that the third 2004 storm, Hurricane Jeanne, broke the back of Treasure Island and forced it to close.  Thus, B&G claims that, though seriously damaged by the first two storms, Treasure Island still was operating at a commercially viable level.  This assertion is central to B&G's claim of $4 million in business interruption claim and $41 million in property losses allegedly caused by Hurricane Jeanne, rather than the first two hurricanes, for which Lexington paid B&G the full policy limits long ago.

Even before this suit was filed, however, Lexington had good reason to believe that the earlier hurricanes (Charley and Frances) had rendered Treasure Island virtually inoperable as to the general public.  All of its rooms were damaged before Jeanne.  Defendant's Ex. 347 (Quigley Deposition), pp. 1 – 22 (previously filed under DE 533).  It appeared that, after Frances, only a few minimally habitable rooms were being occasionally rented, predominantly to construction workers and emergency response organizations.

In short, Lexington had reason to believe B&G's claim that Jeanne was the cause of Treasure Island's demise was false. Because the room folios are the definitive source documents necessary to test the veracity of all B&G's various Treasure Island claims, Lexington requested them during the pre-lawsuit adjustment process. B&G did not produce them, and accordingly Lexington formally requested their production in this lawsuit in August 2007, right after Lexington was served with B&G's complaint. Lexington also sought other important contemporaneous ESI for the crucial time period, such as email traffic to and from hotel managers, including Treasure Island, about storm damage and hotel conditions after each storm. *See, e.g.,* Lexington's First Production Request (DE 202-2), ¶¶ 9, 10, 36, 39, 41, 43, 45, 47, 49, 53, 97.

The room folios were critical to both fact and expert discovery because only they would show to whom, when, for how long, at what price, and on what terms Treasure Island rooms were rented after Frances and after Jeanne.[4]   They would have allowed Lexington to identify neutral eye witnesses with knowledge of the conditions in the 50 or so rooms B&G claims were still "in service" after Frances but before Jeanne – *i.e.,* persons who stayed (or decided not to stay) at Treasure Island at that time. Those witnesses, in turn, could have been asked about the conditions there, such as: Did you check in, and then demand another room, a discount or a refund because of the room's condition? Were the windows boarded up? Was the carpet wet? Did you smell must or mold? Was the wallboard moist? Did the appliances function? Did the

---

[4] A sample from B&G's still incomplete supplemental May 2009 production of Treasure Island room folios is attached as Appendix B, to illustrate the information these source documents contain. Lexington has redacted personal financial information.

elevators function? Did construction activity interfere with peace and quiet? Were common areas, such as the swimming pool, restaurant and bar, available for use?

Simply put, production of the _entire_ set of room folios for the critical time period would have allowed Lexington to undertake a complete evaluation of B&G's claim that Treasure Island was a commercially viable resort hotel after Charley and Frances, and to ask questions of unbiased third-party witnesses in that regard on a timely basis.  That, in turn, could have led to other relevant information refuting B&G's Treasure Island property damage claim as well as the business interruption claim.

Indeed, B&G's property damage experts (CCA) relied on the Treasure Island manager's "rooms out of order" reports after Charley, Frances and Jeanne to support their conclusions as to the amount of damage the storms did to Treasure Island. (_See_ CCA document 400, p.21, a line graph of "out-of-order" rooms, attached as Appendix C.)  But, even if the Treasure Island manager listed a room as "in service" between Frances and Jeanne, it may well have been significantly damaged by Charley or Frances, but rented by someone out of sheer necessity and the lack of facilities elsewhere in the vicinity.  Thus, the persons who stayed in those rooms were vital sources of impartial eyewitness evidence on the critical questions underlying B&G's damage claims.

Because it was not until late May 2009 - - after the close of fact discovery - - that B&G first produced the room folios it contends show persons other than Belfor employees and emergency responders stayed at Treasure Island in the crucial time period, Lexington never got the chance to _timely_ investigate the claimed "general public" room occupancies B&G touts as supporting its damage claims, or to conduct discovery regarding those late-produced documents. Even worse, B&G _can never produce_ a complete set of these crucial room folios for Lexington's

15

use and investigation because B&G deliberately chose to ignore its lawyers' directions and counsel, as well as the discovery obligations imposed by law and contract, and did not preserve the electronic database where the folios were stored.  As a result, Lexington never can do a full investigation based on the complete folio information for the period of time between Frances and Jeanne.

As the Magistrate Judge correctly found Lexington's ability to defend against B&G's Treasure Island claims was irreparably prejudiced by the totality of B&G's discovery misconduct.

## II.   THE PREJUDICE TO LEXINGTON CANNOT BE REMEDIED BY A LESSER SANCTION, AND LESSER SANCTIONS HAVE PROVED INEFFECTIVE.

No lesser sanction than the Magistrate Judge recommends in the challenged order can protect Lexington at this late stage of the lawsuit.   Indeed, the Magistrate Judge herself recognized that such a sanction will not remedy the severe prejudice to Lexington caused by B&G's actions and will not adequately uphold the integrity of the judicial system, leading to her concomitant recommendation of a full dismissal.

Certainly, a continuance is not a sanction on B&G.  To the exact contrary, a continuance would punish and prejudice Lexington, an innocent party, by giving B&G a do-over free pass, causing significant additional expense to Lexington due solely to B&G's misconduct.  *See Goforth v. Owens*, 766 F.2d 1533, 1535 (11th Cir. 1985) (noting that granting continuance "would have punished defendants," the innocent parties, and that because "any further delay would have greatly prejudiced defendants, a lesser sanction than dismissal would not have served the interests of justice."); *accord Vilsant v. Saxon Mortg. Servs., Inc.*, 2009 WL 413724, at *4

16

(S.D. Fla. 2009) (citing *Goforth*, 766 F.2d at 1535, for proposition that continuance is "not appropriate to cure prejudice because it would . . . punish [] the non-offending party").

Lexington already has been forced to spend millions of dollars defending B&G's claims. It should not be forced to start over at this late date because of B&G's discovery misconduct. A continuance at this late stage of the litigation -- requiring new discovery, new expert work, new motion practice, and new trial preparation -- would mean tremendous additional defense costs, for which it is doubtful Lexington ever would receive reimbursement.[5] Mr. Kapila's suggestion that this is the only sanction that should be imposed effectively urges the Court to impose no meaningful sanction against B&G and to disregard the "incurable" prejudice caused to Lexington.

Moreover, the Magistrate Judge has found that her prior, lesser sanctions failed to cause B&G to comply with its discovery obligations. Yet, Mr. Kapila, a stranger to the events, necessarily would have to rely on the managers, owners and personnel of B&G to provide further discovery. Given the pattern of B&G's non-compliance in the past, there is no reason to believe it suddenly will become compliant. In all events, much evidence unquestionably has now been lost forever and cannot possibly be produced to Lexington. A continuance cannot cure the prejudice to Lexington.

The Magistrate Judge has actively supervised discovery throughout this case and is intimately familiar with B&G's discovery misconduct. She held evidentiary hearings and gave fair warning to B&G that continued violations would lead to serious sanctions. The

---

[5] Mr. Kapila, the substitute plaintiff in this case, is a bankruptcy trustee, without assets to satisfy such a sanction. Indeed, he has asserted he cannot be held responsible for monetary sanctions for B&G's misconduct. (DE 604, p.11, n.3) Thus, he is seeking the benefits of B&G's lawsuit, while attempting to avoid its burdens.

recommended sanction is merely the most minimal sanction that can even remotely approach protecting Lexington from the discovery abuses of B&G. *See Vilsant*, 2009 WL 413724, at *4 (affirming striking of pleading as sanction for discovery abuse where "[a] lesser sanction that would cure this prejudice is not readily apparent," and less severe attempts to enforce discovery rules, including order to compel and prior sanction order, had been unsuccessful).

## III.   THE SANCTION IS ENTIRELY PROPER UNDER CONTROLLING LAW.

"Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton*, 178 F.3d at 1374; *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982). A judge's determination of appropriate sanctions under Rule 37 should be based upon what is "reasonable" in light of the circumstances. *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1453 (11th Cir. 1985). Factors that can be considered when determining what is reasonable include: "1) compensating the court and other parties for the added expenses caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney." *Id.*

The Court does not need to find that the party or its counsel acted willfully or in bad faith before imposing Rule 37 sanctions, unless the sanction is dismissal of an entire claim or entry of a default judgment. *See BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994). The limited sanction at issue in this order - - merely precluding evidence by B&G of Treasure Island its claimed business interruption damages -- is entirely appropriate, even if B&G had not acted in bad faith. *See Langley v. Union Elec. Co.*, 107 F.3d 510, 513-515 (7th Cir. 1997) (upholding sanction of precluding evidence on claim of defective product where plaintiff was at fault for failing to produce it for inspection and losing it so inspection was not possible, even though plaintiff did not act with willfulness, holding that "'fault' [under Rule 37] is

18

unconcerned with the non-complying party's subjective motivation, but rather 'only [describes] the reasonableness of the conduct-or lack thereof - which eventually culminated in the violation.'") (Internal citations omitted); *see also Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357 (2 Cir. 1991), *superseded on other grounds by rule change as recognized by Johnson Matthey, Inc. v. Research Corp.*, 2002 WL 31235717 at *2 (S.D.N.Y. Oct. 3, 2002) (issue preclusion appropriate sanction for misconduct preventing opponent from discovery on the issue.).

Of course, the Magistrate Judge found B&G acted in bad faith, as part of a tactical scheme to prejudice Lexington's defense of this case. That justifies dismissal altogether, and even further confirms the correctness of this lesser sanction in the first instance.

## IV.   THE OBJECTIONS OF MR. BEAUDINE, MR. BERRINGER AND REED SMITH ARE WITHOUT MERIT.

Most of Reed Smith's and Mr. Beaudine's filings consist of objections to the Magistrate Judge's findings about their own specific culpability, not the findings about B&G's culpability. Lexington does not respond in detail to those objections, but does note the Magistrate Judge closely supervised and observed discovery in this case, held evidentiary hearings, and is thoroughly familiar with the attorney misconduct she addresses in her orders. Her findings of attorney misconduct and false representations in "deliberate or reckless disregard of the truth" (DE 460, p. 40), are amply supported by this record.

It also goes without saying that lawyers, as officers of the court, have a special, heightened responsibility to assure compliance with court orders and to assure their representations to the court are correct. *See, e.g., Stuart I. Levin & Assocs, P.A. v. Rogers*, 156

F.3d 1135, 1141 (11th Cir. 1998) (finding attorney, as counsel of record, "owed a duty to the court to comply with the court's orders"). That responsibility was ignored in this case.

Mr. Berringer and Reed Smith attempt to cast the Magistrate Judge's orders as being based only on "discovery activity relating to the Treasure Island room folios that occurred *after* March 30, 2009. . . ." DE 602, p. 6 - 7; DE 583, p. 3 (emphasis in original). This is incorrect. As those orders plainly state, her recommendations are based on the "totality" of B&G's cumulative discovery misconduct (DE 578, p. 2). That course of action began with B&G's failure to preserve ESI with the litigation hold urged by its lawyers, and was followed by patently invalid objections to producing room folios, sluggishly delayed document productions, document productions that were not compliant with its obligations under federal rules, and failure to produce Treasure Island room folios promptly when ordered to do so in April 2008. The events after March 2009 are but the latest sad chapter. Furthermore, discovery misconduct occurring as discovery comes to a close is especially egregious and prejudicial.

In much the same vein, Mr. Berringer and Reed Smith assert that the Magistrate Judge's first sanctions order, entered on June 25, 2008, dealt only with the "format," not the "scope," of B&G's initial production. (DE 602, pp. 6 – 7.) That ignores the importance of compliance with the ESI "format" requirements imposed by the federal rules. Where ESI "format" requirements are violated in a large document production such as this, the other party is hamstrung in its ability to determine exactly what has and has not been produced.

That is exactly what happened in this case. Because B&G's ESI was produced without metadata in March and April 2008, Lexington could not search the produced documents in any effective manner, to ascertain what information was - - and was not - - contained among the hundreds of thousands of pages of unorganized documents tendered by B&G.   It accordingly

was not until the Fall of 2008 - - after B&G was forced to comply with the ESI "format" production requirements of the rules -- that Lexington was able to discern that B&G still had not produced the Treasure Island room folios when it produced its ESI, despite the Magistrate Judge's orders to do so.    This delay prejudiced Lexington's discovery efforts and trial preparation.  It cannot be dismissed, as Reed Smith would have it, as a mere technical violation. That is especially the case as the improper "format" of the March - April 2008 productions was the result of "deliberate" manipulation of B&G's ESI to eliminate metadata.

Reed Smith and Mr. Beaudine contend that Lexington has not been prejudiced by the late production of room folios in May 2009 because, in their view, the belatedly-produced folios do not help Lexington, but instead undercut Lexington's defense by showing that Treasure Island rooms were being rented to the general public between Frances and Jeanne. DE 602, p. 14; DE 582, p. 15.  But that misses the point: Lexington is not required to accept B&G's after-the-fact conclusion that the belatedly produced room folios defeat Lexington's position.  Instead, the very reason Lexington was entitled to <u>timely</u> production of these late folios was so Lexington could engage in investigations and discovery to ascertain if the proposition B&G urges - - *i.e.,* that those persons were "members of the general public" - - is in fact accurate.   In addition, information from such witnesses about their stay could lead the jury to conclude the condition of the rented rooms was such that the most or all the physical damage to them was done by Charley or Frances, not by Jeanne.

This argument also ignores altogether B&G's destruction of <u>other</u> room folios that might explain or impeach B&G's claim, as well as emails that might bear on the information in the room folios.  Neither Mr. Beaudine nor Reed Smith offers any excuse why B&G should not be

held accountable for failing to preserve all this crucial evidence.   In fact, as noted by the Eleventh Circuit, such an

> argument disregards the institutional values Rule 37 is designed to protect.  Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the judicial process.  [Plaintiff's] contumacious conduct justified the district court's dismissal of the entire action.  If we were to hold otherwise, "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other District Courts."

*Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 481-82 (11th Cir. 1982) (quoting *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)).

Mr. Beaudine argues that B&G should not be sanctioned for not timely complying with the Magistrate Judge's April 11, 2008 order because, according to him, "Lexington never raised an issue regarding B&G's production of Treasure Island room folios" until December 15, 2008. DE 582, p. 2.  This assertion ignores that it took Lexington a significant period of time after it received a database containing metadata to resolve technical uploading issues and then to search the database to ascertain what was and was not present.  See Appendix D (affidavit of John Camp).  It also ignores the legal obligation of B&G to itself locate and produce the folios that Lexington had expressly requested and that were the subject of court orders, regardless of when Lexington again "raised an issue" about the production.  *See Props. Int'l Ltd. v. Turner*, 706 F.2d 308, 310 (11th Cir. 1983) (finding failure to obey court orders sanctionable, even if party requesting discovery never moved court to compel such discovery); *see also* Fed. R. Civ. P. 37(b)(2)(a) (authorizing sanctions for party's failure to obey discovery orders).

This argument amounts to nothing more than asserting that, because Lexington did not act as B&G's hall monitor, B&G should be excused for being delinquent.  B&G's violation of

court orders cannot be avoided by blaming the party who sought and obtained the orders in the first place.

Finally, Mr. Beaudine argues that, "because B&G did not realize the [January 9, 2009] production of Treasure Island room folios may have been incomplete" until [reading Mr. Fogarty's March 30, 2009, report], it was only then that a duty to supplement arose." DE 582, p. 14. This ignores that B&G was ordered to produce all room folios in April 2008, and the duty to make a proper search arose at that time.  B&G's failure to make a complete production in the first instance was the result of its failure to make a timely or proper search.  As the Magistrate Judge found, "if it had made reasonable efforts to comply with the Court's orders, B&G would have been able to produce all of the Treasure Island room folios it eventually produced within the time required by each order." DE 576, p. 36.

In addition, B&G had been ordered to supplement document productions by January 30, 2009, and hence it had a duty to determine the completeness of its document productions prior to that court-ordered date.  Instead, as the Magistrate Judge found, "B&G, through its counsel, deliberately and deceitfully withheld until after the close of all discovery Treasure Island room folios that always were in B&G's possession, some of which B&G's counsel received on May 4, 2009, in order to gain an unfair strategic advantage against Lexington." DE 578, p. 4.

## V.   MR. KAPILA STANDS IN THE SHOES OF B&G AND CANNOT AVOID SANCTIONS FOR B&G'S MISCONDUCT.

Mr. Kapila, bankruptcy trustee for the "Creditor-Plaintiffs," argues that they should not be bound or "prejudiced" by the actions of B&G.  To the contrary, as the Eleventh Circuit held in *In re Halabi*, 184 F.3d 1335, 1337-38 (11th Cir. 1999):

> [T]he trustee succeeds only to such rights as the bankrupt possessed; and the trustee is subject to all claims and defenses which might have been asserted

against the bankrupt but for the filing of the petition ... [the] Trustee stands in the shoes of the Bankrupt . . . . He is not an innocent holder for value, but takes title to property of the Bankrupt subject to all liens and equities.

(Quoting *Bank of Marin v. England*, 385 U.S. 99, 101 (1966) and *In re Troy*, 490 F.2d 1061, 1064 (6th Cir. 1974)).

Thus, when one enters a case as the successor to the original plaintiff, the successor's status in the litigation -- like the substantive claims [the successor] raise[s] or defend[s] -- tracks the positions of the original litigants. . . . If [for example][the predecessor] failed to comply with its discovery obligations, leading the judge to deem a critical fact established under *Fed.R.Civ.P.* 37(b)(2)(A), the substituted plaintiff could not avoid that sanction. A successor takes over without any other change in the status of the case.

*Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc.*, 53 F.3d 851, 852 (7th Cir. 1995) (internal citations omitted) (emphasis supplied). Indeed, as the *Coreq* court observed, "any other approach would make a shambles of litigation . . . and require the court to start the case from scratch." *Id.* at 598; *see also In re Bernal*, 207 F.3d 595, 598 (9th Cir. 2000) (successor party stands in the shoes of its predecessor "with respect to all phases of the litigation."). In short, a trustee who assumes a debtor's assets takes only what the debtor has, with all attendant risks and encumbrances, and "stands in the shoes" of the debtor.

In *In re Mi-Lor Corp.*, 348 F.3d 294 (1st Cir. 2003), the First Circuit directly addressed the rights held by a creditor trustee substituted as the party in interest for Chapter 11 debtors during litigation. In that case, the debtor had brought an adversary proceeding against its corporate principals seeking to recover for alleged misuse of corporate funds. *Id.* at 298. The defendants asserted those claims were barred because the debtor had executed a release in favor of the defendants regarding the alleged misconduct. *Id.* The First Circuit remanded the case to determine the enforceability of the release. If the release was enforceable, this would bar the

24

creditor trustees' claims because they merely "stood in the shoes" of the debtor as substituted parties in interest and took the debtor's asset as they found it. *Id.*

Despite the fact the "Creditor-Plaintiffs" are a substituted party in interest, and thereby stand in the shoes of B&G in this lawsuit, Mr. Kapila, their representative, asserts that *In re Southeast Banking Corp.*, 204 F.3d 1322 (11th Cir. 2000) is "directly on point" and shields them from B&G's prior litigation misconduct. As correctly explained by the Magistrate Judge, that case involves entirely different circumstances and is not controlling here.

In *Southeast Banking*, a Chapter 7 trustee brought an adversary proceeding for the bankrupt estate. *Id.* at 1324. The trustee sought discovery from the defendants in violation of numerous orders staying discovery, which resulted in district court dismissing the post-appointment case. *Id.* at 1329-1330. The Eleventh Circuit reversed, holding that "<u>on the facts of this case</u>, dismissal is not justified," expressing "the concern that innocent parties who were unable to choose their own representatives might be injured through no fault of their own." *Id.* at 1334-35. The Court, however, emphasized "the limited nature of [its] holding" and stressed it did "not foreclose the possibility that, in a future case, dismissal will be justified as a sanction for violation of court orders." *Id.*

In that case, then, the misconduct was <u>not</u>, as here, the debtor's own litigation misconduct. Instead, it was the trustee's post-appointment misconduct that gave rise to the sanction. In that case, the creditors were passive spectators, who had the misconduct of the court-appointed Trustee and the Trustee's attorney unwillingly thrust upon them. *See id.*

Conversely here, these creditors knowingly stepped into the shoes of B&G and assumed the litigation asset as they found it, with all of its benefits and its burdens. The law firms of Latham Shuker, Eden & Beaudine, LLP and Reed Smith, LLP, who were intimately involved in

25

the discovery issues in this case, were both appointed by the bankruptcy court to pursue this case for B&G as bankruptcy debtor-in-possession. Reed Smith had been counsel of record in this case since the Spring of 2008. Latham Shuker lawyers attended the September 24, 2008 hearing in this case, and acknowledged knowing of previous discovery disputes. DE 375, pp. 17 – 19 (Sept. 24, 2008 Discovery Conference Transcript).

The creditors are deemed to have the knowledge their lawyers possess. *See Link v. Wabash R. Co.*, 370 U.S. 626, 633-634 (1962) (dismissal of claim based on misconduct of attorney affirmed, where attorney was party's agent and party "is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney'").

All of B&G's discovery conduct, the sanctions orders entered by Magistrate Judge Spaulding, and Lexington's May 2009 sanctions motions seeking dismissal (DE 526, 529), were matters of public record when the "Creditor-Plaintiffs" voted to confirm B&G's reorganization plan and thereby become successor plaintiffs in this case. Thus, during B&G's reorganization negotiations and before the bankruptcy plan confirmation in July 2009, the creditors should have known of the status of this litigation, the prior sanctions orders, and the then-pending Amended Motion for Sanctions.

But this is more than a matter of constructive knowledge. Indeed, in an August 6, 2009 bankruptcy hearing on the Motion to Remove Creditor Agent, counsel for B&G testified at length regarding the fact that this information was discussed by the parties in bankruptcy, was included in several bankruptcy filings, besides being available on the Court's docket months

before the bankruptcy plan was confirmed.  *See* Appendix E at 52-53, 83.[6]  Although Mr. Kapila

said he did not recall being told about the latest sanctions motion (DE 526, 529) until July 22,

2009, he admitted that, before confirmation of the reorganization plan, he was aware of

significant problems in this case as to B&G's compliance with discovery obligations and orders.

*See* Appendix E at 107.  The creditors here are wholly unlike the creditors in *Southeast Banking*,

where the trustee himself engaged in misconduct in later proceedings.

Moreover, the misconduct in *Southeast Banking* was nothing like the misconduct here

and did not create the irretrievable prejudice created here for the defendant.  It merely involved

improper efforts to obtain discovery from the defendant in the face of a stay order.  In stark

contrast, this case involves obstruction by B&G of Lexington's discovery rights, willful non-

production of key documents, and inexcusable non-compliance with explicit court orders, all of

which have caused irreparable injury to Lexington's ability to defend.  It also involves

misrepresentations regarding B&G's compliance with court orders, which impairs the integrity

of the judicial system.  On the facts of this case, dismissal, much less the limited sanction

ordered by the Magistrate Judge in DE 576, is the only sanction that can eliminate the prejudice

to the judicial process and to Lexington from B&G's discovery misconduct.

In sum, *Southeast Banking* does not absolve these creditors from sanction for B&G's

discovery misconduct.  To hold otherwise would contravene the paramount interest of assuring

the integrity of the judicial process, and would subject Lexington – the truly innocent party – to

---

[6] Records and proceedings in the related bankruptcy case are judicially noticeable.  *See Fed.R.Ev.* 201; *Schweitzer v. Scott,* 469 F.Supp. 1017, 1020 (C. D. Cal. 1979).  Lexington requests judicial notice of them.  Lexington's attached Appendix E contains the transcript of the August 6, 2009 hearing before the Bankruptcy Court, and the exhibits relevant to testimony in that hearing as to the creditors' knowledge before confirmation of the B&G reorganization plan. Lexington omits other exhibits received in the bankruptcy hearing because they are voluminous and not relevant here.

irreparable prejudice. If B&G had not filed for bankruptcy protection, it still would be prosecuting this case and would have to suffer the consequences of its discovery abuses. The mere transfer of authority to prosecute the case to these "Creditor-Plaintiffs" is no basis to avoid the fully warranted sanction for discovery misconduct in this case, especially to the serious prejudice of Lexington.

## CONCLUSION

Magistrate Judge Spaulding's recommendation of these sanctions is fully warranted given the seriousness of B&G's discovery misconduct and the seriousness of the resulting prejudice to Lexington in not receiving discovery it had been seeking from the outset of this case. Indeed, as the Magistrate Judge expressly recognized in her second report and recommendation (DE 578), these sanctions are not sufficient on the egregious facts of this case, and dismissal of the entire case is required. Nevertheless, Lexington does not oppose the request for an evidentiary hearing so this Court can hear first hand the facts making that clear.

Respectfully submitted,

/s/ Daniel C. Brown
**STEVEN J. BRODIE**
Florida Bar No. 333069
E-Mail: sbrodie@carltonfields.com
**DANIEL C. BROWN**
Florida Bar No. 191049
E-Mail: dbrown@carltonfields.com
**CARLTON FIELDS, P.A.**
4000 International Place
100 S.E. Second Street
Miami, Florida 33131-2114
Telephone: (305) 530-0050
Facsimile: (305) 530-0055

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 22, 2009, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to the following:

Michael J. Beaudine
Daniel H. Coultoff
Latham, Shuker, Eden & Beaudine, LLP
390 N. Orange Avenue, Suite 600
Orlando, FL 32801

John B. Berringer
Reed Smith LLP
22th Floor
599 Lexington Avenue
New York, NY 10022

Jeremy F. Heinnickel
Douglas R. Widin
Luke E. Debevec
John N. Ellison
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Benjamin H. Hill, III
David T. Knight
William C. Guerrant, Jr.
Hill, Ward & Henderson, P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, Florida 33602-2231

Bruce DelValle
Deputy General Counsel
Chief Litigation Officer
Ocean Waters Management
501 N. Atlantic Avenue
Daytona Beach, Florida 32118

/s/ Daniel C. Brown